**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

EMW WOMEN'S SURGICAL CENTER,
P.S.C., *et al.*,

        Plaintiffs,

    v.

ANDREW G. BESHEAR *et al.,*

        Defendants.

Case No.:  3:18-cv-00224-JHM

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR A TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs seek immediate emergency injunctive relief to block Defendants from enforcing an unconstitutional statute that has all but extinguished previability abortion access in the Commonwealth after 15 weeks of pregnancy and is irreparably harming Plaintiffs' patients.  That statute, H.B. 454, 2018 Gen. Assemb., Reg. Sess. (Ky. 2018) (the "Act"), makes it a crime to perform an abortion using the dilation and evacuation ("D&E") method, which is "the most commonly used method for performing previability second trimester abortions" and the only method that can be performed outside a hospital after 15 weeks of pregnancy.  *Stenberg v. Carhart*, 530 U.S. 914, 945 (2000).  The Act is unconstitutional under binding and directly applicable Supreme Court and Sixth Circuit precedent holding unequivocally that a ban on D&E imposes an undue burden as a matter of law.  *See, e.g.*, *id.*  As the Sixth Circuit has made unmistakably clear, a ban on D&E is "simply barred."  *Northland Family Planning Clinic, Inc. v.*

1

*Cox*, 487 F.3d 323, 330 (6th Cir. 2007), *cert. denied*, 552 U.S. 1096 (2008).  Every single court to have considered a comparable law has held it unconstitutional.

Under its unusual and extraordinarily disruptive emergency clause, the premise of which is incontrovertibly undermined by the Governor having held the bill for ten days before signing, the Act became effective the moment the Governor signed it yesterday, April 10, 2018.   As a result, it is *at this very moment* inflicting irreparable harm on Plaintiffs' patients seeking abortions at and after 15 weeks.  The Act has forced Plaintiffs to cancel existing appointments of women in need of abortion care and to turn away women seeking these services—preventing Kentucky women from obtaining an abortion at all, violating their constitutional rights, and irreparably harming them.

Plaintiffs therefore seek emergency relief to block this harmful and unconstitutional law's continued enforcement.  Plaintiffs respectfully request that the Court act on an expedited basis to prevent the Commonwealth from inflicting further irreparable harm on women in need of reproductive health care.[1]

## BACKGROUND

### I.     Abortion in Kentucky

Plaintiffs are EMW Women's Surgical Center ("EMW") and two board-certified obstetrician-gynecologists (the "Physicians") who provide abortion services at EMW.  *See* Declaration of Ashlee Bergin, M.D., M.P.H.,  April 11, 2018 ("Bergin Decl."), attached hereto as Exhibit 1, at ¶¶ 1, 3-5.  EMW is the only outpatient facility in Kentucky licensed to provide

---

[1]  Plaintiffs' counsel hereby certify, pursuant to Fed. R. Civ. P. 65(b), that simultaneously with the present filing, they are attempting to contact defense counsel, by email and telephone, to advise them of Plaintiffs' motion and provide copies of the filings.

abortions.  *Id.* ¶ 5.  Plaintiffs have dedicated their professional lives to providing compassionate health care to women, including abortion care.  *Id.* ¶¶ 4-6.

Women seek abortions for a wide range of personal and medical reasons, including their need to care for the children they already have.  *Id.* ¶ 22 *see also* Declaration of Anne Davis, M.D., M.P.H., dated April 11, 2018 ("Davis Decl."), attached hereto as Exhibit 2, at ¶ 11.  A disproportionate number of abortion patients also struggle with poverty.  Bergin Decl. ¶¶ 6, 24; Davis Decl. ¶ 8.  Women seek abortions in the second trimester—that is, after approximately 14 weeks of pregnancy as measured from the first day of the woman's last menstrual period ("LMP")—for all these same reasons, but often with additional considerations at play.  Davis Decl. ¶ 11.  These additional factors include difficulties in making financial or logistical arrangements to access the clinic, delayed recognition of pregnancy, or the diagnosis of a genetic or anatomical anomaly after the first trimester.  *Id*.

While the vast majority of abortions performed at EMW are first-trimester procedures, Plaintiffs provide care for hundreds of women in need of second-trimester abortion services each year.  Bergin Decl. ¶¶ 10, 21.  As set forth below, for all abortion care starting at 15 weeks, these services had been provided using the D&E method until the Act criminalized the performance of those abortions on April 10, 2018.  *Id.* ¶¶ 15-17, 21.  Because of the Act, EMW has now been forced to cease providing abortions at and after 15 weeks.

## II.     The Act's Ban on D&E Abortions

Over the past fifteen months, the Commonwealth has engaged in sustained attacks on abortion access, including attempting to shut down the Commonwealth's only abortion clinic.[2] The Act is the most recent such effort to obstruct women in need of abortion services.  It is equivalent in all relevant respects to similar statutes recently enacted by other states.  As explained in detail below, every single court to have considered one of these comparable statutes has held it unconstitutional.[3]

The Act makes it a felony, subject to a term of imprisonment of between one and five years, to perform a D&E abortion.  *See* Act, § 2(18); *see also* Ky. Rev. Stat. § 532.060(2)(d) (setting forth penalties for Class D felony).  D&E is the safest and most common method of second-trimester abortion, and the only method available on an outpatient basis after approximately 15 weeks.  *See* Davis Decl. ¶ 7.  It is, as the Supreme Court has explained, "the usual abortion method in [the second] trimester."  *Gonzales v. Carhart*, 550 U.S. 124, 135 (2007).

