**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

EMW WOMEN'S SURGICAL CENTER,
P.S.C., et al.,

          Plaintiffs,

    v.

ADAM W. MEIER, et al.,

          Defendants.

Civil Action No. 3:18-CV-00224-JHM
Judge Joseph H. McKinley, Jr.

**PLAINTIFFS' PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Pursuant to this Court's orders dated November 20, 2018 (Doc. 101) and February 1, 2019 (Doc. 117), Plaintiffs Tanya Franklin, M.D., M.P.H., Ashlee Bergin, M.D., M.P.H., (together, the "Individual Plaintiffs") and EMW Women's Surgical Center, P.S.C. ("EMW"), by and through their undersigned attorneys, respectfully submit the following proposed findings of fact and conclusions of law.

**FINDINGS OF FACT**

**The Act**

1.      House Bill 454 (hereinafter "HB 454," "the Act" or "the Ban") prohibits the performance of an abortion starting at 13 weeks[1] that, *inter alia*, "results in bodily dismemberment" of a fetus, unless fetal demise has already occurred. Act § 1(1)(a), (2)(a), (b).

---

[1] Unless otherwise marked, all references to weeks of pregnancy are as measured by a woman's last menstrual period ("LMP"), which occurs approximately two weeks before fertilization. Tr. Vol. I 56:2 – 57:3 (Davis). Therefore, because the text of HB 454 says it bans abortions starting at 11 weeks post-fertilization, that means it bans abortions starting at 13 weeks LMP.

2.      Although "bodily dismemberment" is not a recognized medical term, the term as defined in the statute, *see* Act §1(1)(a), encompasses the dilation and evacuation abortion procedure ("D&E").[2] *See* Transcript of Bench Trial Before Honorable Joseph H. McKinley, Jr. ("Tr.") Vol. I 39:9-20 (Davis); Tr. Vol. II 30:4-20 (Franklin).

3.      The Ban's only exception is "in the case of medical emergency," Act § 1(2)(b), defined as a condition that "so complicates the medical condition of a pregnant female as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function," K.R.S. § 311.720(9); *see* Act § 1(1)(b).

4.      Violation of the Ban is a Class D felony, Act, § 2(18), subjecting a physician to punishment of up to five years' imprisonment, K.R.S. § 532.060(2)(d), and can also expose clinics and physicians to adverse licensing and disciplinary action, *see* K.R.S. § 311.565; K.R.S. § 311.606.

## The Parties

5.      Plaintiff EMW Women's Surgical Center, P.S.C. ("EMW"), located in Louisville, is currently the only outpatient clinic providing abortions in Kentucky. *See* Tr. Vol. II 8:22-23, 12:17 (Franklin); *see also* Pls.' Ex. (hereinafter "PX") 420 (hereinafter, "Bergin Depo.") Ex. 6 ¶ 1; Defs.' Ex. (hereinafter "DX") 39 ¶ 1 (Franklin Discl.).

---

[2] D&E (or "standard D&E") is distinct from D&X ("dilation and extraction" or "intact D&E"). Unlike a standard D&E, the D&X or intact D&E procedure involves greater dilation of the cervix and entails using instruments with the intention of removing fetal tissue from the uterus intact. *See* Tr. Vol. I 43:25 – 44:19 (Davis); *see also* ¶ 23 (describing D&E procedure) *infra*.

6.      EMW provides medication abortion up to 10 weeks and surgical abortion up to 21 weeks and 6 days. Tr. Vol. II 8:17-18 (Franklin); Bergin Depo. Ex. 6 ¶ 4; DX39 ¶ 4 (Franklin Discl.).

7.      Because it is the only clinic in Kentucky providing abortions, EMW treats patients from all over Kentucky, as well as patients from Tennessee, Ohio, Indiana, Missouri, Michigan, West Virginia, and Virginia. *See* Tr. Vol. II 13:3 – 14:5, 28:22 – 29:6 (Franklin); *see also* Bergin Depo. Ex. 6 ¶ 15.

8.      Although most abortions at EMW occur before 15 weeks, EMW provides care each year to hundreds of women starting at 15 weeks using the D&E method. *See* PX108-19; Bergin Depo. 57:21 – 58:23.

9.      Since 2007, more than 99% of abortions performed in Kentucky each year have been performed at EMW. *See* PX120.[3]

10.     Since 2007, less than 1% of abortions performed in Kentucky each year have been performed in hospitals. *See* PX120; *see also* Tr. Vol. II 13:19-20, 21:21 – 23:6 (Franklin).

11.     The Individual Plaintiffs—Tanya Ellis Franklin, M.D., M.P.H. and Ashlee Bergin, M.D., M.P.H—are experienced, board-certified Kentucky obstetrician-gynecologists ("ob/gyn") and currently the only physicians performing surgical abortions (including D&E) at EMW. *See* Bergin Depo. Ex. 6 ¶ 1; DX39 ¶ 1 (Franklin Discl.); Tr. Vol. II 8:19-23 (Franklin).

12.     Dr. Franklin has provided abortions at EMW for over 10 years, *see* DX39 ¶ 1 (Franklin Discl.), and also maintains a busy, private ob/gyn practice, Tr. Vol. II 5:1 – 6:7 (Franklin); *see also* DX39 ¶ 2 (Franklin Discl.). She currently holds the titles of Assistant

---

[3] From 2007 up to and including 2016, EMW's Lexington office performed a small proportion of these abortions. Since the Lexington office closed in 2016, 99% of the abortions performed in the state each year have been performed at EMW Louisville alone. *See* PX120.

3

Professor in OB/GYN & Women's Health and the Director of the Ryan Residency Training Program in Family Planning at the University of Louisville ("UL") School of Medicine. Tr. Vol. II 2:1-25, 4:16-22 (Franklin); *see also* DX39 ¶ 1 (Franklin Discl.). The Ryan Residency Program is an established four-week rotation in the OB/GYN department at UL, through which residents are able to obtain structured training in abortion care, complex contraception, and other family planning topics through both engagement with didactic and reading materials and the provision of patient care. Tr. Vol. II 4:7-20, 7:1-20 (Franklin); Bergin Depo. 9:25 – 10:7. Dr. Franklin also conducts independent research, including on abortion, which is published in peer-reviewed journals. *See* Tr. Vol. II 7:25 – 8:2, 9:20-23 (Franklin).

13.    Dr. Bergin completed a post-residency fellowship in advanced family planning, has provided abortions at EMW since 2015, *see* Bergin Depo. 6:11 – 7:20; *id.* at 9:12-21; *id.* at 22:22-24, and maintains a busy, private ob/gyn practice, *id.* at 14:4 – 15:7; *see also* Bergin Depo. Ex. 6 ¶ 2. She currently holds the titles of Assistant Professor in OB/GYN & Women's Health and the Assistant Director of the Ryan Residency Training Program in Family Planning at the UL School of Medicine. Bergin Depo. 10:12 – 11:19.

14.    The Individual Plaintiffs currently provide more than 99% of the D&E procedures performed in Kentucky, Tr. Vol. II 21:21 – 22:25 (Franklin); *see also* ¶ 9 *supra*, all of which would be banned should the Act take effect, *see* DX39 ¶¶ 8-9 (Franklin Discl.); Bergin Depo. Ex. 6 ¶¶ 7-8; Tr. Vol. II 35:18 – 36:1 (Franklin).

15.    Defendant Adam W. Meier is the Secretary of the Cabinet for Health and Family Services ("the Cabinet"). In his capacity as Secretary, Defendant Meier is charged with, *inter alia*, oversight and licensing of abortion providers and the regulatory enforcement of those facilities. K.R.S. § 216B.0431(1); 902 K.A.R. 20:360, § 5(1)(a). The Cabinet's regulations

4

include the requirement that all abortion facilities ensure "compliance with . . . state . . . laws," including HB 454. 902 K.A.R. 20:360, § 5(1)(a). Defendant Meier is sued in his official capacity.

16.    Defendant Thomas B. Wine serves as Commonwealth's Attorney for the 30th Judicial Circuit of Kentucky. In this capacity, Defendant Wine has authority to enforce HB 454's criminal penalties in Jefferson County, where Plaintiffs are located. *See* K.R.S. § 15.725(1); K.R.S. § 23A.010(1). Defendant Wine is sued in his official capacity.[4]

### Abortion Care in Kentucky

17.    Legal abortion is one of the safest medical procedures in the United States, and is substantially safer than childbirth; a woman's risk of death associated with childbirth is approximately 10-14 times higher than her risk of an abortion-related death. *See* Bergin Depo. Ex. 6 ¶ 3; DX39 ¶ 3 (Franklin Discl.). While always safer than childbirth, the risks associated with abortion increase as pregnancy progresses. Bergin Depo. Ex. 6 ¶¶ 3, 16; DX39 ¶¶ 3, 14 (Franklin Discl.).

18.    Women seek abortions for a variety of complicated medical, familial, economic and personal reasons, including as a result of health concerns, difficult past pregnancies,

---

[4] Michael S. Rodman, Executive Director (ED) of the Kentucky Board of Medical Licensure, and Andrew G. Beshear, Attorney General of the Commonwealth of Kentucky, were also sued in their official capacities. *See* Compl. ¶¶ 9, 11 (Doc. 1). However, both ED Rodman and Attorney General Beshear were dismissed from the case without prejudice subject to their (i) stipulations that neither they themselves nor their personnel would bring any future disciplinary or enforcement action of any kind with respect to Plaintiffs arising from HB 454 or the facts alleged in Plaintiffs' Complaint until this Court enters a final judgment in the matter and any and all appeals have been exhausted, and (ii) agreement that any final judgment in this action will be binding on their offices. *See* Stipulation & Order of Dismissal Upon Conditions of Andrew G. Beshear (Doc. 51), May 21, 2018; Stipulation & Order of Dismissal of Michael S. Rodman (Doc. 52), May 21, 2018.

diagnosed fetal abnormalities, and difficult social circumstances, such as the demands of caring for other family members and any existing children. Tr. Vol. II 19:3-10 (Franklin); Bergin Depo. Ex. 6 ¶ 14; DX39 ¶ 14 (Franklin Discl.).

19.     Women seek abortion in the second trimester for a number of reasons, including delay caused by difficulty making financial or logistical arrangements to access care or fetal diagnosis. *See* Tr. Vol. II 19:18 – 20:6 (Franklin); Bergin Depo. Ex. 6 ¶ 14; DX39 ¶ 14 (Franklin Discl.).

20.     Up to 10 weeks of pregnancy, patients can opt for a medication abortion, which involves taking a series of pills to induce a miscarriage at home. Tr. Vol. I 34:5-10 (Davis). Patients can also obtain a surgical abortion in the first trimester, which entails using gentle suction to empty the contents of the uterus. Tr. Vol. I 34:11 – 35:6 (Davis); *see also* Tr. Vol. II 20:7-19 (Franklin); DX39 ¶ 4 (Franklin Discl.).

21.     Beginning at approximately 15 weeks, suction alone will not reliably empty the uterus, and physicians must use the dilation and evacuation or D&E method of abortion. Tr. Vol. I 35:9 – 36:3, 113:18 – 114:22 (Davis); *see also* Tr. Vol. II 20:20-25 (Franklin); Bergin Depo. Ex. 6 ¶¶ 5, 6, 9; Brady Depo. 121:1-7.

22.     D&E is extremely safe, with major complications occurring in less than 1% of cases. Tr. Vol. I 42:14 – 43:24 (Davis); Tr. Vol. II 33:13-16 (Franklin).

23.     A D&E has two steps: (1) sufficient dilation of the cervix to allow the safe passage of instruments (usually forceps), and (2) subsequent removal of the fetus and other contents of the uterus using instruments, often in conjunction with suction. Tr. Vol. I 40:7 – 42:3 (Davis); *see also* Tr. Vol. II 31:11-23, 32:6-12 (Franklin). Because the opening of the cervix is

narrow, fetal tissue separates as it is withdrawn through the cervix. Tr. Vol. I 42:4-13 (Davis); Tr. Vol. II 31:24 – 32:5 (Franklin).

24.    In Kentucky, over 99% abortions starting at 15.0 weeks are D&Es. Tr. Vol. II 21:21 – 23:6 (Franklin); PX120.

25.    The only alternatives to D&E—induction of labor or hysterotomy—are extremely rare, carry significant risks, and must be performed in a hospital setting. *See* Tr. Vol. I 36:1 – 38:22 (Davis testifying that induction abortions and hysterotomies are hospital-based procedures that are rarely performed and carry significant risks); Tr. Vol. II 33:17 – 35:17 (Franklin testifying that induction abortion must occur in a hospital setting, carries with it many risks, including infection, hemorrhage and retained placenta, and may fail (necessitating the performance of a D&E), and characterizing a hysterotomy as a "morbid procedure where a woman will have a large abdominal incision . . . on her uterus").

26.    Based on data from 2011-2018 showing the types of abortion performed in hospitals in the Commonwealth, less than 1% of abortions in Kentucky are performed using the induction method, and no abortions have been performed by hysterotomy. PX108-119.