---

[2]  *See* Ky. Rev. Stat. §§ 311.727 & .990(32) (2017 statute forcing a woman seeking an abortion to undergo a narrated ultrasound, even if she does not want the experience and averts her eyes and covers her ears), *permanently enjoined by EMW Women's Surgical Center, P.S.C. v. Beshear*, No. 3:17-cv-16, 2017 WL 4288906, at *15 (W.D. Ky. Sept. 27, 2017), *appeal filed*, No. 17-6183 (6th Cir. Oct. 12, 2017); *see also EMW Women's Surgical Center, P.S.C. v. Glisson*, No. 3:17-cv-189, 2017 WL 2726702, at *1 (W.D. Ky. June 23, 2017) (describing preliminary injunction blocking efforts of Kentucky Cabinet for Health and Family Services to shutter the last abortion clinic in the Commonwealth).

[3]  *See, e.g.*, *Whole Woman's Health v. Paxton*, 280 F. Supp. 3d 938, 954–55 (W.D. Tex. 2017) (permanently enjoining enforcement of comparable statute), *appeal filed*, No. 17-51060 (5th Cir. Dec. 1, 2017); *W. Ala. Women's Ctr. v. Miller* ("*W. Ala. Women's Ctr. II*"), No. 2:15-cv-497, 2017 WL 4843230, at *31 (M.D. Ala. Oct. 26, 2017) (same), *appeal filed*, No. 17-15208 (11th Cir. Nov. 22, 2017); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1069 (E.D. Ark. 2017) (preliminarily enjoining enforcement of comparable statute), *appeal filed*, No. 17-2879 (8th Cir. Aug. 28, 2017).

Although the Act does not use medical terminology, it clearly bans D&E.  *See* Davis Decl. ¶¶ 7, 13.  In the first trimester of pregnancy, a surgical abortion is performed by dilating (or opening) the woman's cervix and using gentle suction to empty the contents of the uterus.  Davis Decl. ¶ 10.  Starting at approximately 15 weeks, it is not possible to perform an abortion using suction alone, and physicians performing outpatient abortions use the D&E method.  *Id.* ¶ 12.  A D&E has two steps: (1) sufficient dilation of the cervix to allow the safe passage of instruments, followed by (2) removal of the fetus and other contents of the uterus using instruments, often in conjunction with suction.  *Id.* ¶¶ 12-13.  The procedure takes 10 to 15 minutes to perform.  *Id.* ¶ 13.  Because the opening of the cervix is narrower than the fetus, separation of fetal tissue occurs as the fetus is withdrawn through the cervix.  *Id.*  Thus, while the Act does not use recognized medical terms, it bans D&E by criminalizing the use of surgical instruments to cause separation (or, in the ban's terms, "dismemberment") of a "living" fetus.[4] Act, §§ 1(1)(a), 1(2)(a); *see also* Davis Decl. ¶¶ 7, 13; *Paxton*, 280 F. Supp. 3d at 942 (explaining that "'[d]ismemberment abortion' is not a medical term used by physicians" but that an equivalent statute prohibited D&E).

---

[4]  Specifically, starting at 11 weeks "post-fertilization," which means at 13 weeks as doctors measure pregnancy, from the woman's last menstrual period or "LMP," Davis Decl. ¶ 10, the Act bans an abortion that will result in what it calls "the bodily dismemberment, crushing, or human vivisection" of a fetus. Act, §§ 1(2)(a).  That language is defined as a procedure in which the person purposely "dismembers the living unborn child and extracts portions, pieces, or limbs of the unborn child from the uterus through the use of . . . forceps . . . or a similar instrument that . . . slices, crushes, or grasps, or performs any combination of those actions on, any portion, piece, or limb of the unborn child's body to cut or separate the portion, piece, or limb from the body." Act, § 1(1)(a).  It also "includes a procedure that" fits that description "in which suction is subsequently used to extract portions, pieces, or limbs of the unborn child after the unborn child's death." *Id.*  The Act's narrow exception allows otherwise banned treatment only when necessary "to avert" the woman's "death or . . . serious risk of substantial and irreversible impairment of a major bodily function." Ky. Rev. Stat. § 311.720(9); *see* Act, § 1(1)(b).

D&E is very safe and is the only abortion method available in a clinic after the earliest weeks of the second trimester.  Davis Decl. ¶¶ 7, 16.  For these reasons, it is by far the most prevalent method of second-trimester abortion, accounting for 95% of all abortions starting early in the second trimester.  *Id.* ¶ 7.