**The Proposed Demise Procedures Are Unfeasible and Unsafe**

*Expert Witnesses*

27.    The Court received expert medical testimony concerning the safety, feasibility, and availability of, and existing research on, the use of potassium-chloride injections, digoxin injections, and umbilical-cord transection procedures (together, the "Proposed Demise Procedures") to induce demise prior to D&E from the following witnesses for the Plaintiffs:

a)    Dr. Anne Davis, M.D., M.P.H., the Wyeth Ayerst Associate Professor of Obstetrics and Gynecology at Columbia Medical Center and the Director of the Family Planning Fellowship at Columbia University. Tr. Vol. I 30:15-20 (Davis); *see also* PX21 (Davis CV). Dr. Davis's responsibilities include teaching and direct patient care, and

supervising all of Columbia's abortion care (including D&E). Tr. Vol. I 30:16 – 31:2, 31:18 – 32:8, 188:6-7; PX21 (Davis CV). Dr. Davis testified based on her experience and expertise, including her over two decades' of experience performing abortions, including D&E abortions, training others to perform D&E abortions, and attempting demise, as well as her interactions with colleagues who provide abortions nationwide, and her familiarity with the relevant medical literature. Tr. Vol. I 33:1-19.

b) Dr. Tanya Ellis Franklin, M.D., M.P.H., *see* ¶ 12 *supra.* Dr. Franklin has provided abortions at EMW for the past decade and performs approximately 1,000 per year. Tr. Vol. II 7:21 – 8:16, 8:24 – 9:5. Dr. Franklin testified based on her experience and expertise, including her extensive experience providing abortion and teaching abortion procedures, including D&E abortion, in Kentucky for over a decade, her research and publishing on a variety of medical topics, including abortion, in peer-reviewed journals, her interactions with colleagues who provide abortions nationwide, and her familiarity with the relevant medical literature. Tr. Vol. II 7:1 – 8:2, 9:9-23, 149:2-4; PX24 (Franklin CV).

c) Dr. Ashlee Bergin, M.D., M.P.H., *see* ¶ 13 *supra*. Dr. Bergin testified (via deposition) based on her experience and expertise, including her extensive experience providing abortion and teaching abortion procedures, including D&E abortion, her interactions with colleagues who provide abortions nationwide, and her familiarity with the relevant medical literature. Bergin Depo. 6:7 – 23:15; Bergin Depo., Ex. 6 ¶¶ 1, 2; PX22 (Bergin CV).

d) Dr. Lynn Simpson, a Maternal Fetal Medicine (MFM) specialist trained in OB/GYN and high-risk obstetrics, Professor of Obstetrics and Gynecology at Columbia University Medical Center, the MFM Division Chief at Columbia Medical Center and Columbia's decade-long MFM Fellowship Director. Tr. Vol. I 200:6-8, 201:16-22; *see also* PX23 (Simpson CV). During the course of her career, Dr. Simpson has performed approximately 600-900 KCl injections and trained approximately 50-60 MFMs fellows in KCl injections. *See* Tr. Vol. I 205:22 – 208:11; PX23. Dr. Simpson testified based on her experience and expertise, as well as her research and publication of over 50 peer-reviewed articles in the field of maternal fetal medicine, her interactions with colleagues who provide abortions nationwide, and her familiarity with the relevant medical literature. Tr. Vol. I 208:16 – 209:20.

e) Dr. Steven Ralston, M.D., M.P.H., is a high-risk obstetrician and MFM specialist, and the Chair of OB/GYN at the University of Pennsylvania, a position that entails significant teaching and clinical responsibilities. Tr. Vol. IV 255:19 – 256:11 (Ralston); *see also* PX27 (Ralston CV). In his practice, Dr. Ralston regularly performs—and teaches—a range of advanced, in-utero needle procedures, including fetal intra-cardiac KCl injections. Tr. Vol. IV 259:10 – 263:1. Dr. Ralston testified based on his experience and expertise, including his extensive experience performing needle procedures, including intra-cardiac KCl injections, and training MFMs to perform needle procedures, including intra-cardiac KCl injections, as well as his extensive experience evaluating, and teaching MFMs and ob/gyn residents to

evaluate, fetal development, his experience providing abortion care, his attendance at medical conferences, interactions with MFM and ob-gyn colleagues nationwide, and his familiarity with the relevant medical literature. Tr. Vol. IV 258:4 – 264:13.

### *Fetal Demise is a Minority Procedure*

28.    No professional medical associations recommend inducing fetal demise prior to a second-trimester D&E abortion. *See* Tr. Vol. I 49:10 – 55:6 (Davis discussing PX97, PX8, PX20).

29.    For example, the American College of Obstetricians and Gynecologists (ACOG), the largest medical professional organization for the field of obstetrics and gynecology whose publications are considered to be authoritative and "the gold standard for the [ob-gyn] field," Tr. Vol. I 51:18 – 52:4 (Davis), has concluded that "[n]o evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion." Tr. Vol I 52:5 – 53:12 (Davis discussing and quoting PX8).

30.    The Society of Family Planning (SFP), an academic society devoted to research related to contraception and abortion that serves as the "gold standard" for defining the standard of care in the ob-gyn field, Tr. Vol. I 50:10-17 (Davis), and the Society of Obstetricians and Gynecologists of Canada, the Canadian equivalent of ACOG, Tr. Vol. I 53:13-16 (Davis), have also concluded that there is not sufficient evidence of a benefit from the Proposed Demise Procedures that could justify imposing the known risks and side effects. Tr. Vol. I 49:16 – 51:17 (Davis discussing PX97); *id.* at 53:13 – 55:6 (discussing PX20).

31.    No Kentucky physicians attempt to induce (let alone routinely cause) fetal demise prior to performing a D&E. Tr. Vol. II 36:10-22 (Franklin); PX108-119; *see also* DX39 ¶ 9 (Franklin Discl.).

32.     Data derived from eleven years of induced termination of pregnancy reports, *see* PX108-119, contains only one reported use of potassium chloride in Kentucky out of over 30,000 abortions, *see* PX118 (Meier002893). In that case, potassium chloride was administered by a Reproductive Endocrinology and Infertility (REI) subspecialist at the UL Hospital to treat an ectopic pregnancy, not prior to a D&E. Tr. Vol. II 40:23 – 42:3 (Franklin).

33.     Outside Kentucky, attempting to induce fetal demise prior to D&E is a minority practice. Tr. Vol. I 44:25 – 45:15 (Davis); *id.* at 45:16 – 49:9 (Davis discussing PX107). If the three demise procedures are attempted prior to a D&E at all, they are typically are not attempted until 18 to 20 weeks. Tr. Vol. I 45:16 – 49:5 (Davis discussing PX107); *id.* at 69:5-10.

34.     There is no place in the United States where physicians are legally required to cause demise prior to performing a D&E, as would be required under the Act. The minority of physicians outside Kentucky who currently *attempt* to induce fetal demise before an abortion (e.g., to demonstrate compliance with the federal partial birth abortion ban) can still lawfully perform a D&E in the event that demise fails, which would not be the case under the Act. Tr. Vol. I 121:16 – 122:15 (Davis); *see also id*. at 83:10 – 86:22, 102:5 – 103:12, 109:10-18 (Davis).

35.     There is no reliable evidence that abortion patients prefer that physicians attempt to induce fetal demise prior to performing a D&E. Tr. Vol. I 114:23 – 118:13 (Davis discussing PX60); *id.* at 118:14 – 120:5 (discussing PX51); Tr. Vol. II 169:19 – 172:15 (Franklin); *see also* Tr. Vol. III-B 120:17-25 (Thorp discussing PX60); Tr. Vol. V-B 40:14 – 43:1 (Curlin discussing PX60). But even if some patients preferred fetal-demise procedures, their preference would not justify mandating fetal demise for *every* D&E patient. Tr. Vol. I 120:6-14 (Davis); Tr. Vol. II 208:25 – 209:13 (Joffe).

### *Digoxin*

36.     Digoxin injections are not a feasible means of continuing to perform D&E under the Act because they are unstudied and experimental during the gestational age range when approximately 50% of D&Es in Kentucky occur; because they cannot be administered to many patients; because they have a failure rate of up to 20%; and because the safety and efficacy of repeat digoxin injections in cases where digoxin fails to cause demise are unknown.

37.     Digoxin injections are administered via a long spinal needle inserted through the patient's skin, into her abdomen and uterine muscle, and then into the fetal tissue (for an intra-fetal injection) or amniotic fluid (for an intra-amniotic injection). Tr. Vol. I 57:6-19 (Davis); Tr. Vol. II 52:9-17 (Franklin). These injections are painful, invasive, and emotionally distressing. Tr. Vol. I 70:4-8, 84:11-21, 123:5-7 (Davis); *see also id.* at 207:16-20, 224:12 – 225:11, 260:11-21 (Dr. Simpson discussing other trans-abdominal needle procedures); Tr. Vol. IV 119:16-18 (Berry).

38.     Digoxin injections are virtually untested (e.g., the safety and efficacy is unknown) prior to 18 weeks, *see* Tr. Vol. I 67:25 – 69:10 (Davis); Tr. Vol. II 59:12-18 (Franklin); Tr. Vol. III-B 102:23 – 103:2 (Thorp); Tr. Vol. IV 114:23 – 115:3 (Berry), when approximately 50% of D&Es in Kentucky occur, Tr. Vol. II 56:22 – 59:10 (Franklin); PX128.

39.     Thus, mandated digoxin use before 18 weeks would amount to experimentation on at least 50% of Kentucky D&E patients. Tr. Vol. I 68:7-25 (Davis); Tr. Vol. II 59:12-18 (Franklin).

40.     Even after 18 weeks, a physician cannot determine prior to attempting a digoxin injection whether it can be successfully administered to a given patient. For example, common conditions (i.e., obesity, uterine fibroids, and scar tissue from prior abdominal surgeries like cesarean section deliveries) and/or fetal and placental positioning can make digoxin injections

difficult or even impossible to administer to certain women. Tr. Vol. I 58:21 – 59:23 (Davis); Tr. Vol. III-B 103:12 – 104:13 (Dr. Thorp testifying that obesity and fibroids may make digoxin injections more difficult to administer); Tr. Vol. IV 99:17-24 (Dr. Berry agreeing that obesity and fibroids can make transabdominal injections "[t]echnically more challenging"); *see also id.* at 317:21 – 319:19 (Dr. Ralston testifying that common traits, i.e., obesity, fibroids and scar tissue make intra-uterine needle procedures more difficult); Tr. Vol. I 222:6 – 223:15 (Dr. Simpson testifying that obesity, fibroids and c-section scars can affect the difficulty of performing intra-uterine needle procedures).

41.     Approximately 30% of women have fibroids, Tr. Vol. I 223:9-10 (Simpson); Tr. Vol. II 39:1-5 (Franklin); Tr. Vol. IV 319:5-6 (Ralston), which can be anywhere from one or two centimeters up to the size of a small basketball, Tr. Vol. IV 25:5-10 (Berry); approximately 30% of women who have given birth have had a c-section, Tr. Vol. IV 319:7-9 (Ralston); and obesity is an extremely common condition, both nationally and in Kentucky, Tr. Vol. I 223:5-8 (Simpson); Tr. Vol. II 39:6-7 (Franklin); Tr. Vol. IV 319:3-4 (Dr. Ralston testifying there is an "epidemic" of obesity in the U.S.).

42.     Digoxin is also contraindicated for certain women, including women with certain known fetal abnormalities, multiple gestations, history of cardiac abnormalities, history of digoxin toxicity, hypersensitivity to cardiac glycosides, chronic renal failure, bleeding disorder, or concurrent use of a medication that may reduce clearance of digoxin. Tr. Vol. I 59:24 – 61:22 (Davis); Tr. Vol. III-B 103:3-11 (Thorp).

43.     A physician must wait 24-hours to determine whether digoxin has caused demise, assuming it causes demise at all. Tr. Vol. I 67:13-19 (Davis); Tr. Vol. II 52:1-3 (Franklin). Thus, the use of digoxin would force patients who would have otherwise been able to have a single-day

D&E procedure to make an additional trip to the clinic. Bergin Depo. Ex. 6 (Bergin Discl.) ¶ 11; DX39 (Franklin Discl.) ¶ 10; *see also* Tr. Vol. I 67:20-24 (Davis).

44.     The best available evidence shows intra-amniotic digoxin injections have a failure rate of 15 to 20%. Tr. Vol. I 62:1-7 (Davis); Tr. Vol. II 52:18 – 54:18 (Dr. Franklin discussing PX72); *see also* Tr. Vol. III-B 97:9 – 98:5, 98:14-17 (Dr. Thorp discussing PX72 and admitting approx. 20% failure rate for intra-amniotic digoxin). While evidence shows intra-fetal digoxin injections have a lower failure rate (up to 5%), Tr. Vol. I 62:8-13 (Davis); Tr. Vol. III-B 61:2-4 (Thorp); Tr. Vol. IV 41:10-13 (Berry), evidence also shows that "technical consideration[s] such as placenta location, fetal position, large maternal habitus [obesity], or low amniotic fluid volume" can prevent successful intra-fetal injections in pregnancies at 20–24 weeks nearly 20% of the time, Tr. Vol. I 62:14 – 66:15 (Davis) (discussing PX72); Tr. Vol. II 54:19 – 55:19 (Franklin) (same).

45.     Intra-fetal injections are even more difficult to perform before 20 weeks (i.e., when most D&Es in Kentucky occur, *see* PX108-19), when the fetus is even smaller, Tr. Vol. I 65:20 – 66:15 (Dr. Davis discussing PX72); Brady Depo. 72:16-25; *see also* Tr. Vol. III-B 111:10-25 (Thorp).

46.     If digoxin fails, "the medically appropriate course of action" would be to "do the abortion." Tr. Vol. I 67:10-12 (Davis); *see also id.* at 86:13-22 ("Q. [B]efore you gave the digoxin injection, how important was it to have in your mind that you could always resort to standard D&E if the digoxin failed? A. It was critical, because if I couldn't use the standard D&E, I couldn't complete the procedure, and I would not start a procedure that I couldn't complete. That would be completely outside of medical practice and not safe."); Tr. Vol. II

106:19 – 107:6 (Dr. Franklin testifying that "abandon[ing] women after "inject[ing] a toxic substance into a woman in her pregnancy" is "not good care.").

47.      However, if digoxin fails to cause demise, a physician cannot lawfully perform a D&E under HB 454. Tr. Vol. II 106:19 – 107:2 (Franklin).

48.      The safety and efficacy of repeat digoxin injections after an initial failure are completely unstudied; thus, administering a second dose of digoxin in the case of failure would be akin to venturing into "unknown territory" and a physician would have no "way of knowing if that's a safe thing to do." Tr. Vol. I 66:16 – 67:2 (Davis); *see also* Tr. Vol. II 56:8-21 (Franklin), Tr. Vol. III-B 102:5-19 (Thorp). Without such data, it is difficult for a physician to obtain informed consent for a second dose. Tr. Vol. I 67:3-9 (Davis).

49.      If a physician performed a repeat injection, it would also extend the abortion procedure by at least another day, Tr. Vol. II 146:17-20 (Franklin), and there is no evidence to suggest a second (or third, etc.) injection would be successful if the first was not, Tr. Vol. I 66:20-25 (Davis); Tr. Vol. III-B 102:16-19 (Thorp). Nor is there evidence of the proper dosage for a repeat injection. Tr. Vol I 67:1-2 (Davis).