The only alternative to D&E is induction of labor, in which physicians use medication to induce labor and delivery of a nonviable fetus.  *Id.* ¶ 16.  In contrast to D&E, induction of labor must be performed at a facility, such as a hospital, with the capacity to admit patients for an extended stay, not an outpatient clinic like EMW.  *Id.*  Unlike D&E, which takes less than 15 minutes to complete, an induction abortion takes anywhere from five hours to three days, and is usually far more expensive than D&E because it is not performed on an outpatient basis.  *Id.*  In addition, inductions require women to go through labor, which is painful, psychologically challenging for some women (particularly those obtaining abortions after receiving a diagnosis of fetal anomaly), and medically contraindicated for some women (including those who have had previous cesarean deliveries).  *Id.* ¶¶ 16-17.  Induction is far less common than D&E nationally and is not available to most women in Kentucky.  *Id.* ¶¶ 7, 16-17; Bergin Decl. ¶ 16.

## III.   The Act Is Currently Inflicting Irreparable Harm on Plaintiffs' Patients

The Act purported to declare an emergency and became effective instantaneously upon the Governor's signature on April 10, 2018.  Act, § 3.  As a result, the Act has forced Plaintiffs to stop performing abortions starting at 15 weeks.  Bergin Decl. ¶¶ 17, 21; Davis Decl. ¶¶ 18, 39. The Act has compelled Plaintiffs to cancel patients' existing appointments and to turn away women in need of abortion services.  Bergin Decl. ¶ 21.  It has resulted in the complete and immediate elimination of outpatient abortion in Kentucky starting at 15 weeks and is—each and

every day it remains in effect—blocking Kentucky women from obtaining an abortion at all. Bergin Decl. ¶ 21.

In recent litigation over comparable D&E bans, states have asserted that because these laws criminalize the performance of a D&E where the fetus is "living," Act, § 1(1)(a), the bans might not extinguish post-15-week abortion care because physicians could try to circumvent them by using separate procedures aimed at causing fetal demise before performing a D&E. As detailed in Point II.B, *infra*, this assertion has been uniformly rejected as factually unfounded by every court before which it has been raised. The record here demonstrates why.

Under the Act, the only D&E that would be legal is one in which a physician had *successfully* induced fetal demise before the abortion. *See* Act, § 1(1)(a). But as the declaration of Dr. Davis makes clear, there are no procedures that the Physicians can use to safely and reliably induce fetal demise.[5] Davis Decl. ¶¶ 18-38. States have invoked three procedures to support the contention that physicians could attempt to cause fetal demise to circumvent a D&E ban: transabdominal injection of digoxin, transabdominal injection of potassium chloride, or transection of the umbilical cord. As every court to have considered the matter has found, none affords a means to circumvent a ban on D&E.[6]

---

[5] Dr. Davis is the Wyeth Ayerst Associate Professor of Obstetrics and Gynecology in the Department of Obstetrics and Gynecology at Columbia University Irving Medical Center. Davis Decl. ¶ 4; *see also W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *26 (finding Dr. Davis "highly credible and knowledgeable about the fetal-demise methods, the strengths and weaknesses of various types of studies, the provision of abortion, and, in particular, the practical realities of provision of abortion in outpatient clinics").

[6] *See Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 145 (3d Cir. 2000); *Paxton*, 280 F. Supp. 3d at 949–52; *W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *18–26; *Hopkins*, 267 F. Supp. 3d at 1060–64; *Evans v. Kelley*, 977 F. Supp. 1283, 1301 (E.D. Mich. 1997).

- Digoxin cannot be relied upon because it often fails to cause demise and when it fails, the proper medical course is to perform a D&E even if demise has not occurred (which the Act forbids).  *Id.* ¶¶ 21-39.  Resorting to multiple injections of digoxin when it fails is medically unacceptable and unstudied.  *Id.* ¶ 26.  Digoxin is also virtually untested before the 18th week of pregnancy, which is when the overwhelming majority of D&Es are performed.  *Id.* ¶ 25; *see also* Bergin Decl. ¶ 10.  It cannot be administered to women with common traits like obesity and fibroids.  Davis Decl. ¶ 23.  And it takes 24 hours to work (when it works); such delays pose a hindrance to many women seeking abortions.  *Id.* ¶ 22; *see also* Bergin Decl. ¶¶ 24, 27.

- Potassium chloride cannot be relied upon because it is an extremely complex procedure that is beyond the capacity of all but a small number of highly trained subspecialists.  Davis Decl. ¶¶ 31-32; Bergin Decl. ¶ 19.  Like digoxin, it cannot be administered to some women with common traits like obesity and fibroids.  Davis Decl. ¶ 31.

- Umbilical cord transection cannot be relied upon because it can be impossible to locate and transect the cord.  *Id.* ¶¶ 33-38.  The procedure is also essentially unstudied.  *Id.*

Moreover, as the record establishes and as every court to have considered the matter has found, each of these procedures would subject women to significant health risks.[7]

- State-mandated digoxin use would subject women to medically unjustified risks, including infection, bleeding, extramural delivery (expulsion of the fetus in a nonmedical setting, which can cause hemorrhage and emotional distress), and substantially enhanced risk of hospitalization.  *Id.* ¶ 28.

- State-mandated use of potassium chloride would subject women to medically unjustified risks, including cardiac arrest and infection.  *Id.* ¶ 31.