50.      In addition to being painful, unfeasible, and unreliable, the best available evidence shows that mandating the use of digoxin prior to D&E would subject every woman seeking a D&E to health risks while providing no medical benefit. Tr. Vol. I 55:17-20 (Davis testifying that digoxin "risk/benefit ratio for [a patient] would be unacceptable"), 73:2 – 74:6 (Davis) (discussing PX60); Tr. Vol. II 60:5 – 62:13 (Franklin) (discussing, *inter alia*, PX51); Bergin Depo. Ex. 6 ¶ 11; DX39 ¶ 10 (Franklin Discl.); *see also* PX20, PX8, PX97.

51.     Indeed, as Defendants' expert Dr. Thorp conceded at trial, the highest-level evidence available has concluded that earlier theories of a benefit from using digoxin to induce demise is unfounded. Tr. Vol. IV 98:24 – 101:5 (Thorp discussing PX60, DX130).

52.     Even Defendants' experts admit that the risks associated with demise procedures are additive; in other words, they pose additional risks on top of those already associated with a D&E procedure. Tr. Vol. V-B 43:25 – 44:19 (Curlin admitting that "the feticidal intervention" has its own set of risks); Tr. Vol. IV 102:6-13 (Berry, admitting risk of infection imposed by a KCl injection is "an additive risk"); Brady Depo. 327:17-21 (Brady admitting that a woman who has a D&E with digoxin has an elevated risk of extramural delivery as compared to a woman who has a D&E without digoxin).

53.     The risks of digoxin injection include the risk of infection, including serious infections like sepsis and chorioamionitis, Brady Depo. 326:1-6; Tr. Vol. I 69:16-18, 70:13 – 71:22 (discussing life-threatening infection to patient from insertion of needle into amniotic fluid), 74:7 – 77:2, 78:10 (discussing PX29) (Davis); Tr. Vol. II 38:3-9, 59:19-25 (Franklin); Tr. Vol. III-B 107:25 – 108:3 (Thorp), and perforation of an organ, such as the bowel, Brady Depo. 326:21 – 327:12; Tr. Vol. I 232:20 – 234:10 (Dr. Simpson, discussing risks associated with intra-uterine needle procedures); Tr. Vol. III-B 108:4-17 (Thorp); Tr. Vol. IV 103:3-6 (Berry).

54.     There is also one reported case of hyperkalemic paralysis, a rare but potentially lethal complication, following a digoxin injection. Tr. Vol. I 70:9-12 (Davis); *id.* at 81:4 – 82:23 (discussing PX48); Tr. Vol. III-B 106:18 – 107:24 (Thorp) (same).

55.     The only studies comparing D&E patients who received digoxin with those who did not also found that patients undergoing digoxin injections were five times more likely to experience nausea and vomiting, Tr. Vol. I 69:14-16; 72:2-6 (discussing PX60) (Davis); *see also*

15

*id.* at 171:12 – 172:23 (Davis); extramural delivery (i.e., expulsion of the fetus outside the intended medical facility, a traumatic event which can lead to hemorrhage), Tr. Vol. I 74:7 – 79:4, 79:14 – 80:11 (Davis) (discussing PX29); *id.* at 85:8-25 (Davis); *see also* Brady Depo. 327:13-21; infection, and hospitalization, Tr. Vol. I 76:23 – 77:2, 78:10-13, 79:5-13, 80:12-18 (Davis) (discussing PX29).

### *Potassium Chloride (KCl)*

56.     KCl injections are not a feasible means of continuing to perform D&E under the Act because they are outside Plaintiffs' skills, training, and experience; because Plaintiffs cannot obtain the necessary skills, training, and experience; because even with necessary skills, training, and experience, KCl injections can be difficult or impossible to perform, particularly without the support of experienced colleagues; and because KCl is not always effective at causing demise.

57.     KCl injections are administered via a long spinal needle inserted through the patient's skin, into her abdomen and uterine muscle, into the amniotic sac and then through the fetal cardiac chamber into the fetal heart. Tr. Vol. I 212:16 – 215:2 (Simpson); *see also id.* at 87:15 – 88:3 (Davis). The fetal heart is approximately the size of a dime at 15-16 weeks and the size of a quarter at 20-22 weeks. Tr. Vol. I 212:6-12 (Simpson); Tr. Vol. IV 23:13-18 (Berry); *see also* Tr. Vol. I 88:1-3 (Davis); Tr. Vol. IV 317:17-20 (Ralston); Brady Depo. 280:4-9.

58.     Fetal intra-cardiac injections are extremely difficult from a technical perspective, because a physician must guide a needle into an extremely small target inside another small, *moving* target. Tr. Vol. I 215:22 – 216:2, 217:2-18, 221:22 – 222:5, 291:3-13 (Simpson); *see also id.* at 87:6-8, 89:9-24 (Davis); Tr. Vol. IV 316:22 – 317:16 (Dr. Ralston testifying that fetal movement could make the procedure more difficult); Brady Depo. 257:25 – 258:12 (Dr. Brady testifying that fetus in second trimester is not stationary).

59.     KCl injections are used by MFM specialists typically for selective or multifetal reductions; they are not routinely used to perform fetal demise prior to D&E. Tr. Vol. I 204:16 – 205:19 (Simpson); *see also* Tr. Vol. I 88:24 – 89:5 (Davis). However, not even all MFMs offer these procedures. Brady Depo. 219:1-4; Tr. Vol. I 89:6-8 (Davis); *id.* at 210:13 – 211:2 (Simpson).

60.     KCl injections are typically performed in a hospital setting. Tr. Vol. I 89:25 – 90:3 (Davis); *id.* at 210:13 – 211:2 (Simpson).

61.     MFM subspecialists undergo years of specialized training and rely on the assistance of a highly trained sonographer to safely and successfully perform intra-cardiac injections. Tr. Vol. I 89:9 – 93:14 (Davis); *id.* at 226:24 – 232:14, 214:13 – 215:2 (Simpson); Tr. Vol. IV 314:13 – 316:17 (Dr. Ralston testifying to technical and ultrasound skill needed to do a KCl injection); Brady Depo. 178:23 – 179:17.

62.     This training is not offered in ob-gyn generalist programs; however, not even all subspecialty fellowship programs offer this training. *See* Tr. Vol. I 88:4 – 89:13 (Davis); *id.* at 227:14-25 (Simpson); Tr. Vol. II 39:20 – 40:12 (Franklin); Tr. Vol. IV 259:21 – 260:12 (Dr. Ralston testifying he teaches advanced needle procedures to MFM fellows and other MFM specialists who did not learn these procedures in their own fellowships, not OB/GYN residents), 262:22 – 263:11 (same); DX39 ¶ 12 (Franklin Discl.).

63.     Despite their best efforts, even some ob-gyns who pursue advanced training in MFM will simply never have the hand/eye coordination required to competently guide their needle into the fetal heart target. Tr. Vol. I 231:13 – 232:2 (Simpson); Tr. Vol. IV 316:8-17 (Ralston).

64.    Neither of the two Individual Plaintiffs have the necessary training and skills to perform KCl injections, Tr. Vol. II 39:20-25 (Franklin); Bergin Depo. Ex. 6 (Bergin Discl.) ¶ 12; DX39 ¶¶ 9, 12 (Franklin Discl.), and there is no evidence that such training available in Kentucky, *see* Tr. Vol. II 40:13-15, 110:19 – 111:4 (Franklin); DX39 ¶ 12 (Franklin Discl.); Bergin Depo. 122:9-19; Brady Depo. 213:2 – 215:4.

65.    Moreover, some cases may be so challenging that even fully trained subspecialists will require the immediate assistance of another trained subspecialist to perform the procedure safely and successfully, Tr. Vol. I 218:11 – 219:11 (Simpson), a back-up scenario that would not be available at EMW, Tr. Vol. II 44:11-25 (Franklin).

66.    A number of factors can further complicate or prevent an intra-cardiac injection, including common traits or conditions such as obesity, fibroids, and scar tissue; fetal and/or uterine positioning; the amount of amniotic fluid; fetal anomalies; and patient discomfort and anxiety. *See* Tr. Vol. I 94:7-12 (Davis), *id.* at 222:6 – 225:11, 289:3-20 (Simpson); Tr. Vol. IV 317:21 – 319:9 (Ralston); Brady Depo. 283:10-22.

67.    Needle guides would not eliminate the technical difficulty of, and risks and complications associated with, KCl injections; to the contrary, use of a needle guide could in fact hamper a physician's ability to administer a KCl injection by precluding the physician from adjusting the angle and trajectory of the transducer and needle in the event the target, the non-stationary fetus, moves. Tr. Vol. IV 320:10 – 321:11 (Ralston); Tr. Vol. I 215:3 – 216:11, 284:11 – 287:20 (Simpson); Brady Depo. 230:20 – 231:25, 256:2-13, 266:23 – 268:22, 273:17 – 274:2, 281:10 – 283:22, 286:21 – 287:7.

68.    Defendants' expert Dr. Brady testified that he could not identify any practitioner currently using a needle guide to inject a non-stationary target, let alone to assist in fetal intra-cardiac KCl injections. Brady Depo. 264:12-19, 285:11 – 286:2; *see also id.* at 264:20 – 266:22.

69.    Even if Plaintiffs had the training to perform KCl injections, KCl cannot be relied upon to cause fetal demise in every case. Tr. Vol. I 93:15 – 94:12 (Davis); *id.* at 218:4 – 220:2 (Simpson). Defendants' expert Dr. Berry estimated "a one to five percent failure rate in the future of Kentuckians if they have to undergo KCl injections before D&Es." Tr. Vol. IV 96:4-11.

70.    In addition to being painful, unfeasible, and unreliable, mandating the use of KCl prior to D&E would subject every woman seeking a D&E to serious health risks, including: infection, including serious infections like sepsis, Tr. Vol. I 94:13 – 95:1, 96:7 – 97:13 (Davis) (discussing PX97), *id.* at 232:20-23 (Simpson), Tr. Vol. III-B 114:17 – 116:3 (Thorp) (discussing PX97); damage to internal organs, including the bowel or bladder, Tr. Vol. I 233:2 – 234:10, 270:13 – 271:1 (Simpson); Tr. Vol. IV 13:3-6 (Berry); Brady Depo. 231:19-25; and even cardiac arrest if KCl is inadvertently injected into the maternal bloodstream, Tr. Vol. I 95:2 – 95:16, 97:14-23 (Davis), *id.* at 234:11 – 236:14 (Simpson) (discussing PX19), Tr. Vol. II 191:10-13 (Franklin); Tr. Vol. III-B 112:25 – 114:16 (Thorp) (discussing PX19), Tr. Vol. IV 103:7-22 (Berry), Brady Depo. 208:17 – 209:9; DX39 ¶ 12 (Franklin Discl.).

71.    These types of complications will likely occur with more frequency if KCl is administered by physicians who lack training in these procedures, rather than those, like MFMs, with the requisite specialized training. Tr. Vol. I 95:17 – 96:6, 97:14 – 98:4 (Davis); *id.* at 236:11-14, 243:19 – 244:1 (Simpson).

***Umbilical Cord Transection (UCT)***

72.     UCT is not a feasible means of continuing to perform D&E under the Act because it is virtually unstudied and experimental, can be impossible to perform, and would subject women to significant health risks.

73.     To use UCT to comply with the Act, a physician must dilate the cervix, rupture the amniotic sac, and then insert a surgical instrument into the uterus in an effort to locate, isolate, and transect the cord without causing the separation of any other fetal tissue. Tr. Vol. I 105:2-13, 106:15-23 (Davis); Tr. Vol. II 46:14 – 47:10 (Franklin).

74.     UCT is virtually unstudied and therefore experimental. There is only a single retrospective case series (i.e., Level III evidence) on UCT in the world's medical literature. Tr. Vol. I 109:22 – 111:2 (Davis) (discussing PX100); *see also id.* at 104:16 – 105:1.

75.     Moreover, because the physicians in that single study were not attempting to transect the cord separately from fetal tissue, as would be required under the Act, they did not perform the same procedure that would be required here. Tr. Vol. I 112:12 – 113:17 (Davis) (discussing PX100).

76.     That study does not provide sufficient evidence of safety to force physicians to use cord transection prior to every D&E. Tr. Vol. I 112:8-11 (Davis); *see also id.* Tr. Vol. III-B 118:10 – 119:16 (Dr. Thorp agreeing that "we should be careful about reaching a generalized conclusion about [UCT] from a study performed by only two providers in a single setting noncomparative context."). The study's sole focus was the time it took from transection of the cord to the cessation of cardiac activity (asystole). Tr. Vol. I 110:15-20 (Davis) (discussing PX100). However, no study compares outcomes for patients who underwent cord transection with patients who had no pre-D&E demise procedure, determines how long finding and transecting the cord delays completion of the procedure, or determines how many passes into the

uterus with instruments were necessary before the cord was transected, all of which are proxies for safety. Tr. Vol. I 111:3 – 112:7 (Davis); *see also id.* at 104:2-15.

77.    UCT is not feasible because it is very difficult, if not impossible, to visualize the cord separately from the other tissue, which is what is required by the terms of the Act: Once the amniotic sack is ruptured, the amniotic fluid drains out and the uterus begins to contract, which causes the placenta, fetal tissue and umbilical cord—which, at around 15 or 16 weeks, is only about the width of a piece of yarn—to all become one mass of tissue. Tr. Vol. I 105:14 – 106:23, 108:3-16 (Davis); *see also* Brady Depo. 117:17 – 119:19; Bergin Depo. 124:11 – 125:19; DX39 ¶ 11 (Franklin Discl.).

78.    Every time a physician attempts UCT, she knows there is "always a risk that [the physician] could grab something that's not the umbilical cord and grasp some other tissue" thereby violating the Act. Tr. Vol. II 46:14-22 (Franklin); *see also* Brady Depo. 47:2-16, 118:16 – 119:23; Tr. Vol. I 105:14 – 107:6, 112:12 – 113:7 (discussing PX100) (Davis); Bergin Depo. Ex. 6 ¶ 12; DX39 ¶ 11 (Franklin Discl.).