- State-mandated use of umbilical cord transection would subject women to medically unjustified risks, including blood loss and uterine perforation.  *Id.* ¶¶ 35-38.

---

[7] *See Farmer*, 220 F.3d at 145; *Paxton*, 280 F. Supp. 3d at 949–51; *W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *18–24; *Hopkins*, 267 F. Supp. 3d at 1060–64.

Given the unfeasibility and medical risks of these procedures, abortion providers in Kentucky do not use them.  Bergin Decl. ¶¶ 18-20; *see also* Davis Decl. ¶ 20 (nationally, only a minority of physicians attempt fetal demise, and only starting later in the second trimester).

*      *      *

In short, there is no way for the Physicians to continue providing abortion services starting at 15 weeks under the Act.  Bergin Decl. ¶¶ 17-20; Davis Decl. ¶¶ 18, 39.  As of April 10, 2018, the Act eliminated outpatient abortion access in Kentucky for all women at and after 15 weeks.  Bergin Decl. ¶¶ 16-17, 21.  It is inflicting acute and irreparable harm each and every day it remains in effect.

**ARGUMENT**

Plaintiffs accordingly seek a temporary restraining order and/or preliminary injunction to prevent the Commonwealth from inflicting further harm on their patients.  Four factors govern this motion, and all weigh overwhelmingly in Plaintiffs' favor.  The Court must consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (internal quotation marks omitted).

These factors are "to be balanced" and "are not meant to be rigid and unbending requirements." *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (internal quotation marks omitted).  "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal. for*

*Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (internal quotation marks omitted).

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (internal quotation marks omitted).

As set forth below and in the accompanying declarations, there can be no question that Plaintiffs readily satisfy this standard. Plaintiffs are strongly likely to prevail on the merits because the Act is plainly unconstitutional under decades of binding and directly applicable Supreme Court and Sixth Circuit precedent; enforcement of the Act is currently inflicting severe and irreparable harm on Plaintiffs' patients and will continue to do so until it is enjoined; the balance of hardships weighs decisively in Plaintiffs' favor; and the public interest would be served by blocking the enforcement of this unconstitutional and harmful statute.[8]

## I.    Plaintiffs Are Substantially Likely to Prevail on the Merits

### A.    The Act's Ban on D&E Is Unconstitutional as a Matter of Law

First, Plaintiffs are strongly likely to prevail on the merits, because dispositive Supreme Court and Sixth Circuit precedent establishes unequivocally that the Act is unconstitutional. The Act prohibits D&E, which is the safest and most common second-trimester abortion method and the *only* method performed on an outpatient basis starting at approximately 15 weeks LMP. *See* Davis Decl. ¶¶ 7, 16. Supreme Court and Sixth Circuit precedent establishes that it is unconstitutional to ban the most common second-trimester abortion method in general, and D&E

---

[8]  The standing of Plaintiffs—as physicians subject to the Act's criminal penalties and the abortion clinic where they work—to assert their patients' rights in this action "is not open to question." *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998); *see also*, *e.g.*, *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987).

in particular.  *See, e.g.*, *Gonzales*, 550 U.S. at 165; *Stenberg*, 530 U.S. at 945–46; *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 77–79 (1976); *Northland Family Planning Clinic*, 487 F.3d at 330 (a prohibition on D&E is "simply barred").  The Act directly conflicts with this precedent, and Plaintiffs are likely to prevail on their claim that it is unconstitutional.

In *Danforth*, the Supreme Court first held that a law banning the principal second-trimester abortion method is unconstitutional.  428 U.S. at 77–79.  *Danforth* addressed a ban on the abortion method that was then "employed in a substantial majority . . . of all post-first-trimester abortions."  *Id.* at 77.  Of the alternative second-trimester methods at that time, one was "used only on an experimental basis" and the remaining two would "force[] a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed."  *Id.* at 77–79.  Given "the *prevalence*" of the banned procedure, *id.* at 77 (emphasis added), the ban had the "effect of inhibiting[] the vast majority of abortions after the first 12 weeks," and it therefore could "not withstand constitutional challenge," *id.* at 79.

The Court reaffirmed the principle that a state may not prohibit the most common second-trimester abortion method, and confirmed its direct application to the very method banned by the Act—D&E—in *Stenberg*.  *Stenberg* struck down a Nebraska law purporting to target an uncommon procedure, D&X, precisely because it was so broadly written that it also banned D&E, which the Court correctly recognized is "the most commonly used method for performing previability second trimester abortions."  530 U.S. at 945.  As the Court explained, the ban "impose[d] an undue burden on a woman's ability to choose a D&E abortion, *thereby*

*unduly burdening the right to choose abortion itself.*"[9]  *Id.* at 930 (emphasis added) (internal quotation marks omitted).