79.    UCT is also not feasible because approximately 50% of the time the fetus will block the physician from accessing and transecting the cord altogether, making it impossible for a physician to cause demise prior to removing fetal tissue as required under the Act. Brady Depo. 43:20 – 44:24; *see also id.* at 41:12 – 42:13; Tr. Vol. I 106:24 – 107:6 (Davis); Tr. Vol. II 47:23 – 48:9 (Franklin). Access to the umbilical cord may also be blocked by the presence of fibroids and other anatomical structures. Tr. Vol. II 47:23 – 48:9 (Franklin).

80.     In addition to being experimental and not feasible, mandating UCT prior to D&E will subject every woman seeking a D&E to significant health risks. Because UCT is essentially a blind procedure, Tr. Vol. I 107:22-23 (Davis); *see also id.* at 106:8-23 (Davis); Tr. Vol. II

50:14-25 (Franklin); Bergin Depo. 125:6-19, the physician may have to make multiple passes through the uterus with instruments, increasing the risk of infection, cervical injury and perforation with each pass. Tr. Vol. I 107:7 – 108:2 (Davis); Tr. Vol. II 51:7-10 (Franklin); DX39 ¶ 11 (Franklin Discl.); Brady Depo. 307:16-19.

81.    Assuming the physician successfully transects the cord, she must then wait for cessation of fetal heart activity (asystole), which can take more than 10 minutes, while the patient is having contractions and losing blood, and the placenta is separating. Tr. Vol. I 107:8-21, 108:17 – 109:9 (Davis); Tr. Vol. II 47:11-22 (Franklin). As Dr. Davis testified:

> During the time that we were waiting for the cord transection to result in intrafetal demise, we had ongoing bleeding and so you're in a circumstance where you're watching your patient lose blood and then you're waiting for this thing to occur, for the heartbeat to stop, and you know there's no medical reason for that. You know that what you should do, as the surgeon who's caring for your patient, is do the operation properly. And instead, you're trying to weigh the risk of her losing blood with being in compliance with this law, which has no medical reason behind it. So it's a very stressful position for the doctor to be in, waiting and knowing that they're doing their patient harm.

Tr. Vol. I 108:23 – 109:9 (Davis).

**Mandating Demise Prior to D&E Will Eliminate Abortion Care in Kentucky Beginning at 15 Weeks**

82.    The Individual Plaintiffs credibly testified that because they cannot rely on any of the Proposed Demise Procedures to guarantee demise before every D&E, and because they cannot know in advance of attempting one of the Proposed Demise Procedures whether it will fail, and they cannot abandon the patient midway through the procedure in the event demise does fail, they will stop providing abortions at and after 15 weeks if HB 454 takes effect. Tr. Vol. II 65:2-24 (Franklin); *id.* at 37:14-18, 45:21 – 46:13, 47:1-3, 51:15-18, 62:14-16; 106:19– 107:9; Bergin Depo. Ex. 6 ¶¶ 7, 10-13; DX39 (Franklin Discl.) ¶¶ 8-13.

83.     The Individual Plaintiffs credibly testified that because attempting to induce fetal demise imposes significant health risks on their patients and does not provide any countervailing benefits, they will stop providing abortions at and after 15 weeks if HB 454 takes effect. Tr. Vol. II 65:2-24 (Franklin); *id.* at 37:14-18, 45:21 – 46:13, 51:15-18, 62:14-16; DX39 ¶¶ 10-12 (Franklin Discl.); Bergin Depo. Ex. 6 ¶¶ 10-12.

84.     Dr. Davis's personal experience attempting pre-abortion fetal demise supports Plaintiffs' testimony. *See* Tr. Vol. I 82:24 – 86:22 (Davis); *id.* at 102:5 – 103:22. Dr. Davis testified that she stopped using digoxin because it did not reliably cause fetal demise and it increased the health risks to and traumatized her patients. Tr. Vol. I 82:24 – 86:22 (Davis). Dr. Davis also testified that even with her decades of experience as an ob-gyn practitioner, fetal intra-cardiac KCl injections were too difficult for her to administer and she could therefore not rely on KCl to induce demise. Tr. Vol. I 102:5 – 103:22 (Davis).

85.     Dr. Davis testified that she could not rely on umbilical cord transection to induce demise because it is not feasible to perform UCT for every D&E, especially earlier in the second trimester when the cord is smaller and even more difficult to locate and access, and that UCT increases the risk to the patient while providing no medical benefit. *See* Tr. Vol. I 104:2 – 109:21 (Davis).

86.     Dr. Davis testified that she would never attempt to induce fetal demise prior to performing an abortion if she did not know in advance that she retained the ability to perform a standard D&E in the event demise failed. Tr. Vol. I 86:12-22 (Davis, discussing digoxin); *id.* at 103:4-12 (Davis, discussing KCl); *id.* at 109:10-18 (Davis, discussing cord transection).

87.     Plaintiffs' testimony is further supported by the events that unfolded during the brief two-week span when the Act was in effect, prior to the Commonwealth agreeing to suspend

its enforcement during the pendency of this litigation. During that time, Plaintiffs stopped performing abortions at and after 15 weeks, and as a result were forced to turn away approximately 53 patients who came to them seeking abortion care. Tr. Vol. II 62:24 – 64:20 (Franklin); *see also* PX37.

88.     As Dr. Franklin testified, this had a devastating effect on patients, as well as clinical staff. As one example, Dr. Franklin described "try[ing to] console a woman who was inconsolable in the waiting room and try[ing] to help her find an alternative, which wasn't readily available." Tr. Vol. II 62:24 – 64:6 (Franklin).

## **Defendants Purported Interests Are Not Served By HB 454**

### ***Mandating Fetal Demise Prior to D&E Violates Medical Ethics***

89.     The Court received expert testimony on medical ethics from Plaintiffs' expert Dr. Steven Joffe, Professor of Medical Ethics and Health Policy at University of Pennsylvania Perelman School of Medicine, in the Department of Medical Ethics and Health Policy, and a practicing pediatric oncologist at Children's Hospital of Philadelphia. Tr. Vol. II 178:25 – 179:7 (Joffe). Dr. Joffe testified based on his extensive experience teaching medical ethics to graduate students, law students and medical students, running two fellowship programs for postdoctoral training in medical ethics, serving on hospital-based and research-based medical ethics committees, authoring approximately 140 to 150 peer-reviewed articles, the vast majority of which relate to medical ethics, and speaking publicly on medical ethics issues across the country, as well as his interactions with colleagues in the medical ethics field nationwide, and his familiarity with the relevant medical ethics literature. Tr. Vol. II 182:4 – 185:21 (Joffe); *see also* PX26 (Joffe CV).

90.     Each of the Proposed Demise Procedures increases the risks associated with the abortion without providing any corresponding medical benefit to the pregnant woman. Tr. Vol. I 45:7-15, 51:9-14, 55:7-20, 73:23 – 74:1, 87:1-14, 104:13-15, 196:17-21 (Davis); Tr. Vol. II 38:3-9, 51:11-14, 59:21 – 60:10 (Franklin); *see also* Tr. Vol. I 232:20 – 234:10 (Dr. Simpson testifying to risks of KCl injections); *id.* at 239:19-23 (Dr. Simpson testifying that there are no medical benefits associated with using KCl to induce fetal demise before a D&E); Tr. Vol. III-B 104:14-18, 108:2-17, 114:21 – 116:3 (Dr. Thorp acknowledging risks); Tr. Vol. IV 49:1-2 (Dr. Berry testifying "[a]s far as medical benefits [to demise], I don't know that there's any benefits necessarily"); *id.* at 101:7-9, 103:3-6 (Dr. Berry acknowledging risks); Brady Depo. 326:1 – 327:12; Tr. Vol. IV 328:14-18 (Ralston); Bergin Depo. Ex. 6 ¶ 11.

91.     There is no legal or medical ethical principle that permits pregnant women to be forced to undergo painful, risk-enhancing, and experimental medical procedures to benefit their fetus. Tr. Vol. II 97:12 – 98:5 (Franklin); Tr. Vol. II 197:7 – 198:13 (Joffe); *id.* at 222:4 – 223:15, 226:15 – 230:8 (Joffe).

92.     For example, the Commonwealth's own medical-ethics expert, Dr. Farr Curlin, conceded that a law that would require a healthy parent to donate an organ to a sick child, or force a pregnant woman to undergo a c-section delivery to save her fetus, would be "an undue encroachment of state authority." Tr. Vol. V-B 38:7-21.

93.     Thus, forcing physicians to perform, and patients to undergo, any of the Proposed Demise Procedures as a precondition to obtaining an abortion violates three core principles of medical ethics:

1)  a physician's medical obligation not to subject patients to potentially harmful, experimental procedures that confer no known medical benefits (non-

maleficence), Tr. Vol. II 197:7 – 198:13 (Joffe); Tr. Vol. I 123:11-18 (Davis); *see also* Tr. Vol. II 62:17-23 (Franklin testifying she does not perform any procedures that carry risks and inflict pain on patients but provide no medical benefit), *id.* at 60:11 – 62:13 (Franklin discussing PX51);

2) a physician's obligation to respect patient autonomy by not interfering with a "decisionally capable pregnant woman's decision to refuse recommended medical or surgical interventions," Tr. Vol. II 225:3-5 (Joffe quoting PX6); *see also id.* at 223:16 – 227:5 (Joffe), and instead denying women the ability to make a voluntary informed choice as to the procedure, *id.* at 205:7-13 (Joffe); *see also id.* at 202:20 – 203:16, 204:6-9 (Joffe); and

3) a physician's obligation to adhere to the principle of justice, by reducing access to second-trimester abortions that would disproportionately "affect women who are vulnerable, who are poor, [and] who are disadvantaged," Tr. Vol. II 217:4-12 (Joffe); *see also id.* at 215:15 – 217:19 (Joffe); *id.* at 62:24 – 66:25 (Franklin testifying about obstacles faced by patients when HB 454 was in effect).

94.    Moreover, as a result of the unstudied and experimental nature of many of these demise procedures, forcing physicians to perform them on all second-trimester abortion patients as a precondition to receiving an abortion would also interfere with the doctor-patient relationship and the physician's ability to obtain truly informed consent. Tr. Vol. II 203:17 – 204:25 (Joffe); Tr. Vol. I 84:4-21 (Davis); *see also id.* at 123:23-25 (Davis).

### *HB 454 Does Not Protect the Medical Profession from "Scandal and Disrepute"*

95.    There is no evidence that HB 454 is necessary to protect the medical profession "from scandal and disrepute and from mistrust." Tr. Vol. V-A 108:17-21 (Curlin). Indeed, the

Commonwealth provided no data to support this claim beyond the *ipse dixit* of its expert Dr. Curlin, a staunch opponent of abortion. Tr. Vol. V-B 21:16 – 23:5 (Curlin).

96.    Dr. Joffe credibly testified: (1) that medical professionals have been providing D&E abortions across the country for decades now, without any evidence of associated scandal or disrepute to the profession, Tr. Vol. II 211:16 – 212:10 (Joffe), (2) that the guidance policies or statements on abortion, including D&E abortion, that have been issued by numerous reliable medical professional organizations, including the AMA and ACOG, in no way suggest that these organizations, as "representative bod[ies] of American physicians[,] [are] concerned with the possibility that abortion providers performing abortions will bring scandal and disrepute on physicians as a profession or on the field of medicine," Tr. Vol. II 212:11 – 215:5 (Joffe discussing PX9, PX8), and (3) that along with ACOG, a number of women's health societies, including Society of Family Planning and Society of Maternal-Fetal Medicine, in fact recommend the D&E procedure as the preferred procedure for second-trimester abortion in most cases, evincing a complete lack of concern that the performance of D&E would bring scandal and disrepute to the field, Tr. Vol. 215:6-14 (Joffe discussing PX8).

97.    Moreover, Defendants' expert Dr. Farr Curlin admitted that he could not identify a single patient who declined to seek necessary medical care because some physicians have decided to provide some women with D&E abortion care, Tr. Vol. V-B 54:25 – 55:4 (Curlin), and that he was not aware of any empirical research establishing that patients are losing confidence or trust in the medical profession because of abortion care, Tr. Vol. V-B 55:17-23 (Curlin).

### *There Is No Scientific Evidence of Fetal Pain Perception Before 24 Weeks LMP At the Earliest*

98.     The overwhelming consensus in the medical community, as supported by the best and most up-to-date scientific evidence, is that fetal pain perception is not possible before 24 weeks LMP at the earliest, because the requisite thalamo-cortical connections are not yet intact and the cerebral cortex is not yet of sufficient complexity and organization. Tr. Vol. IV 270:11 – 285:12 (Ralston discussing PX77, PX68, PX11, PX64); *id.* at 310:4 – 312:9 (Dr. Ralston discussing PX7 and referring back to previously discussed review articles, explaining that his opinion reflects the consensus in the medical community); *id.* at 340:5-15 (Ralston).

99.     For example, an extremely broad and in-depth literature review conducted by the Royal College of Obstetricians and Gynecologists (RCOG) concluded, based on an examination of over 50 relevant scientific articles (including some of the studies by Dr. Anand relied on by Defendants' expert), that connections from the periphery (i.e., the nerve endings in the skin) to the cortex are not intact before 24 weeks LMP, and that this lack of cortical connections indicates that pain perception is not possible until after 24 weeks LMP. Tr. Vol. IV 271:19 – 276:21 (Ralston discussing PX77).

100.     Numerous other peer-reviewed medical-review articles and meta-analyses support this conclusion, comprising the views of hundreds of scientists. *See* Tr. Vol. IV 276:22 – 279:3 (Ralston discussing PX68, another review article that examined over 200 studies); *id.* at 279:8 – 281:23 (Ralston discussing PX11, a meta-analysis of approximately 150 brain imaging studies); *id.* at 282:3 – 284:14 (Ralston discussing PX64, another review article).

101.     Even Defendants' expert Dr. Colleen Malloy admitted that the ACOG, the RCOG, and an extensive literature review in the Journal of the American Medical Association (JAMA), all refute her position that fetal pain perception can occur at 22 weeks LMP and possibly earlier, *see* Tr. Vol. IV 211:4 – 212:6, and that she is not aware of any medical or

28

scientific organization, apart from the American Academy of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the Christian Medical and Dental Association (CMDA), that agrees with her opinion, Tr. Vol. IV 218:5-21.