Most recently, the Supreme Court reiterated that a ban on D&E is unconstitutional in *Gonzales*.  Like *Stenberg*, *Gonzales* addressed a statute prohibiting an uncommon abortion method, D&X.  550 U.S. at 146–47.  But unlike *Stenberg*, the law in *Gonzales* was "more specific concerning the instances to which it applie[d]," *id.* at 133, because it restricted only the uncommon method, while preserving access to standard D&E, "the usual abortion method in [the second] trimester," *id.* at 135; *see also id.* at 154.  The Court upheld the restriction *precisely* because it did not reach standard D&E.  *Id.* at 150–54.  Reemphasizing the rule that a ban on the dominant method of second-trimester abortion (that is, D&E) is invalid, the Court reaffirmed its earlier precedent on this exact basis:

> The instant cases, then, are different from [*Danforth*], in which the Court invalidated a ban on saline amniocentesis, *the then-dominant second-trimester abortion method* . . . . Here the Act allows, among other means, a commonly used and generally accepted method, [standard D&E,] *so* it does not construct a substantial obstacle to the abortion right.

*Id.* at 164–65 (emphasis added).

Binding Sixth Circuit precedent interpreting these decisions confirms that a ban on D&E cannot stand.  In *Northland Family Planning*, the Sixth Circuit addressed the constitutionality under *Gonzales* and *Stenberg* of a Michigan statute that, like the Act, prohibited D&E.  487 F.3d at 331.  As the Court explained, "*Gonzales* did not disrupt *Stenberg*'s holding that prohibition of

---

[9]  *See also id.* at 945 ("[U]sing this law some present prosecutors and future Attorneys General may choose to pursue physicians who use D&E procedures, the most commonly used method for performing previability second trimester abortions . . . . *The result is an undue burden* upon a woman's right to make an abortion decision.") (emphasis added).

D&E would amount to an unconstitutional undue burden." *Id.* The Court held in no uncertain terms that "under the framework of *Stenberg* and *Gonzales*," a statute like the Act that "prohibit[s] D&E . . . *impose[s] an unconstitutional undue burden*" as a matter of law. *Id.* at 337 (emphasis added). The Sixth Circuit's binding and directly applicable holding that a ban on D&E is "simply barred" decides this case. *Id.* at 330.

Indeed, *every* court to have addressed a law like the Act that prohibits the D&E method has reached the same conclusion—a ban on D&E "is an unconstitutional burden on a woman's right to choose to have an abortion." *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997); *see also, e.g.*, *Hope Clinic v. Ryan*, 249 F.3d 603, 604–05 (7th Cir. 2001) (per curiam); *Causeway Med. Suite v. Foster*, 221 F.3d 811, 812 (5th Cir. 2000); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 145–46 (3d Cir. 2000). This raft of unbroken authority includes multiple courts that have enjoined the enforcement of statutes nearly identical to the Act within the past year alone. *See Paxton*, 280 F. Supp. 3d at 953–54; *W. Ala. Women's Ctr. v. Miller* ("*W. Ala. Women's Ctr. II*"), No. 2:15-cv-497, 2017 WL 4843230, at *31 (M.D. Ala. Oct. 26, 2017) (same), *appeal filed*, No. 17-15208 (11th Cir. Nov. 22, 2017); *Hopkins*, 267 F. Supp. 3d at 1069. Not one court has reached a contrary conclusion.

Simply put, "the Supreme Court's determinations in *Stenberg* and *Gonzalez*—that laws with the effect of banning the standard D&E procedure result in an undue burden upon a woman's right to have an abortion and are therefore unconstitutional"—are dispositive here, and "[t]his court need look no further." *Paxton*, 280 F. Supp. 3d at 945; *accord Northland Family Planning*, 487 F.3d at 331. D&E is the most common second-trimester abortion method; the Act bans it; and it therefore "impose[s] an unconstitutional undue burden" as a matter of law and must be enjoined. *Northland Family Planning*, 487 F.3d at 337.

13

**B.      There Are No Safe, Feasible Alternatives to the Method Banned by the Act**

As noted above, in recent litigation challenging similar D&E bans, states have sought to defend those restrictions by contending that physicians could try to circumvent the bans by subjecting patients to separate, invasive procedures in an attempt to cause fetal demise prior to performing a D&E.  Those contentions have been uniformly dismissed as legally immaterial and factually incorrect, and not one court has adopted them.  *See Paxton*, 280 F. Supp. 3d at 949–52; *W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *31; *Hopkins*, 267 F. Supp. 3d at 1064.  The Act makes no mention of such procedures, but to the extent the Commonwealth would rely upon a similar argument here, it is unavailing for two reasons.

First, the argument is irrelevant as a matter of law.  A ban on D&E is unconstitutional, irrespective of the availability (or lack thereof) of separate, invasive procedures to attempt to work around it by causing fetal demise.  *See, e.g.*, *Stenberg*, 530 U.S. at 925, 945; *Northland Family Planning*, 487 F.3d at 337; *Paxton*, 280 F. Supp. 3d at 944–45.  Indeed, like the Act, the statute in *Stenberg* effectively prohibited D&E where there is "a living" fetus, but, again like the Act, it did not apply if fetal demise had already occurred.  530 U.S. at 922 (citation omitted).  This fact was not relevant to the Court's decision, even though the Court was well aware of some physicians' attempts to induce fetal demise before an abortion.  *Id.* at 925 (discussing procedures aimed at causing fetal demise after 20 weeks).  If the existence of fetal demise procedures were constitutionally sufficient to uphold a ban on D&E, then it would have been sufficient to uphold the ban in *Stenberg*.  *See Paxton*, 280 F. Supp. 3d at 944–45.  It was not sufficient then and it is not now.