102.    Dr. Malloy also admitted that even some of the articles she relied on conclude that fetal pain perception is not possible until *after* at least 22 weeks LMP, *see* Tr. Vol. IV 243:11-15, and that these articles in fact caution that the mere presence of certain anatomical, physiological, or behavioral "markers", *see infra* ¶¶ 104 – 108, do not indicate that fetal pain perception is occurs, Tr. Vol. IV 243:16-19.

103.    Fetal pain perception is also extremely unlikely *even after* 24 weeks LMP, because consciousness does not occur in utero for a variety of reasons, including the presence of sleep-inducing neurotransmitters and hormones, the warm, buoyant amniotic environment, limited stimuli, and the fetus's hypoxic (very low oxygen) state. Tr. Vol. IV 285:15 – 289:12 (Ralston); *see also id.* at 289:13 – 293:7 (Ralston discussing PX79, PX77, PX68); *id.* at 268:13-15 (Dr. Ralston testifying that an organism must be conscious in order to perceive pain); *id.* at 340:5-20 (Dr. Ralston testifying that even through the third trimester, consciousness does not occur). Moreover, as Dr. Ralston explained, the unique uterine environment and physiologic state of the fetus make it medically inappropriate "to interpret neonatal behaviors as evidence of what is happening [to the fetus] in[] utero." Tr. Vol. IV 301:3-14 (Ralston).

104.    Dr. Malloy admitted that the presence of certain "anatomical markers" or bodily structures before 24 weeks LMP—structures that are associated with pain in children and adults, including certain sensory receptors and nociceptors, spinal cord fibers, the thalamus, and the transient pre-cortex or cortical plate—does not establish that fetal pain perception is possible prior to 24 weeks LMP. Tr. Vol. IV 241:15-18 (Malloy).

105.    Rather, the scientific evidence shows that pathways *connecting* these structures (e.g., connecting the sensory receptors to the cortex) are simply not present until well past 24 weeks LMP, and that without those connections, pain perception is not possible. Tr. Vol. IV 302:10 – 303:20 (Ralston discussing PX77); *id.* at 284:5-9 (Ralston discussing PX64); *id.* at 281:6 – 282:2 (Ralston discussing PX11); *id.* at 276:6-24 (Ralston discussing PX77); *id.* at 278:16 – 279:3 (Ralston discussing PX68).

106.    "Physiological markers," such as hormonal responses (e.g., increases in adrenalin and cortisol) or vital sign changes (e.g., heart rate and blood pressure), also do not indicate that fetal pain perception is possible before 24 weeks LMP. These stress and hormonal responses are caused by the autonomic nervous system and the lower parts of the brainstem and midbrain that are completely unrelated to cortical and conscious pain perception, Tr. Vol. IV 303:21 – 304:13 (Ralston); they can and do occur absent any consciousness or cortical function, Tr. Vol IV 304:4-13 (Ralston). Indeed, even Dr. Malloy admitted that the presence of physiological markers alone does not mean that fetal consciousness or pain perception is possible. Tr. Vol. IV 241:19 – 242:4 (Malloy).

107.    That the fetus exhibits certain "behavioral markers," such as reflex responses and withdrawal from noxious stimuli, likewise does not establish the possibility of fetal consciousness or pain perception before at least 24 weeks LMP. Tr. Vol. IV 265:9 – 266:4 (Ralston); *id.* at 295:12 – 296:8, 304:14-21 (Ralston).

108.    As Dr. Ralston explained, organisms incapable of consciousness, including bacteria, respond to stimuli and display behavior, Tr. Vol. IV 265:9-11 (Ralston); thus, the fact of fetal "behavior" and stimulus response in no way indicates that the fetus has consciousness or the ability to perceive pain, Tr. Vol. IV 265:23 – 266:4 (Ralston). As Dr. Malloy admitted, what

she calls "behavioral markers" exist without the ability to perceive pain, Tr. Vol. IV 242:5-8 (Malloy); withdrawal from noxious stimuli can be entirely reflexive, Tr. Vol. IV 242:19-21 (Malloy); and a reflex does not imply the ability to perceive pain, Tr. Vol. IV 243:7-10 (Malloy).

109.    There is no evidence to support Dr. Malloy's "dimmer switch" analogy, according to which the ability to perceive pain starts sometime prior to 22 weeks LMP and, alongside the fetus's pain modulation system, continues to slowly develop to permit increasing pain perception, and increasing capacity to modulate that pain, as pregnancy advances, Tr. Vol. IV 151:7-21 (Malloy); *id.* at 153:25 – 155:7 (Malloy, discussing DX119); *id.* at 250:9-22 (Malloy). As Dr. Ralston explained, prior to 24 weeks LMP, the necessary cortical connections are not intact and the neuro-circuitry required for *any* degree of pain perception (and thus, any need for pain modulation) simply does not exist. Tr. Vol. IV 313:9 – 314:7 (Ralston); *id.* at 304:22 – 305:8 (Ralston).

110.    Physicians' use of fetal anesthesia when performing certain in utero surgeries does not reflect medical recognition of fetal pain perception; rather, the evidence shows that the purpose of such anesthesia is to immobilize the fetus and to prevent hormonal responses such as adrenalin release that can affect post-natal development—not to prevent pain perception. Tr. Vol. IV 297:6 – 298:11 (Ralston); *see also id.* at 246:23 – 247:15 (Malloy).

## The Impact of HB 454 on Abortion in Kentucky and Plaintiffs' Patients

111.    If Plaintiffs stop providing abortion care at 15 weeks as a result of HB 454, 100% of the patients who would otherwise have sought that care in Kentucky will be forced to travel to another state to obtain an abortion. Tr. Vol. II 65:2 – 66:10 (Franklin).

112.    Even if Plaintiffs did not stop providing abortions starting at 15 weeks altogether, if Plaintiffs were forced to attempt to induce fetal demise before all abortions starting at 15

31

weeks, 100% of patients in Kentucky seeking abortions at this time would be subjected to additional, unnecessary, painful, invasive, and/or experimental medical procedures that impose significant health risks. *See supra* ¶¶ 36–81.

113.    Moreover, given the failure rates associated with the Proposed Demise Procedures, even if Plaintiffs were willing to attempt demise prior to D&E, a significant portion patients in Kentucky seeking abortions starting at 15 weeks would still be unable to obtain an abortion. *See, e.g.*, ¶ 44 (20% failure rate for digoxin), ¶ 69 (KCl cannot be relied on cause demise in every case), ¶¶ 77, 79 (impossibility of performing cord transection), *supra*.

### The Burdens of Increased Travel on Poor and Low-Income Abortion Patients

114.    The Court received expert testimony on the sociology of gender and poverty and the impact of poverty on access to medical care from Dr. Sheila M. Katz, Ph.D., Associate Professor of Sociology at the University of Houston. Tr. Vol. III-A 8:1-13, 23:18 – 24:3 (Katz); PX25 (Katz CV). Dr. Katz testified based on her experience and expertise, including her experience teaching academic courses on the sociology of poverty, the sociology of gender, qualitative research methods, and sociological theory, her research into women's daily experiences in poverty in the United States and on understanding low-income women's access to a variety of health and human services, and her participation on several national poverty and gender research working groups and in sociological professional organizations, as well as her interactions with colleagues who work in the field of sociology nationwide, and her familiarity with the relevant literature and research. Tr. Vol. III-A 9:11 – 10:3, 15:19 – 23:17 (Katz).

115.    Kentucky is the fifth poorest state in the United States. DX200.[5]

---

[5] Testimony by Dr. Sheila Katz, Plaintiffs' gender and poverty expert, was based on the most up-to-date numbers available at the time she completed her expert report—2016 U.S. Census Bureau data revealing Kentucky's poverty rate to be 18.8%, making it the fourth poorest state in

116.    Individuals and households with annual salaries that are below the federal poverty guidelines are considered poor. Tr. Vol. III-A 26:5 – 28:5 (Katz). Individuals and households with annual salaries that are below 200% of the federal poverty guidelines are considered nearly poor or low-income. Tr. Vol. III-A 26:5-22 (Katz).

117.    A single woman with one child working full-time at Kentucky's minimum wage ($7.25/hour) earns approximately $1,256/month, Tr. Vol. III-A 31:2-11 (Katz); her annual income is below the federal poverty line for a household of that size ($16,460), Tr. Vol. III-A 27:22 – 28:9 (Katz).

118.    Seventy-five percent of women seeking abortions in the United States are poor or nearly poor. *See* Tr. Vol. III-A 33:20 – 34:5, 35:12-18 (Katz); *see also* PX53. Dr. Katz credibly testified that it is reasonable to infer that abortion patients in Kentucky, one of the poorest states in the country, *supra* ¶ 115, n.5, are similarly situated. Tr. Vol. III-A 35:9-18 (Katz). There is no evidence that Kentucky is a national anomaly with disproportionately wealthy abortion patients. *See* Tr. Vol. III-A 35:19-25 (Katz); *see also EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17-CV-00189-GNS, 2018 WL 6444391, at *8 (W.D. Ky. Sept. 28, 2018) (finding that "[l]ow-income and younger women have traditionally been at increased risk for unintended pregnancy and, in turn, abortion.") (internal citations and quotation marks omitted).

---

the United States at that time. *See* Tr. Vol. III-A 27:13-21; *id.* at 79:8-21. Dr. Katz testified that any slight fluctuations or decreases in the state poverty rate over time would not alter her underlying opinion in this case, explaining that while poverty rates fluctuate every year, "that does not change the overall experience of low-income women in [Kentucky]," *id.* at 47:25 – 48:11, and noting that Kentucky has consistently ranked among the poorest states in the nation, *id.* at 79:22 – 82:17. Indeed, the 2017 U.S. Census Bureau statistics relied on by the Commonwealth, *see* DX200; Tr. Vol. III-A 81:13-18; show that Kentucky remains among the poorest states in the nation, listing Kentucky as fifth poorest state after Puerto Rico, Mississippi, New Mexico and Louisiana, with a poverty rate of 18.3%. *See* Percent of People Below Poverty in the Past 12 Months, State Comparison, U.S. Census Bureau, American FactFinder, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/GCT1701.US01PR/0100000US.

119.    EMW's own data indicates that a significant number of EMW's patients are poor or low-income. Tr. Vol. II 16:1-20, 17:9 – 19:2, 126:3 – 127:15 (Franklin). For example, between January and November 2018, 25% of EMW patients qualified for private financial aid that is *only* available to those who were at or below 110% of the federal poverty guidelines. Tr. Vol. II 17:13 – 19:2 (Franklin). Because this number excludes patients between 111-200% of the federal poverty guidelines, the number of EMW patients who are poor or nearly poor is almost certainly higher than 25%.

120.    Many EMW patients who reschedule appointments report doing so because of difficulty raising funds to afford the procedure. Tr. Vol. II 16:10-20; *see also* Bergin Depo. Ex. 6 ¶ 15; DX39 ¶¶ 14-15 (Franklin Discl.) (Dr. Franklin discussing obstacles facing EMW's low-income patients). And many of the patients that eventually reach EMW and attend their appointments are only able to do so with the assistance of charities that provide transportation, gas cards, meals, and lodging. Bergin Depo. Ex. 6 ¶ 15.

121.    An abortion can cost several hundred dollars, *see, e.g.*, DX16, however Medicaid does not cover abortion, Tr. Vol. III-A 33:15-19 (Katz), and under Kentucky law, a woman can only obtain private insurance coverage for abortion if she has previously purchased a separate abortion-rider for an additional premium, *see* K.R.S. § 304.5-160(1).

122.    For EMW's patients who are poor or low-income, *see* Tr. Vol. II 16:1-20,126:3 – 127:15 (Franklin); Tr. Vol. III-A 35:9-25 (Katz), the costs associated with increased travel would pose significant, if not insurmountable, obstacles to obtaining an abortion. Tr. Vol. II 65:2 – 66:25 (Franklin); Tr. Vol. III-A 25:3 – 26:4, 36:1 – 37:3, 46:12 – 47:24 (Katz); Bergin Depo. Ex. 6 ¶ 16; DX39 ¶ 16 (Franklin Discl.).

123. Approximately 40% of EMW's D&E patients live in Jefferson County, *see* Tr. Vol. II 15:1-5 (Franklin); PX129, which is indisputably closer to EMW than any identified out-of-state clinic.

124. If EMW stopped providing abortions starting at 15 weeks, patients in Jefferson County would have to travel approximately 100 miles each way to Cincinnati, Ohio, to get to the next-closest clinic performing D&E, *see* Tr. Vol. III-A 25:18-19 (Katz).

125. A woman from Jefferson County would have to make up to three 200-mile roundtrip journeys and/or pay for up to two nights' lodging in a hotel to obtain an abortion in Cincinnati:

   a. *First*, because Ohio also has mandatory waiting period requirement, *see* Ohio Rev. Code § 2317.56(B)(1), which requires abortion patients to make an in-person visit to an abortion clinic at least 24-hours before the abortion procedure, a patient would either have to make the roundtrip journey to Cincinnati twice, or pay for overnight lodging in Cincinnati. Tr. Vol. III-A 40:15 – 41:6, 42:7-22 (Katz).

   b. *Second*, a D&E can be a two-day procedure. *See* Tr. Vol. I 40:7 – 41:9 (Davis); Tr. Vol. II 31:11-19, 32:6-9 (Franklin). Therefore all these patients would be required either to make another 200-mile roundtrip journey in the midst of the medical procedure or pay for another night's lodging.

126. If sedation is used during the abortion procedure, the patient might have to cover additional travel and/or hotel costs for someone to accompany her to the procedure. Tr. Vol. III-A 40:24 – 41:6 (Katz).

127. For EMW's patients who are poor or low-income, *see* Tr. Vol. II 16:1-20, 126:3 – 127:15 (Franklin); Tr. Vol. III-A 35:9-25 (Katz), the costs associated with increased travel would

pose significant, if not insurmountable, obstacles to obtaining an abortion. Tr. Vol. II 65:2 – 66:25 (Franklin); Tr. Vol. III-A 25:3 – 26:4, 36:1 – 37:3, 46:12 – 47:24 (Katz); Bergin Depo. Ex. 6 ¶ 16; DX39 ¶ 16 (Franklin Discl.).