Second, as *every* court to have considered the question has determined, there are no feasible, safe means to continue providing abortions at and after 15 weeks under a D&E ban, and

14

any assertion to the contrary is factually incorrect.[10]  *See* Davis Decl. ¶¶ 18-39.  The "burdens" a

ban on D&E imposes thus outweigh any interest the Commonwealth could assert in its defense.

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016).  As set forth in the

declaration of Dr. Davis and as every court to have addressed the matter has found, *no fetal*

*demise procedure* affords a means to circumvent a ban on D&E because these purported

workarounds are unreliable and/or unfeasible.[11]  *See* Davis Decl. ¶¶ 18-39.  Physicians cannot

rely upon unworkable alternatives to circumvent the ban on the primary abortion method, *see*

*Danforth*, 428 U.S. at 77 n.12, and enforcement of the Act has thus caused women to "lose their

right to pre-viability abortion access at or after 15 weeks," *W. Ala. Women's Ctr. II*, 2017 WL

4843230, at *31.  That is an undue burden by any measure.  *See, e.g.*, *Planned Parenthood of*

*Wis., Inc. v. Schimel*, 806 F.3d 908, 918–19 (7th Cir. 2015).  And, no less fundamentally, as Dr.

Davis's declaration makes clear and as every court to have addressed the issue has found, state-

mandated use of any of these invasive procedures would subject women to significant health

---

[10]  *See Paxton*, 280 F. Supp. 3d at 952 ("The court finds that none of the proposed fetal-demise methods is feasible for any physician other than a specialist in maternal-fetal medicine, without substantial additional training, to induce fetal demise *in utero* in all instances before performing the evacuation phase of a standard D&E procedure."); *W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *31 ("[T]he court concludes that the proposed fetal-demise methods are not feasible for inducing fetal demise before standard D&E at the Alabama clinics."); *Hopkins*, 267 F. Supp. 3d at 1064 ("[T]hese proposed methods are not feasible for inducing fetal demise before the standard D & E procedure Dr. Hopkins and other Arkansas abortion providers perform."); *accord Farmer*, 220 F.3d at 145 ("The increased risk of injury or death to the woman by attempting to ensure fetal demise *in utero* . . . clearly constitutes an undue burden."); *Evans*, 977 F. Supp. at 1318 ("[A]ttempting to ensure fetal demise before commencing a D&E procedure does not eliminate the undue burden . . . upon women seeking second trimester abortions. Quite the contrary, the Court finds that attempting to ensure fetal demise as argued by Defendants would operate as an additional undue burden because it would impose additional medical risks on women seeking abortions.").

[11]  *See Paxton*, 280 F. Supp. 3d at 949–52; *W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *18–25; *Hopkins*, 267 F. Supp. 3d at 1060–64; *Evans*, 977 F. Supp. at 1301.

risks.[12] *See* Davis Decl. ¶¶ 28, 31, 35-38.  That too is an undue burden.  *See, e.g.*, *Gonzales*, 550 U.S. at 161 (abortion restriction that subjects women to "significant health risks" is unconstitutional) (internal quotation marks omitted).

*     *     *

In sum, Plaintiffs are substantially likely to prevail on the merits of their claim.  The Supreme Court and the Sixth Circuit have held unequivocally that a statute that "prohibit[s] D&E . . . impose[s] an unconstitutional undue burden" as a matter of law.  *Northland Family Planning*, 487 F.3d at 337.  The Act does just that, and as a result, it has eliminated abortion access starting at 15 weeks in Kentucky.  *See* Bergin Decl. ¶¶ 16-21; Davis Decl. ¶¶ 18, 39.  There can be no question that Plaintiffs are likely to prevail on their claim that it is unconstitutional.

## II.     The Act Is Currently Inflicting Irreparable Harm on Plaintiffs' Patients

By its extreme terms, the Act took effect instantaneously upon the Governor's signature on April 10, 2018.[13]  As a result, Plaintiffs' patients seeking abortion services at and after 15 weeks are now prevented outright from obtaining the constitutionally protected health care they require.  *See* Bergin Decl. ¶¶ 16-17, 21.  The Act is thus *currently* inflicting substantial, irreparable, and ongoing harm upon Plaintiffs' patients.  Each and every day it remains in effect,

---

[12]  *See Farmer*, 220 F.3d at 145; *Paxton*, 280 F. Supp. 3d at 949–52; *W. Ala. Women's Ctr. II*, 2017 WL 4843230, at *18–24; *Hopkins*, 267 F. Supp. 3d at 1060–64; *Evans*, 977 F. Supp. at 1301.