128.    Poor and low-income women, including EMW patients, have less access to private vehicles, or to safe and reliable vehicles, than do middle class or upper-middle class families or low-income men. Tr. Vol. III-A 37:4 – 39:15 (Katz); Tr. Vol. II 19:24 – 20:3 (Franklin). Those without access to a safe and reliable vehicle will have to pay as much as $89 for each roundtrip bus ticket from Louisville to Cincinnati. Tr. Vol. III-A 39:20 – 40:14 (Katz).

129.    An overnight stay at a hotel in Cincinnati can cost up to $135 per night. Tr. Vol. III-A 42:4 – 43:4 (Katz).

130.    Additionally, most low-wage workers do not have paid time off, Tr. Vol. III-A 42:25 – 43:4 (Katz); low-wage workers risk losing their job by even asking for time off and, at the very least, may be forced to reveal confidential details about their decision to have an abortion in order to justify their request, *id.* at 43:13-25 (Katz).

131.    Even if a low-wage worker is able to get time off, a woman working minimum wage in Kentucky could expect to lose over $50/day for every day that she misses work. Tr. Vol. III-A 44:3-17 (Katz).

132.    Moreover, the majority of women seeking abortion in Kentucky have at least one child already, so a patient traveling out of state for an abortion would also have to pay for childcare which, in Kentucky, costs approximately $30 to $33 per day, depending on location; overnight childcare is even more expensive and extremely difficult to find. Tr. Vol. III-A 44:18 – 46:11 (Katz).

133.     In sum, the costs of transportation, lodging, childcare, and lost wages associated with traveling out of state to obtain an abortion that could previously be obtained closer to home (and involving fewer trips to the clinic) could add hundreds of dollars to the cost of a procedure. Tr. Vol. III-A 37:22 – 46:11 (Katz).

134.     Faced with limited options, poor and low-income women may be forced make harmful sacrifices in attempt to raise money to cover increased these increased costs, Tr. Vol. III-A 92:1-7 (Katz), including seeking financial assistance from risky and dangerous sources like predatory lenders and abusive or coercive ex-partners, *id.* at 32:22-10, or attempting to cut back on vital necessities, such as rent, food, heating and air conditioning, *id.* at 32:14-21, 46:16-23, thereby putting themselves (and their families) at risk of eviction, hunger and domestic violence, *id.* at 55:18-25, 92:3-7.

135.     Even if a woman is eventually able to raise the necessary funds and overcome these financial and logistical barriers, the time it takes to do so may delay her from accessing her abortion, pushing her further into her pregnancy and increasing the risks to her health. Tr. Vol. III-A 52:5-12 (Katz); Bergin Depo. Ex. 6 ¶¶ 15, 16; DX39 ¶¶ 14, 15 (Franklin Discl.). Indeed, delay caused by lack of financial resources is one of the reasons women have D&Es in the first place. Tr. Vol. II 19:18-24 (Franklin).

136.     Other low-income women may find the barriers to accessing abortion care to be insurmountable, and may be forced to remain pregnant against their will. Bergin Depo. Ex. 6 ¶¶ 15, 16; DX39 ¶¶ 14, 15 (Franklin Discl.).

137.     Quantitative research studies have found increased travel distances to obtain abortion are associated with delay in obtaining abortions and a decline in abortion rates; other studies confirm that increased travel distances to obtain abortion impose substantial

informational, financial, and logistical barriers to access, which are compounded by poverty. *See* Tr. Vol. III-A 48:12 – 55:25 (Katz discussing PX34, PX94; PX106; PX13).

## CONCLUSIONS OF LAW

### I.   PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT THE RIGHTS OF THEIR PATIENTS.

138.   To determine whether a particular plaintiff has standing to assert the rights of a third party,  a court must look "primarily to two factual elements": (1) "the relationship of the litigant to the person whose right he seeks to assert," in order to determine whether "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue," and whether "the relationship . . . [is] such that the [litigant] is fully, or very nearly, as effective a proponent of the right as the [third party]," and (2) "the ability of the third party to assert [her] own right," assessing whether there is some "obstacle" to the third party's ability to assert her own right. *Singleton v. Wulff*, 428 U.S. 106, 114–16 (1976)

139.   Supreme Court and Sixth Circuit precedent establish that abortion clinics and physicians, such as Plaintiffs, meet the foregoing criteria and have third-party standing to represent their patients' Fourteenth Amendment interests in challenges to abortion regulations. *See Singleton*, 428 U.S. at 118 (finding it "appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"); *see also Planned Parenthood of Greater Ohio v. Himes*, 888 F.3d 224, 230 (6th Cir. 2018) ("[P]recedent . . . clearly holds that abortion providers have standing to enforce their patients' abortion rights."), *opinion vacated*, 892 F.3d 1283 (6th Cir. 2018), *rev'd on other grounds on reh'g en banc sub nom. Planned Parenthood of Greater Ohio v. Hodges*, No. 16-4027, 2019 WL 1120412 (6th Cir. March 12, 2019); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) (holding that the rights of women are "inextricably bound

38

up with the activity the Planned Parenthood clinic desires to pursue and seemingly would not be asserted as effectively by the third parties who actually possess those rights.") (internal quotations omitted); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323 (6th Cir. 2007), *cert. denied*, 552 U.S. 1096 (2008) (adjudicating physicians' and clinics' § 1983 action seeking declaratory and injunctive relief against abortion-method ban on behalf of their patients); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 191–92 (6th Cir. 1997) (same).

## II.     LEGAL FRAMEWORK: THE UNDUE BURDEN TEST.

140.    In the nearly half century since *Roe v. Wade* recognized the Fourteenth Amendment right to decide whether or not to terminate a pregnancy, the Supreme Court has consistently held that a state may not impose an "undue burden on a woman's right to decide to have an abortion." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016), *as revised* (June 27, 2016) (internal quotations omitted); *see also Planned Parenthood of Se. Pa. v. v. Casey*, 505 U.S. 833, 877 (1992).

141.    A law imposes an undue burden if "the purpose or effect of the provision is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Whole Woman's Health*, 136 S. Ct. at 2299 (internal quotations omitted).

142.    While the Supreme Court has recognized certain legitimate government interests in regulating pre-viability abortion, the Court's holdings make unequivocally clear that "a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Casey*, 505 U.S. at 833, 877; *see also Gonzales v. Carhart*, 550 U.S. 124, 125–126 (2007) (same).

143.    The Supreme Court most recently clarified the undue burden standard in *Whole Woman's Health*, holding the undue burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887–98). In so doing, a court must "consider[] the evidence in the record—including expert evidence, presented in stipulations, depositions, and testimony[,] [and] then weigh[] the asserted benefits against the burdens." *Id.* at 2310.

144.    *Whole Woman's Health* also recognizes that a court applying the undue burden test must be mindful not to blind itself to practical realities. *See Whole Woman's Health*, 136 S. Ct. 2310–14 (considering, *inter alia*, safety of abortion procedure, inability of remaining Texas clinics to absorb patients from clinics forced to close in assessing burdens and benefits of admitting privileges requirement). Instead, a court must "consider the impact of [a new abortion restriction] based on the reality of the abortion provider and its patients, not as it could if providers and patients had unlimited resources." *Planned Parenthood of Ind. & Ky., Inc.* ("*PPINK*") *v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 824 (7th Cir. 2018); *see also Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014) (undue burden analysis to include consideration of "the ways in which an abortion regulation interacts with women's lived experience, socioeconomic factors, and other abortion regulations"), *cert. denied*, 135 S. Ct. 870 (2014); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014) (undue burden test requires a court to "look to the entire record and *factual context in which the law operates*") (emphasis added).

### III.    HB 454 IS UNCONSTITUTIONAL BECAUSE IT BANS D&E, THE PREDOMINANT SECOND-TRIMESTER ABORTION PROCEDURE, IN DIRECT VIOLATION OF BINDING SUPREME COURT AND SIXTH CIRCUIT PRECEDENT.

i.   **Supreme Court and Sixth Circuit Precedent Dictate that D&E Bans
     Are Unconstitutional.**

145.    The evidence in this case establishes that over 99% of abortions in Kentucky at

and after 15 weeks are performed using the D&E method, and that D&E is the only method that

can be used in an outpatient (non-hospital) setting in Kentucky at this point in pregnancy. *See*

*supra* ¶¶ 24–25; *see also Gonzales*, 550 U.S. at 135 (D&E "is the usual abortion method in [the

second] trimester").

146.    As set forth below, the Supreme Court and Sixth Circuit have unwaveringly held

that it is unconstitutional to ban the dominant second-trimester abortion method, i.e. D&E. *See,

e.g.*, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976); *Stenberg v. Carhart*,

530 U.S. 914 (2000); *Gonzales*, 550 U.S. 124; *Voinovich*, 130 F.3d 187; *Eubanks v. Stengel*, 224

F.3d 576 (6th Cir. 2000); *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436 (6th Cir. 2003);

*Northland Family Planning*, 487 F.3d 323.

147.    Under this precedent, a ban on the "usual" second-trimester abortion method, i.e.

D&E, "imposes an undue burden, as a facial matter, because its restrictions on second-trimester

abortions are too broad." *Gonzales*, 550 U.S. at 135, 150; *see also id.* at 164–65; *Northland

Family Planning*, 487 F.3d at 330 (explaining that the Supreme Court has held that "the undue

burden standard simply bar[s] a state from prohibiting" D&E).

### Supreme Court

### *Danforth*

148.    In *Danforth*, the Supreme Court addressed a ban on the saline amniocentesis

method, which was then "employed in a substantial majority" of all second-trimester abortions.

428 U.S. at 77. Given the "prevalence" of the prohibited procedure, the ban effectively

"inhibit[ed] the vast majority of abortions after the first 12 weeks." *Id.* at 77, 79. The purported

41

availability of alternative methods was not sufficient to save the ban, because (i) one was "used only on an experimental basis," and (ii) the remaining two would "force[] a woman and her physician to terminate her pregnancy by methods more dangerous to her health." *Id.* at 77–79.

149.    Accordingly, the Court determined the ban could "not withstand constitutional challenge." *Id.* at 79.

### *Stenberg*

150.    The Supreme Court reaffirmed the principle that a state may not prohibit the most common second-trimester abortion method, and confirmed its direct application to the very method prohibited by the Ban here—D&E—in *Stenberg*. There, the Supreme Court struck down a Nebraska law purporting to target an uncommon procedure, D&X or "intact D&E," precisely because it was so broadly written that it also banned D&E, which the Court recognized as "the most commonly used method for performing previability second trimester abortions." 530 U.S. at 945. As the Court explained, the ban "impose[d] an undue burden on a woman's ability to choose a D&E abortion, *thereby unduly burdening the right to choose abortion itself*." *Id.* at 930 (emphasis added) (internal quotations omitted).

151.    Significantly, in issuing its decision that D&E must remain available to every woman seeking a second-trimester abortion, the *Stenberg* Court was well aware of the existence of the same fetal-demise procedures that the Commonwealth proposes here. *Id.* at 925 (discussing digoxin and KCl injections).

### *Gonzales*

152.    In *Gonzales*, the Supreme Court addressed a federal D&X ban that, unlike the statute at issue in *Stenberg*, targeted *only* the rarely used D&X and preserved access to "the usual abortion method in [the second] trimester," i.e., D&E. 550 U.S. at 135; *see also id.* at 150.

Reemphasizing the rule that a ban on the dominant method of second-trimester abortion (*i.e.*, D&E) is invalid, the Court reaffirmed its earlier precedent on this exact basis:

> The instant cases, then, are different from [*Danforth*], in which the Court invalidated a ban on saline amniocentesis, *the then-dominant second-trimester abortion method* . . . . Here the Act allows, among other means, a commonly used and generally accepted method, [standard D&E,] *so* it does not construct a substantial obstacle to the abortion right.

*Id.* at 164–65 (emphasis added). The *Gonzales* Court also took pains to distinguish and affirm *Stenberg*, explaining that the statute at issue in *Stenberg* constituted an unconstitutional undue burden because it banned *both* D&X and D&E, *id.* at 154, whereas the law at issue in *Gonzales* did not ban standard D&E, *id.* at 164–65.

153.    If the ban in *Gonzales* had reached D&E, it would have "impose[d] an undue burden, as a facial matter, because its restrictions on second-trimester abortions" would have been "too broad." *Gonzales*, 550 U.S. at 150.

### Sixth Circuit

154.    The Sixth Circuit has faithfully applied the foregoing precedent to strike laws banning D&E. *See Voinovich*, 130 F.3d 187; *Eubanks*, 224 F.3d 576; *Northland Family Planning*, 487 F.3d 323.

155.    Two decades after *Danforth*, the Sixth Circuit became the first appellate court to strike a ban on D&E abortions. *See Voinovich*, 130 F.3d at 193. In *Voinovich*, the Sixth Circuit considered a challenge to an Ohio law that purported to ban the rarely-used D&X procedure. However, the evidence presented to the Court demonstrated that the statute, as written, would prohibit D&E (prior to demise), as well. *Id.* at 198–99.

156.    As is still true today, the evidence in *Voinovich* also showed that D&E was "[t]he most common method of abortion in the second trimester." *Id.* at 198. Therefore, citing *Casey* and *Danforth*, the Sixth Circuit held:

> Because the definition of the banned procedure includes the D&E procedure, the most common method of abortion in the second trimester, the Act's prohibition on the D&X procedure has the effect "of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 . . . As in *Danforth,* the Act bans the most commonly used second trimester procedure and therefore is an unconstitutional burden on a woman's right to choose to have an abortion.

*Id.* at 201; *see also id.* ("The undue burden posed by the Act lies in the fact that the Act bans the most common second trimester procedure.").

157.    In *Stengel*, the Sixth Circuit affirmed a decision by Judge Heyburn of this Court striking a Kentucky law banning D&X that also would have prohibited D&E (prior to demise). *See Stengel*, 224 F.3d at 577 ("[W]e conclude that [*Stenberg*] is controlling in this case, and that the district court was correct when it held that the Kentucky statute [was] unconstitutional.").