[13]  This extraordinary and disruptive provision mandating that the Act take immediate effect is anomalous.  "States that have passed similar laws have allowed much longer implementation time." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 797 (7th Cir. 2013).  For example, the nearly identical D&E bans in Alabama, Arkansas, and Texas all provided for approximately 90 days between enactment and enforcement.  *See* Ala. Acts 2016-397, § 11; Tex. Act 2017, 85th Leg., ch. 441, § 22; *Hopkins*, 267 F. Supp. 3d at 1034 (addressing Arkansas D&E ban scheduled to take effect 90 days after legislative adjournment).

it will continue to irreparably harm women in need of pre-viability abortion services at and after 15 weeks, altogether preventing every woman it affects from "making the ultimate decision to terminate her pregnancy before viability" until this Court blocks its enforcement. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992); *see also* Davis Decl. ¶ 9 (pregnancy itself carries risks for a woman; a woman's risk of death associated with childbirth is approximately 14 times higher than her risk associated with abortion; while abortion is extremely safe, delay in accessing care pushes the woman later into pregnancy, which increases the risks).

As the Sixth Circuit has long made clear, "if it is found that a constitutional right is being threatened or impaired, *a finding of irreparable injury is mandated*." *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003) (emphasis added) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed.") (internal quotation marks omitted); *Obama for Am.*, 697 F.3d at 436 (same); *Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("[T]he loss of constitutional rights for even a minimal amount of time constitutes irreparable harm."). Because "the abortion decision is one that simply cannot be postponed, or it will be made by default with far-reaching consequences," *Bellotti v. Baird*, 443 U.S. 622, 643 (1979), the presumption of irreparable harm applies with particular force where the threatened or impaired right is a woman's fundamental right to abortion, *see, e.g.*, *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *Van Hollen*, 738 F.3d at 795–96.

That is unquestionably the case here. The Act criminalizes the performance of the only method of abortion available in an outpatient setting starting at 15 weeks. Davis Decl. ¶¶ 7, 16. It has extinguished abortion access from that point forward in Kentucky. Bergin Decl. ¶¶ 16-17,

21.  As a result, Plaintiffs have been forced to cancel the appointments of all women in need of an abortion at and after 15 weeks and have suspended the provision of those services indefinitely, *see id.* ¶ 21, turning away women whose need for abortion services "simply cannot be postponed," *Bellotti*, 443 U.S. at 643.

The Act is therefore inflicting acute harm on Kentucky women each and every day it remains in effect.[14]  That harm is irreparable, as all courts to have confronted similar laws have held.  *See, e.g.*, *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 824 (W.D. Tex. 2017) ("The court concludes that Plaintiffs have established that absent a temporary restraining order they will suffer irreparable harm by being unable to access the most commonly used and safest previability-second-trimester-abortion procedure ahead of any substantial constitutional review of the act."); *Hopkins*, 267 F. Supp. 3d at 1068–69 (enforcement of D&E ban would inflict irreparable harm on plaintiff physician and his patients "as there is no adequate remedy at law"); *W. Ala. Women's Ctr. v. Miller* ("*W. Ala. Women's Ctr. I*"), 217 F. Supp. 3d 1313, 1347 (M.D. Ala. 2016) ("In the absence of an injunction, Alabama women would immediately lose the right to obtain a pre-viability abortion anywhere in the State when they reached 15 weeks of pregnancy," and so the "irreparable harm" requirement "is satisfied.").

In short, from the moment it took effect, the Act has denied—and continues to deny— women the ability to obtain an abortion at all.  It is blocking women from obtaining the abortion

---

[14]  "The fact that the due process rights implicated by [the Act] are actually those of Plaintiffs' patients is of no consequence."  *Preterm-Cleveland v. Himes*, No. 18-cv-109, 2018 WL 1315019, at *7 n.7 (S.D. Ohio Mar. 14, 2018).  Plaintiffs have standing to assert their patients' rights, and the irreparable harm to their patients must be considered in the irreparable harm analysis of Plaintiffs' request for injunctive relief.  *See, e.g.*, *id.*

services they seek and violating their constitutional rights.  There can be no question that this constitutes severe and irreparable harm as a matter of law.

### III.     The Balance of Hardships Weighs Decisively in Plaintiffs' Favor

It is beyond dispute that Plaintiffs' patients face far greater irreparable injury as a result of the Act's enforcement than Defendants would face if its enforcement were enjoined and the preexisting *status quo* restored.  The Commonwealth "does not have an interest in enforcing a law that is likely constitutionally infirm," *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), which the Act manifestly is, *Northland Family Planning*, 487 F.3d at 337.

As explained by a court confronted by a nearly identical statute:

> [I]n the absence of an injunction, Alabama women would immediately lose the right to obtain a pre-viability abortion anywhere in the State when they reached 15 weeks of pregnancy, whereas all the State will face is that a likely unconstitutional law passed by legislators will not go into effect.  The threatened harm to the plaintiffs clearly outweighs whatever damage or harm a proposed injunction may cause the State.