158.    As here, the evidence in *Stengel* showed that D&E was the predominant second-trimester abortion method in Kentucky and the only such method available in the outpatient setting. *See Eubanks v. Stengel*, 28 F. Supp. 2d 1024, 1031–32 (W.D. Ky. 1998). Thus, the district court found based on testimony that the law would criminalize at least some, if not all, D&E abortions in Kentucky. *Id.* at 1035. "By doing so," Judge Heyburn concluded, "the words and the Act they comprise create an undue burden upon the women who seek only to exercise their rights." *Id.*

159.    Significantly, the evidence in *Stengel* also showed that, as here, *see supra* ¶ 31, physicians in Kentucky did not attempt fetal demise prior to D&E, *see* 28 F. Supp. 2d at 1032,

1040. And, as here, *see supra* ¶ 82, the evidence showed that physicians could not know before starting any given procedure whether they might run afoul of the ban, *see* 28 F. Supp. 2d at 1035.

160.    Most recently, in *Northland Family Planning*, the Sixth Circuit struck a Michigan law that would have prohibited D&E. 487 F.3d at 331–37. In striking the law, the Sixth Circuit made clear that that "*Gonzales* did not disrupt *Stenberg*'s holding that prohibition of D&E would amount to an unconstitutional undue burden." *Id.* at 331. "[U]nder the framework of *Stenberg* and *Gonzales*," a statute that "prohibit[s] D&E . . . impose[s] an unconstitutional undue burden" as a matter of law, *id.* at 337, and is "simply barred," *id.* at 330.

161.    In fact, like the Supreme Court, the Sixth Circuit has only ever upheld one abortion-method ban. And, like the Supreme Court, it did so only and precisely because that statute "secure[d], by means of an explicit exception, the continued availability of traditional D&E." *Taft*, 353 F.3d at 452.

162.    Numerous other courts have reached the same conclusion. *See, e.g.*, *Hope Clinic v. Ryan*, 249 F.3d 603, 604–05 (7th Cir. 2001) (per curiam); *Causeway Med. Suite v. Foster*, 221 F.3d 811, 812 (5th Cir. 2000); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 145–46 (3d Cir. 2000); *Whole Woman's Health v. Paxton*, 280 F. Supp. 3d 938, 945 (W.D. Tex. 2017); *see also Hodes & Nauser*, *v. Schmidt*, 368 P.3d 667, 677–79 (Kan. Ct. App. 2016) (affirming preliminary injunction against D&E ban, explaining "Kansas has simply attempted to do in two statutes what the United States Supreme Court held Nebraska could not do in one— ban both D&E and [D&X] abortions").

## IV.    HB 454 IS UNCONSTITUTIONAL BECAUSE IT WOULD IMPOSE SUBSTANTIAL OBSTACLES IN THE PATH OF EVERY WOMAN SEEKING ABORTION IN KENTUCKY STARTING AT 15 WEEKS.

163.    In addition to the foregoing binding precedent establishing that a ban on D&E is

"simply barred," *Northland Family Planning*, 487 F.3d at 330, the record evidence, including the

testimony presented at trial, overwhelmingly establishes that HB 454 would impose a substantial

obstacle in the path of every woman seeking an abortion in Kentucky beginning at 15 weeks for

two independent reasons. *See, e.g.*, *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1327

(11th Cir. 2018) ("All of those findings about the fetal demise methods . . . support the

conclusion that the Act would place a substantial obstacle in the path of a woman seeking an

abortion before . . . viability.") (internal quotations omitted).

164.    **First**, a state cannot defend a prohibition on the standard abortion method by

pointing to different medical procedures (such as the Proposed Demise Procedures) that are

unfeasible and/or unreliable. *See, e.g.*, *Danforth*, 428 U.S. at 77–79; *W. Ala. Women's Ctr.*, 900

F.3d at 1327; *Paxton*, 280 F. Supp. 3d at 952.

165.    The evidence establishes there are no feasible means of ensuring fetal demise

prior to every D&E, which is what the Ban requires for Plaintiffs to lawfully continue

performing abortions starting at 15 weeks. *See supra* ¶¶ 36–49, 56–69, 72–79, 82.

166.    Indeed, every court to have examined similar evidence regarding the Proposed

Demise Procedures at trial has found that none affords physicians feasible means to circumvent a

ban on D&E. *See Paxton*, 280 F. Supp. 3d at 952 ("The court finds that none of the proposed

fetal-demise methods is feasible for any physician other than a specialist in maternal-fetal

medicine, without substantial additional training, to induce fetal demise *in utero* in all instances

before performing the evacuation phase of a standard D&E procedure."); *W. Ala. Women's Ctr.

v. Miller*, 299 F. Supp. 3d. 1244, 1286 (M.D. Ala. 2017), *aff'd sub nom. W. Ala. Women's Ctr. v.

Williamson*, 900 F.3d 1310 (11th Cir. 2018) ("[T]he court concludes that the proposed fetal-

demise methods are not feasible for inducing fetal demise before standard D&E at the Alabama clinics."); *accord W. Ala. Women's Ctr.*, 900 F.3d at 1322–28 (upholding findings on unfeasibility of demise procedures).

167.    Therefore, the Ban would eliminate access to abortion in Kentucky beginning at 15 weeks, imposing an unconstitutional undue burden. *See Casey*, 505 U.S. at 879 ("Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.")

168.    **Second,** a state cannot defend a prohibition on the standard abortion method by pointing to different medical procedures (such as the Proposed Demise Procedures) that would subject women to significant health risks. *See, e.g.*, *Gonzales*, 550 U.S. at 161; *W. Ala. Women's Ctr.*, 900 F.3d at 1324–26.

169.    The evidence, *see supra* ¶¶ 37–39, 48, 50–55, 57, 70–71, 74, 76, 80–81, 90, demonstrates that mandating fetal demise prior to every D&E would force every woman seeking a D&E "to endure a medically unnecessary, invasive procedure that increases the duration of the procedure as well as the risk of complications," *W. Ala. Women's Ctr.*, 299 F. Supp. 3d at 1280–1281.

170.    Indeed, every court to have examined similar evidence at trial has found that mandating the Proposed Demise Procedures impose additional medical risks on women seeking abortion. *See, e.g.*, *W. Ala. Women's Ctr.*, 299 F. Supp. 3d at 1282, *aff'd sub nom. W. Ala. Women's Ctr.*, 900 F.3d at 1324–26; *Paxton*, 280 F. Supp. 3d at 953; *see also Farmer*, 220 F.3d at 145 ("The increased risk of injury or death to the woman by attempting to ensure fetal demise *in utero* . . . clearly constitutes an undue burden."); *Evans v. Kelley*, 977 F. Supp. 1283, 1318 (E.D. Mich. 1997) ("[A]ttempting to ensure fetal demise before commencing a D&E procedure

does not eliminate the undue burden . . . upon women seeking second trimester abortions. Quite the contrary, the Court finds that attempting to ensure fetal demise as argued by Defendants would operate as an additional undue burden because it would impose additional medical risks on women seeking abortions.").

171.    An abortion-method ban that forces a woman to obtain an abortion "by methods more dangerous to her health" imposes an unconstitutional undue burden. *Danforth*, 428 U.S. at 79. The Supreme Court has never sanctioned a state's attempt to condition the exercise of a constitutional right upon submitting to additional, invasive procedures that impose significant risks but confer no benefits. *See id.* at 78–79; *see also Paxton*, 280 F. Supp. 3d at 953 (enjoining D&E ban where "the court [was] unaware of any other medical context that requires a doctor— in contravention of the doctor's medical judgment and the best interest of the patient—to conduct a medical procedure that delivers no benefit to the woman."). Instead, the Court has long recognized the link between the abortion right and the right to bodily integrity. As *Casey* explains, the right to abortion is a rule of "personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing *limits on governmental power to mandate medical treatment* or to bar its rejection." 505 U.S. at 857. Unsurprisingly "[t]he State cites no support for the proposition that a state may subject women [seeking abortion] to an increased degree of risk." *W. Ala. Women's Ctr.*, 900 F.3d at 1326.

## V.    NO STATE INTEREST CAN JUSTIFY THE BAN'S BURDENS.

172.    Because the Ban imposes substantial and indeed insurmountable obstacles to a woman seeking a pre-viability abortion after 15 weeks, no state interest is adequate can justify its burdens. *See, e.g.*, *Casey*, 505 U.S. at 877.

173.     Moreover, even if the interests identified by the Commonwealth were sufficient to justify the obstacles the Ban imposes (which they are not), the Commonwealth failed to prove the Ban actually advances these interests. *See Whole Woman's Health*, 136 S. Ct. at 2315 (striking abortion restriction not "reasonably related to preserving women's health, the asserted purpose of the Act").

174.     For example:

a.  There is no evidence that fetal pain-perception is possible at the points in pregnancy when Plaintiffs perform abortions, *see supra* ¶¶ 6, 98–110;

b.  There is no evidence that D&E, which has been performed for decades because it is the safest method of second-trimester abortion and is recommended by major medical associations, such as ACOG and SFP, causes "scandal and disrepute" to the medical profession, *see supra* ¶¶ 95–97;

c.  Even the Commonwealth's own experts dispute that mandating demise prior to D&E actually protects the dignity of the fetus, *see* Tr. Vol. III-B 24:20 – 25:4 (Levatino); Brady Depo. 151:1 – 152:7 ("A. . . . You can get dismemberment with suction, so I don't see any difference. Q. So would it just be irrational to ban [dismemberment with forceps] and allow [dismemberment with suction]? . . . A. It doesn't make sense, but there's a lot of weird laws out there. Q. I mean, in your view, it's irrational, right? A. Yes.").

d.  If anything, the evidence is undisputed that none of the Proposed Demise Procedures provide any medical benefit to the woman having an abortion. Therefore, by mandating physicians perform procedures that are invasive, often experimental, and are accompanied by increased pain, risks, and side-effects, and

have no countervailing medical benefit, the Ban violates the core principles of medical ethics. *See supra* ¶¶ 89–94.

## VI.    THE COMMONWEALTH'S REMAINING ARGUMENTS CANNOT SAVE THE BAN FROM INVALIDATION.

### i.    *Gonzales* Does Not Support the Commonwealth's Argument.

### Medical Uncertainty

175.    The Commonwealth's argument that, under *Gonzales*, any "dispute" in the medical community "must be resolved in the favor of the Commonwealth" is incorrect for four reasons. Comm. Br. 14.

176.    **First**, in *Whole Woman's Health* the Court explicitly rejected the argument that *Gonzales* dictates "that legislatures, and not courts, must resolve questions of medical uncertainty" when assessing the burdens posed by an abortion restriction. 136 S. Ct. at 2310. "Instead, the Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Id*. Therefore, nothing in *Gonzales* prevents a district court from performing its traditional role of fact-finder in an abortion case. *See, e.g.*, *W. Ala. Women's Ctr.*, 900 F.3d at 1325 (affirming decision striking D&E ban where "[t]he district court heard the testimony, including that of competing experts, and thoroughly explained its resolution of all the material conflicts in the evidence").

177.    **Second,** medical uncertainty discussion in *Gonzales* simply was not pertinent to the analysis of whether it is constitutional to ban the predominant second-trimester abortion method (the Supreme Court had already affirmed that it had not). *Gonzales*, 550 U.S. at 135, 150–54, 164. The discussion arose in the context of a wholly separate claim: whether the federal ban was unconstitutional on its face because it lacked an exception for instances in which the

prohibited procedure was necessary to protect a woman's health. *Id.* at 161–162. This claim is not at issue in this case.

178. **Third,** the uncertainty in *Gonzales* was over whether the prohibition on D&X "would *ever* impose significant health risks on women" in view of the continued availability of D&E, which "[e]xperts testifying for both sides" agreed "was safe." 550 U.S. at 162, 164. Here, the situation is exactly the opposite: by prohibiting D&E without an additional (and successful) fetal-demise procedure, the near-unanimous record evidence, *see supra* ¶¶ 50–55, 70–71, 80–81, is that the Ban "would *always* impose some increased health risks on women." *W. Ala. Women's Ctr.*, 900 F.3d at 1326 (emphasis in original). That the *Gonzales* Court was unwilling to strike on its face a law that, even its opponents believed would only inflict harm in a small number of relevant cases, *Gonzales*, 550 U.S. at 163–67, is a far cry from a case where the evidence, expert testimony, and concessions by defense experts overwhelmingly demonstrate that mandating fetal demise procedures would pose significant health risks to every woman seeking a D&E.

179. **Fourth,** the "uncertainty" in the *Gonzales* record was not merely a disagreement between the parties' experts. Rather, it was between extensive Congressional fact-finding that comprised the federal law and the factual record developed at trial. *Whole Woman's Health*, 136 S. Ct. at 2310 (supposed legislative judgment, particularly relating to medical evidence, is not entitled to deference where "the relevant statute [] does not set forth any legislative findings"); *W. Ala. Women's Ctr.*, 299 F. Supp. 3d. at 1287 (where law banning D&E "contained no findings as to the safety of . . . [demise methods] proposed by the State" and there was no other evidence that the methods had "been subject to scrutiny through the legislative fact-finding process," nor any "indication that the Alabama legislature relied on the safety of these alternatives in drafting the fetal-demise law," the court considered "the evidence in the record—

51

including expert evidence, and [gave] significant weight to that evidence.") (internal quotations and citation omitted). Under those circumstances, the Court was unwilling to strike the law on its face.

180.    By contrast, HB 454 contains no legislative findings concerning the safety, efficacy, and/or availability of the Proposed Demise Procedures—indeed, neither the term "fetal demise" nor any of the procedures pressed by the Commonwealth is even mentioned in the statute, nor did the Commonwealth provide any legislative history indicating that the General Assembly considered any evidence concerning the safety, efficacy, and/or availability of the Proposed Demise Procedures. *See* DX61; *see also W. Ala. Women's Ctr.*, 900 F.3d at 1325–26 (citing *Whole Woman's Health* as controlling precedent that "refutes" the assertion that the legislature should be left to resolve questions of medical uncertainty and instead compels the court to "retain[] an independent constitutional duty to review factual findings where constitutional rights are at stake") (internal quotations and citations omitted).