*W. Ala. Women's Ctr. I*, 217 F. Supp. 3d at 1347; *see also Van Hollen*, 738 F.3d at 795–96; *Whole Woman's Health*, 264 F. Supp. 3d at 824 ("Here, the threatened injury—taking away from women in Texas who seek a constitutionally lawful previability second-trimester abortion, the commonly performed and safe standard D&E procedure before fetal demise—outweighs any damage that a *status quo* temporary restraining order might cause the State."); *Hopkins*, 267 F. Supp. 3d at 1069 (same); *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 3d 416, 423–24 (S.D. Miss. 2013), *aff'd*, 760 F.3d 448 (5th Cir. 2014).  The Commonwealth will suffer no harm from being ordered not to enforce a statute that is unconstitutional under decades of Supreme Court and Sixth Circuit precedent.

That the Act has profoundly disturbed the longstanding *status quo* further confirms that the balance of hardships weighs decisively in Plaintiffs' favor. *See, e.g.*, *Mich. State*, 833 F.3d at 669. "Here, the *status quo* is forty-five years of binding Supreme Court precedent holding that women have the unfettered right to choose whether to terminate, or continue, a pregnancy pre-viability."[15] *Preterm-Cleveland v. Himes*, No. 18-cv-109, 2018 WL 1315019, at *8 (S.D. Ohio Mar. 14, 2018).

In short, the balance of hardships weighs overwhelmingly in Plaintiffs' favor, further demonstrating that preliminary injunctive relief is necessary and appropriate here.

## IV.    A Temporary Restraining Order or Preliminary Injunction Is in the Public Interest

Finally, the interests of Plaintiffs and the public are aligned in favor of granting preliminary injunctive relief in this case. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Mich.*, 796 F.3d at 649 (alteration in original) (internal quotation marks omitted); *accord Mich. State*, 833 F.3d at 669 (same); *Am. Freedom Def.*

---

[15] The fact that the Commonwealth upended this longstanding *status quo* through the Act's immediate effective date does not, of course, change the analysis. When temporary injunctive relief is sought, the *status quo* is the "'last peaceable *uncontested* status existing between the parties before the dispute developed.'" *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (emphasis added) (quoting 11A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). "The 'status quo' in preliminary-injunction parlance is really a 'status quo ante.' This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018) (citation omitted). Plaintiffs filed this challenge to the Act "the very same day it was signed into law," and so "[w]ithout doubt, this is . . . a prohibitory injunction seeking to maintain the status quo." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

*Initiative v. Suburban Mobility Auth. for Reg'l Transp.,* 698 F.3d 885, 896 (6th Cir. 2012) ("the public interest is promoted by the robust enforcement of constitutional rights"); <u>*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*</u>, 23 F.3d 1071, 1079 (6th Cir. 1994) (same).  The only way to ensure that Plaintiffs' patients' constitutional rights are not denied is by enjoining enforcement of the Act.

**V.       A Bond Is Not Necessary in This Case**

Finally, this Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement.  The Sixth Circuit has long held "that the district court possesses discretion over whether to require the posting of security."  *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (emphasis omitted) (internal quotation marks omitted); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (affirming district court decision to require no bond "because of the strength of [the plaintiff's] case and the strong public interest involved").  This Court should use its discretion to waive the bond requirement here, where the relief sought will result in no monetary loss for Defendants.  Moreover, Plaintiffs are health care providers dedicated to serving women in low-income and underserved communities, and a bond would strain the providers' already-limited resources.  Bergin Decl. ¶ 6.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a temporary restraining order and/or preliminary injunction.


April 11, 2018

Respectfully submitted,

s/Amy D. Cubbage
Amy D. Cubbage, Interim Legal Director
ACLU of Kentucky
401 West Main Street, Suite 1200
Louisville, Kentucky 40202
(502) 583-7400
acubbage@ackersonlegal.com

Heather L. Gatnarek
Legal Fellow
ACLU of Kentucky
315 Guthrie Street, Suite 300
Louisville, KY  40202
(502) 581-9746
heather@aclu-ky.org

Andrew Beck*
Talcott Camp*
Elizabeth Watson*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York  10004
(212) 549-2633
abeck@aclu.org
tcamp@aclu.org
ewatson@aclu.org
*pro hac vice motions pending*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was filed on April 11, 2018 using the Court's CM/ECF system. Counsel further certifies that a courtesy copy of the foregoing was served via electronic mail to the following:

M. Stephen Pitt
S. Chad Meredith
Office of the Governor
The Capitol, Suite 100
700 Capital Avenue
Frankfort, Kentucky 40601
steve.pitt@ky.gov
chad.meredith@ky.gov

Andrew G. Beshear
Kentucky Office of the Attorney General
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
Andrew.Beshear@ky.gov

Hans Herklotz
Cabinet for Health and Family Services
275 E. Main Street, 5W-B
Frankfort, Kentucky 40621
Hans.herklotz@ky.gov

S. Travis Mayo
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601-3449
travis.mayo@ky.gov

Thomas B. Wine
Office of the Commonwealth's Attorney
514 West Liberty Street
Louisville, KY  40202
tbwine@louisvilleprosecutor.com

Michael S. Rodman
310 Whittington Parkway, Suite 1B
Louisville, KY 40222
kbml@ky.gov

/s/ Amy D. Cubbage
Amy D. Cubbage, Interim Legal Director
ACLU of Kentucky
401 West Main Street, Suite 1200
Louisville, Kentucky 40202
(502) 583-7400
acubbage@ackersonlegal.com