### Scienter Requirement

181.    The Commonwealth's contention that, under *Gonzales*, the Ban's scienter requirement—indeed, *any* scienter requirement—necessarily saves the Ban from invalidation is incorrect. Comm. Br. 35.

182.    The Ban prohibits the "intentional[]" separation and removal of fetal tissue prior to fetal demise. Act, § 1(2)(a). The Kentucky Supreme Court has held that intent "may be inferred from the actions of a defendant or from the circumstances surrounding those actions." *Little v. Com.*, 272 S.W.3d 180, 186 (Ky. 2008) (quoting *Marshall v. Com.*, 60 S.W.3d 513, 518 (Ky. 2001)). Under Kentucky law, "a person is presumed to intend the logical and probable consequences of his conduct." *Id.* (internal quotations omitted).

183.    Here, when demise fails or is impossible to achieve on a given patient—as the evidence shows will invariably occur, *see supra* ¶¶ 40–49, 65–69, 77–79—a physician would have no choice but to intentionally perform the prohibited procedure thus running afoul of the Ban.

184.    Moreover, with respect to UCT in particular, the undisputed evidence is that a physician knows there is a risk of transecting and removing fetal tissue prior to causing demise. *See supra* ¶ 78. As such, it is indisputable that Plaintiffs are aware that the logical and probable consequence of inserting forceps into the uterus in an attempt to grasp and transect the cord would be to violate the Ban.

185.    This is wholly unlike *Gonzales*, where the evidence showed that there were a number of steps physicians could take to minimize the likelihood of performing the prohibited procedure, thus "bel[ying] any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E." 550 U.S. at 155.

### Fetal Demise Methods

186.    The Commonwealth's claim that *Gonzales* somehow endorses the mandated use of KCl or digoxin injections prior to every D&E is also completely incorrect. *See* Comm. Br. 33–34. Rather, it was only *after* holding the federal D&X ban to be constitutional because it preserved access to standard D&E, and *after* holding that the federal D&X ban did not impose significant health risks on any woman because every woman seeking a second-trimester abortion could still obtain a standard D&E, that the *Gonzales* Court acknowledged injections as an option for the minority of physicians who believed performing a D&X was "truly necessary" for a woman's health. 550 U.S. at 164. This *dicta* in no way supports a law mandating demise prior to every abortion.

187.    The Commonwealth's argument wholly "fails to appreciate the distinction between elective and government-mandated surgical procedures." *W. Ala. Women's Ctr.*, 299 F. Supp. 3d at 1282.

### ii.    The Medical-Emergency Exception Does Not Save the Ban.

188.    HB 454's medical-emergency exception cannot save the Ban. As the Act's plain language and legislative history make clear, the exception allows the otherwise banned treatment *only* in the very narrow circumstance of a "medical emergency," when a woman a woman's medical condition "necessitate[s]" the "immediate" treatment to avert "death or . . . serious risk of substantial *and* irreversible impairment of a major bodily function." Ky. Rev. Stat. § 311.720(9) (emphasis added); *see also* Act, §1(1)(b).

189.    As the Eleventh Circuit held in reviewing a virtually identical exception, this language provides "cold comfort to practitioners and women":

> By its express terms, *the health exception would not apply when complying with the Act would result in the woman being subjected to a serious risk of reversible, substantial physical impairment of a major bodily function*. . . . Nor would the exception apply to irreversible substantial physical impairments of a minor bodily function (whatever that is) —or two or three of them for that matter.

*W. Ala. Women's Ctr.*, 900 F.3d at 1328–29 (emphasis added); *see also W. Ala. Women's Ctr.*, 299 F. Supp. 3d at 1284 (explaining that virtually identical language "provides vanishingly little protection for patients or doctors,"  setting the bar so high that "[t]he physician could not invoke the [] exception where the patient, *while at serious risk of grave illness*, would likely recover from the illness eventually, no matter how long that recovery would take"); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1066 (E.D. Ark. 2017) (identical language "would require that a woman be denied a D&E abortion until her health condition substantially and inevitably deteriorated").

190.    Moreover, as the record makes clear, the medical-emergency exception does nothing to mitigate the significant medical risks—e.g., infection, bowel perforation, extramural delivery, and cardiac arrest—inherent in the Proposed Demise Procedures themselves, *see supra see supra* ¶¶ 50–55, 70–71, 80–81; nor does it address the circumstances of any woman for whom the Proposed Demise Procedures "are difficult or impossible because of anatomy or medical contraindication," *Hopkins*, 267 F. Supp. 3d at 1066; *see, e.g., supra* ¶¶ 40–42, 66, 79, nor would invoking of the exception protect Plaintiffs' patients from experimental medical procedures, *see, e.g., supra* ¶¶ 38–39, 48–49, 72–81.

## VII.    FACIAL RELIEF IS APPROPRIATE BECAUSE HB 454 IMPOSES AN UNDUE BURDEN ON A LARGE FRACTION OF PATIENTS.

191.    Once it has been determined that a restriction places a substantial obstacle in the path of a woman seeking an abortion, the court must determine the scope of the appropriate remedy. *See generally Whole Woman's Health*, 136 S. Ct. at 2307 ("[A] final judgment should grant the relief to which each party is entitled[.]") (internal quotations omitted); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330–31 (2006) (courts should grant relief that appropriately remedies constitutional violation).

192.    As the Supreme Court and Sixth Circuit have "repeated[ly] and continuous[ly]" recognized, to determine whether facial relief is appropriate in a challenge to an abortion restriction, this Court "must analyze the factual record to determine whether the challenged regulation in a *large fraction* of the cases in which it is relevant, will operate as a substantial obstacle to . . . abortion." *Cincinnati Women's Servs. v. Taft*, 468 F.3d 361, 369 (6th Cir. 2006) (emphasis in original); *accord Whole Woman's Health*, 136 S. Ct. at 2320.

193.    To identify the fraction's denominator, the "proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894.

194.    Here, the equation is straightforward, because the denominator and numerator are the same: HB 454 is "only relevant" to women seeking D&E, and by effectively banning all such care, it poses a "substantial obstacle" to "100%" of these women. *Hopkins*, 267 F. Supp. 3d at 1066–68. Because "there is a one hundred percent correlation between those whom the statute affects and its constitutional invalidity as applied to them," this "is sufficient to require declaring the statute entirely invalid, even under the strict standard" of the large-fraction test." *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013); *see also Northland Family Planning*, 487 F.3d at 339 (striking on its face and rejecting argument for partial invalidation of "statute that clearly went beyond the limitations established by the Supreme Court in *Stenberg* on a nearly identical issue"); *Stengel*, 28 F. Supp. 2d at 1040–41 (facially invalidating law banning D&E), *aff'd*, 224 F.3d 576; *Voinovich*, 130 F.3d at 195–96, 200–201 (same).

195.    Even if Plaintiffs were to use the Proposed Demise Procedures to attempt to circumvent the Ban, HB 454 would nevertheless impose a substantial obstacle on 100% of affected women, because it would force every one of them "to undergo an unwanted, risky, invasive, and experimental procedure in exchange for exercising her right to choose an abortion." *W. Ala. Women's Ctr.*, 299 F.3d at 1282.

196.    The Commonwealth's attempts to evade this inevitable conclusion are unavailing.

197.    First, the Supreme Court has flatly rejected attempts to expand the large-fraction denominator to include all women seeking abortions. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2320 (holding the Fifth Circuit erred in defining the denominator in challenge to law that

56

would have closed most (but not all) Texas abortion clinics as all "Texan women of reproductive age") (internal quotations omitted); *Casey*, 505 U.S. at 895 (holding denominator for large fraction analysis of spousal notification provision to be women "who do not wish to notify their husbands of their [abortion] intentions *and* who do not qualify for one of the statutory exceptions to the notice requirement.") (emphasis added); *see also Taft*, 468 F.3d at 373 (recognizing large-fraction denominator in D&E ban as "all women upon whom the restriction actually operated— i.e., women seeking second-trimester pre-viability abortions").

198.    Second, under Supreme Court precedent it is irrelevant that only approximately 16% of abortions in Kentucky are D&E. *See* Comm. Br. 39. For example, in *Casey*, the Supreme Court held that group for whom spousal notification provision was an "actual rather than an irrelevant restriction" consisted solely of "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement." 505 U.S. at 895. It was wholly irrelevant to the Court that the affected group amounted to less than one percent of women obtaining abortions in Pennsylvania. *Id.* at 894–95. As the Supreme Court explained, "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there." *Id.* at 894; *see also id.* at 895. Every other court that has considered a law banning D&E has likewise rejected attempts similar to that of the Commonwealth here to manipulate the large fraction test in this way. *See, e.g.*, *W. Ala. Women's Ctr.*, 900 F.3d at 1326; *Hopkins*, 267 F. Supp. 3d at 1067; *accord Paxton*, 280 F. Supp. 3d at 953.

199.    Third, under Supreme Court precedent the availability of out-of-state abortion clinics is irrelevant to the large fraction analysis.  In *Whole Women's Health*, 136 S. Ct. at 2318–20, the Supreme Court overturned a ruling by the Fifth Circuit that the patients of the sole

abortion facility in El Paso, Texas, were not entitled to relief against a law that would have closed the clinic because a New Mexico facility was 12 miles away, *see Whole Woman's Health v. Cole*, 790 F.3d 563, 598 (5th Cir. 2015). And just last September, another judge in this District rejected the Commonwealth's argument that the Court should "consider the availability of abortion clinics in other states in evaluating the burdens placed on Kentucky women's access to such facilities," holding that "the availability of abortion services in other states does not cure the infirmities presently imposed by Kentucky law," and that "Defendants' contention that it can trample upon the rights of Kentucky women because those rights could be exercised in other states [was] without merit." *EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17-cv-00189-GNS, 2018 WL 6444391, at *26–27 (W.D.Ky. Sept. 28, 2018); *see also Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 918–19 (7th Cir. 2015). In other words, "Kentucky simply cannot foist upon sister states its obligation to provide constitutional protections to its own citizens." *Glisson*, 2018 WL 6444391, at *26–27 (collecting cases).

200.    Moreover, even if it *were* proper to factor the existence of out-of-state abortion clinics in the large fraction test, the record before this Court makes clear that the increased travel burdens would impose substantial burdens on a large fraction of Plaintiffs' patients and, in particular, erect a significant barrier to care for poor and low-income women. *See supra* ¶¶ 114–137; *see also Glisson*, 2018 WL 6444391, at *16 (finding the implication of women being forced to travel hundreds of miles to an abortion in the event EMW closes to be "significant, particularly in light of the fact that a large portion of . . . EMW's patients have limited financial resources").

201.    Finally, even if the Ban did not impose an undue burden on 100% of women seeking abortions in Kentucky starting at 15 weeks, the Commonwealth is incorrect to contend

that the large-fraction test requires precise quantification of the fraction's numerator. *See, e.g.*, *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 686 (W.D. Tex. 2014) (holding large-fraction test satisfied when "a significant, but ultimately unknowable, number of women" would be unduly burdened by the challenged provisions), *aff'd*, 136 S. Ct. at 2320; *Casey*, 505 U.S. at 887–95 (holding large-fraction test satisfied when "likely" spousal notification provision would "prevent a significant number of women from obtaining an abortion" even though existing evidence "involv[ed] samples too small to be representative").

202.    To the contrary, "*Casey* teaches that the court need not find that a law imposes an undue burden on a precise percentage of impacted women in order find that facial relief is warranted," and held instead that if a law "would unduly burden access to abortion for a *significant number* of the women for whom the law is relevant," the large-fraction test is satisfied. *Planned Parenthood Southeast, Inc. v. Strange*, 172 F. Supp. 3d 1275, 1288 (M.D. Ala. 2016) (citing *Casey*, 505 U.S. at 594–95) (emphasis added); *accord Reproductive Health Services v. Marshall*, 268 F. Supp. 3d 1261, 1272 (M.D. Ala. 2017).

## VIII.   PLAINTIFFS SATISFY THE PERMANENT INJUNCTION FACTORS.

203.    In considering whether permanent injunctive relief should be granted, a court considers four factors: (1) success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See, e.g.*, *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012).

204.    The Plaintiffs have amply demonstrated they are entitled to permanent injunctive relief against the Ban.

205.     For the reasons set forth in ¶¶ 138 – 202 *supra*, Plaintiffs have shown success on the merits.

206.     Further, enforcement of the Ban will cause immediate, ongoing, and irreparable harm to Plaintiffs' patients' constitutional rights as a matter of law. *See, e.g.*, *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 824 (W.D. Tex. 2017) ("The court concludes that Plaintiffs have established that absent a [TRO] they will suffer irreparable harm by being unable to access the most commonly used and safest previability-second-trimester-abortion procedure."); *Hopkins*, 267 F. Supp. 3d at 1068–69 (enforcement of D&E ban would inflict irreparable harm on plaintiff physician and his patients "as there is no adequate remedy at law"); *W. Ala. Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1347 (M.D. Ala. 2016) ("In the absence of an injunction, Alabama women would immediately lose the right to obtain a pre-viability abortion anywhere in the State when they reached 15 weeks of pregnancy," and so the "irreparable harm" requirement "is satisfied.").

207.     Even if enforcement of the Ban did not constitute *per se* irreparable harm, the evidence in the record overwhelmingly leads to the same result. *See supra* ¶¶ 134 – 137; *see also Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) (irreparable harm where "women who carry unwanted pregnancies to term are at increased risk of death and childbirth complications"); *W. Ala. Women's Ctr.*, 299 F. Supp. 3d at 1263 ("Where these types of barriers exist, it is likely that some women will pursue risky alternatives."); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (irreparable harm from pain, complications, and other adverse effects due to delayed medical treatment).

208.     Finally, where, as here, a challenged law is unconstitutional the balance of hardships tilts clearly in Plaintiffs' favor because "no substantial harm to others can be said to

inhere in its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't*, 274 F.3d 377, 400 (6th Cir.

2001). Moreover, "it is always in the public interest to prevent the violation of . . . constitutional

rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.

1994).

Tendered by:

/s/Alexa Kolbi-Molinas
Alexa Kolbi-Molinas
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
akolbi-molinas@aclu.org
*Counsel for Plaintiffs*