# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  June 02, 2020

Mr. Andrew Beck
Ms. Meagan Burrows
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Mr. Daniel J. Cameron
Office of Attorney General of Kentucky
700 Capital Avenue, Suite 118
Frankfort, KY 40601

Mr. Benjamin Michael Flowers
Office of the Attorney General
30 E. Broad Street, 14th Floor
Columbus, OH 43215

Ms. Heather Lynn Gatnarek
325 W. Main Street
Suite 2210
Louisville, KY 40202

Ms. Michele D. Henry
Craig Henry
401 W. Main Street
Suite 1900
Louisville, KY 40202

Ms. Roxann E. Henry
Morrison & Foerster
2000 Pennsylvania Avenue, N.W.
Suite 6000
Washington, DC 20006

Ms. Alexa Kolbi-Molinas
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Mr. Matthew Franklin Kuhn
Office of the Governor
of Kentucky
700 Capital Avenue
Suite 101
Frankfort, KY 40601

Mr. Stephen Chad Meredith
Office of the Attorney General
of Kentucky
700 Capitol Avenue
Suite 118
Frankfort, KY 40601

Ms. Ester Murdukhayeva
Office of the Attorney General
New York Office
28 Liberty Street
23rd Floor
New York, NY 10005

Mr. Brett Robert Nolan
Office of the Attorney General
of Kentucky
700 Capitol Avenue
Suite 118
Frankfort, KY 40601

Ms. Kimberly A. Parker
Wilmer, Cutler, Pickering, Hale and Dorr
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Mr. Mark Stephen Pitt
Office of the Governor
of Kentucky
700 Capital Avenue
Suite 101
Frankfort, KY 40601

Ms. Alexandra Preece
Morrison & Foerster
12531 High Bluff Drive
Suite 100
San Diego, CA 92130

Ms. Elizabeth Watson
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Ms. Catherine E. York
Commonwealth of KY
Cabinet for Health and Family Services
250 E. Main Street
5w-B
Frankfort, KY 40621

Re:  Case No. 19-5516, *EMW Women's Surgical Center, et al v. Eric Friedlander, et al*
Originating Case No. : 3:18-cv-00224

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Vanessa L. Armstrong

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0169p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

EMW WOMEN'S SURGICAL CENTER, P.S.C., on behalf
of itself, its staff, and its patients; ASHLEE BERGIN,
M.D., M.P.H. and TANYA FRANKLIN, M.D., M.S.P.H.,
on behalf of themselves and their patients,

        *Plaintiffs-Appellees*,

      *v.*

ERIC FRIEDLANDER, in his official capacity as Acting
Secretary of Kentucky's Cabinet for Health and
Family Services,

        *Defendant-Appellant*.

> No. 19-5516

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:18-cv-00224—Joseph H. McKinley, Jr., District Judge.

Argued: January 29, 2020

Decided and Filed: June 2, 2020

Before: MERRITT, CLAY, and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Matthew F. Kuhn, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for
Appellant. Andrew D. Beck, AMERICAN CIVIL LIBERTIES UNION OF NEW YORK, New
York, New York, for Appellees. **ON BRIEF:** Matthew F. Kuhn, M. Stephen Pitt, S. Chad
Meredith, Brett R. Nolan, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for Appellant.
Andrew D. Beck, Alexa Kolbi-Molinas, Meagan M. Burrow, Elizabeth Watson, AMERICAN
CIVIL LIBERTIES UNION OF NEW YORK, New York, New York, Amy D. Cubbage,
ACKERSON & YANN, Louisville, Kentucky, Heather Lynn Gatnarek, AMERICAN CIVIL
LIBERTIES UNION OF KENTUCKY, Louisville, Kentucky, for Appellees. Benjamin M.
Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Ester
Murdukhayeva, OFFICE OF THE NEW YORK ATTORNEY GENERAL, New York, New

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 5 of 47 PageID #: 5839
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 2   (5 of 47)

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 2

York, Alexandria Preece, MORRISON & FOERSTER LLP, San Diego, California, Roxann E. Henry, MORRISON & FOERSTER LLP, Washington, D.C., Kimberly A. Parker, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Amici Curiae.

CLAY, J., delivered the opinion of the court in which MERRITT, J., joined. BUSH, J. (pp. 33–43), delivered a separate dissenting opinion.

_____

## OPINION

_____

CLAY, Circuit Judge. This case asks whether a state can require patients to undergo a procedure to end potential fetal life before they may receive an abortion performed through the method most common in the second trimester of pregnancy—dilation and evacuation. Kentucky House Bill 454 does just that. Plaintiffs, Kentucky's sole abortion clinic and two of its doctors, argue that House Bill 454 violates patients' constitutional right to abortion access prior to fetal viability because the burdens the law imposes significantly outweigh its benefits. Defendant Eric Friedlander, the Acting Secretary of Kentucky's Cabinet for Health and Family Services, disagrees. He contends that Kentucky may constitutionally require patients to undergo such a procedure because it is a reasonable alternative to the standard dilation and evacuation abortion. The district court agreed with Plaintiffs and permanently enjoined Kentucky from enforcing House Bill 454.

For the reasons set forth below, we **AFFIRM** the district court's judgment.

## BACKGROUND

### Factual Background

In the first trimester of pregnancy, a physician may perform an abortion through two methods. She may offer medication to induce a process like miscarriage, or she may perform a surgical abortion, using suction to remove the contents of the uterus intact. But these methods are only effective in the initial weeks of pregnancy. Starting around fifteen weeks of pregnancy, measured from the time of the individual's last menstrual period ("LMP"), physicians must use the dilation and evacuation ("D&E") method. D&E is the standard method used in the second

trimester, accounting for 95% of second-trimester abortions performed nationwide.  To perform a D&E, a physician first dilates the patient's cervix, and then uses instruments and suction to remove the contents of the uterus.  At this stage of pregnancy, the fetus has grown larger than the cervical opening, and so fetal tissue separates as the physician draws it through that narrow opening.

This leads us to Kentucky's House Bill 454 ("H.B. 454" or "the Act"), which was signed into law on April 10, 2018.  H.B. 454 provides, in relevant part:

> No person shall intentionally perform or induce or attempt to perform or induce an abortion on a pregnant woman . . . [t]hat will result in the bodily dismemberment, crushing, or human vivisection of the unborn child . . . [w]hen the probable post-fertilization age of the unborn child is eleven (11) weeks or greater [(*i.e.*, thirteen (13) weeks or greater as measured since the last menstrual period)][1] . . . .

(H.B. 454, R. 43-1 at PageID #244.)  "[B]odily dismemberment, crushing, or human vivisection" includes:

> a procedure in which a person, with the purpose of causing the death of an unborn child, dismembers the living unborn child and extracts portions, pieces, or limbs of the unborn child from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that . . . slices, crushes, or grasps . . . any portion, piece, or limb of the unborn child's body to cut or separate the portion, piece, or limb from the body.

(*Id.* at ##243–44.)  While H.B. 454 does not use the words "dilation and evacuation" or "D&E," the parties agree that it references the standard D&E.  Because fetal tissue separates as physicians remove it from the uterus during the standard D&E, H.B. 454 forbids D&E abortions when performed on "living unborn" fetuses—or, in clinical terms, prior to "fetal demise."

H.B. 454 does not identify any workaround for physicians who seek to perform or patients who seek a D&E after thirteen weeks.  The Act does not suggest that physicians should

---

[1]Like Plaintiffs, the Secretary, and the district court before us, we identify the relevant stage of pregnancy based on the number of weeks since the individual's last menstrual period, or weeks "LMP."  However, H.B. 454 identifies the stage of pregnancy based on the number of weeks "post fertilization." (H.B. 454, R. 43-1 at PageID #244.)  Eleven weeks post fertilization is equivalent to thirteen weeks LMP.

or must induce fetal demise prior to performing a D&E. Specifically, it does not discuss any procedures for inducing fetal demise.

H.B. 454 provides for a single exception to this prohibition: physicians may perform a D&E prior to fetal demise in a "medical emergency." (*Id.* at #244.) A "medical emergency" is a situation that a physician deems to "so complicate[] the medical condition of a pregnant female as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function." (*Id.*); Ky. Rev. Stat. § 311.720(9).

Violation of H.B. 454 is a Class D felony, (H.B. 454, R. 43-1 at PageID #247), for which providers may receive up to five years of imprisonment, Ky. Rev. Stat. § 532.060(2)(d), and adverse licensing and disciplinary action, *id.*, §§ 311.565, 311.606.

## Procedural Background

On the day H.B. 454 was signed, Plaintiffs EMW Women's Surgical Center ("EMW") and its two obstetrician-gynecologists, Dr. Ashlee Bergin and Dr. Tanya Franklin, brought suit against various Kentucky officials to challenge it. EMW is Kentucky's only licensed outpatient abortion facility, and Dr. Bergin and Dr. Franklin are the only doctors providing surgical abortions at EMW. Plaintiffs argued that H.B. 454 is facially unconstitutional because it effectively bans the most common second-trimester abortion procedure—the D&E—and therefore imposes an undue burden on the right to elect abortion prior to viability, in violation of the Fourteenth Amendment. Plaintiffs moved for a temporary restraining order and a preliminary injunction shortly thereafter.

The parties entered a joint consent order, under which the Commonwealth defendants agreed that they would not take steps to enforce H.B. 454 until the district court ruled upon Plaintiffs' motions. The court later ordered the parties to continue following the terms of the consent order until the case was tried on the merits.

Aside from then-Secretary of Kentucky's Cabinet for Health and Family Services, Adam Meier, and Commonwealth Attorney Thomas B. Wine, all of the defendants were voluntarily

dismissed prior to trial.  The district court heard Plaintiffs' case in a five-day bench trial in November 2018.

Before the court, Plaintiffs presented their argument as to H.B. 454's unconstitutionality. Defendants Meier and Wine, for their part, argued that H.B. 454 did not ban D&E abortions, but simply required individuals seeking a D&E abortion after thirteen weeks to first undergo a procedure to induce fetal demise.  They identified three possible methods of inducing fetal demise: by injecting digoxin into the fetus or amniotic sac, by injecting potassium chloride into the fetal heart, or by cutting the umbilical cord in utero.  Plaintiffs responded that none of these three procedures was a feasible workaround to H.B. 454.  Both parties presented substantial expert testimony and evidence about the safety, efficacy, and feasibility of each of these procedures.

On May 8, 2019, the district court entered judgment for Plaintiffs and an order permanently enjoining the enforcement of H.B. 454.  *EMW Women's Surgical Ctr., P.S.C. v. Meier*, 373 F. Supp. 3d 807, 826 (W.D. Ky. 2019).  At bottom, the district court found that H.B. 454 imposed an undue burden on one's right to elect an abortion prior to viability, in violation of the Fourteenth Amendment.  *Id.*  In particular, it concluded that none of the three identified procedures was a feasible option for inducing fetal demise and, therefore, H.B. 454 effectively banned D&E abortions.  *Id.* at 823.

This timely appeal followed.  Former defendant Commonwealth Attorney Wine did not join this appeal.  Due to the recent change in administration from prior Kentucky Governor Matt Bevin to current Governor Andy Beshear, now-Acting Secretary of Kentucky's Cabinet for Health and Family Services Eric Friedlander ("the Secretary") has replaced Adam Meier as the named Defendant-Appellant in this case.  *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

## DISCUSSION

Kentucky is not the first state to pass legislation requiring fetal demise prior to the performance of a D&E.  At least ten other states have passed similar laws.  *See, e.g.*, Ala. Code § 26-23G-1 *et seq.*; Ark. Code. Ann. § 20-16-1801 *et seq.*; Ind. Code §§ 16-34-2-7(a), 16-18-2-96.4; Kan. Stat. Ann. § 65-6741 *et seq.*; Okla. Stat. Ann. § 1-737.7 *et seq.*; La. Stat. Ann. § 1061.1.1 *et seq.*; Miss. Code Ann. § 41-41-151 *et seq.*; Ohio Rev. Code § 2919.15(B); Tex. Health & Safety Code Ann. § 171.151 *et seq.*; W. Va. Code Ann. § 16-2O-1 *et seq*.  In nearly every state, plaintiffs have challenged those laws as unduly burdening the right to elect abortion before viability, as Plaintiffs have done here.  And in every challenge brought to date, the court has enjoined the law, finding that it indeed unduly burdens that right.  *See, e.g.*, *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1327, 1329–30 (11th Cir. 2018) (affirming permanent injunction of Ala. Code § 26-23G-1 *et seq.*), *cert denied sub nom. Harris v. W. Ala. Women's Ctr.*, 139 S. Ct. 2606 (2019); *Bernard v. Individual Members of Ind. Med. Licensing Bd.*, 392 F. Supp. 3d 935, 962, 964 (S.D. Ind. 2019) (preliminarily enjoining Ind. Code §§ 16-34-2-7(a), 16-18-2-96.4); *Planned Parenthood of Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848, 869, 872 (S.D. Ohio 2019) (preliminarily enjoining Ohio Rev. Code § 2919.15(B)); *Whole Woman's Health v. Paxton*, 280 F. Supp. 3d 938, 953–54 (W.D. Tex. 2017) (permanently enjoining Tex. Health & Safety Code Ann. § 171.151 *et seq.*); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1064–65, 1111 (E.D. Ark. 2017) (preliminarily enjoining Ark. Code. Ann. § 20-16-1801 *et seq.*); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 467–68, 504 (Kan. 2019) (affirming temporary injunction of Kan. Stat. Ann. § 65-6741 *et seq.*); *see also, e.g.*, *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 145–46, 152 (3d Cir. 2000) (affirming permanent injunction of a partial-birth abortion ban, finding that its fetal-demise workaround would constitute an undue burden); *Evans v. Kelley*, 977 F. Supp. 1283, 1318–20 (E.D. Mich. 1997) (permanently enjoining a similar law).  The district court here reached the same conclusion.  *Meier*, 373 F. Supp. 3d at 826.  While these cases do not dictate this Court's decision, we find them highly persuasive.  *See Glossip v. Gross*, 135 S. Ct. 2726, 2740 (2015) ("Our review is even more deferential where . . . multiple trial courts have reached the same finding, and multiple appellate courts have affirmed those findings."); *cf. Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017) ("[A]ll else equal, a finding is more likely to be plainly wrong if some judges disagree with it.").

No. 19-5516     *EMW Women's Surgical Center, et al. v. Friedlander, et al.*     Page 7

All this said, our duty is to assess the record in this case and independently review the district court's decision to permanently enjoin H.B. 454. "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)). When considering a district court's decision to grant a permanent injunction following a bench trial, we apply three standards of review. We review the scope of injunctive relief for an abuse of discretion, the district court's legal conclusions *de novo*, and the court's factual findings for clear error. *Id.*

In this and all cases, the clear error standard presents a particularly high hurdle for the appellant to overcome. The district court compiled a thorough judicial record over the course of a five-day bench trial, during which the parties presented a wealth of testimonial and documentary evidence. In reviewing the court's factual findings based on that record, we ask only if its "account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). If so, we must affirm the district court's finding. We consider a factual finding clearly erroneous only when we are "left with the definite and firm conviction that a mistake has been committed." *Id.* at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." *Id.* at 574.

With this groundwork laid, we turn to the issues presented on appeal.[2]

---

[2]At the threshold, we address a point belabored by the dissent. In the proceedings below, the Secretary cursorily argued that Plaintiffs do not have standing to assert this challenge. The district court rightly rejected this notion. *Meier*, 373 F. Supp. 3d at 813. The Secretary does not renew this argument on appeal, but merely states that he "preserves his right to argue that EMW lacks standing to prosecute this case on behalf of women seeking an abortion." (Def. Br. at 25, n.3.) Generally speaking, "a party does not preserve an argument by saying in its opening brief (whether through a footnote or not) that it may raise the issue later." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009).

Nevertheless, the dissent makes the unsupportable assertion that we are always required to *sua sponte* address prudential third-party standing arguments, even when the parties do not raise them. We are not convinced that the cases upon which the dissent relies require us to do so. *C.f. Craig v. Boren*, 429 U.S. 190, 193–94 (1976) (holding that third-party standing is a prudential issue, not a constitutional one). In any event, we need not answer that question now because this case does not present any third-party standing issue. (Perhaps this is also the reason

# I.

Nearly fifty years ago, the Supreme Court declared that the Fourteenth Amendment protects an individual's right to elect to have an abortion. *Roe v. Wade*, 410 U.S. 113, 153–54 (1973). Twenty years later, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992), the Court reaffirmed what it identified as *Roe*'s essential holdings:

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

Under this framework, "[r]egardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879. On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State . . . may express profound

---

the Secretary does not press the issue on appeal.) As we recently explained, physician plaintiffs "unquestionably have standing to sue on their *own* behalf" when a law threatens them with criminal prosecution. *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 923 n.10 (6th Cir. 2020); *see also, e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 440 n.30 (1983), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973). Even if Plaintiffs were not directly regulated by H.B. 454 and only asserted their patients' rights, the Supreme Court has long since determined that abortion providers have standing to do so. *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976). And it has found that providers have standing even when their interests are arguably in potential conflict with patients'—as when regulations assertedly protect the health and safety of patients. *See, e.g., City of Akron*, 462 U.S. at 440 n.30; *Danforth*, 428 U.S. at 62; *Doe v. Bolton*, 410 U.S. at 188.

Casting aside this Supreme Court precedent, the dissent proclaims that Plaintiffs do not have standing because their interests potentially conflict with those of their patients. In so concluding, the dissent wrongly assigns to itself the district court's due fact-finding role, without providing any justification for doing so. Regardless, the supposed conflicts the dissent identifies do not exist. The dissent misleadingly uses studies suggesting some would prefer to undergo a fetal-demise procedure before receiving a D&E. But this attacks a straw man. Plaintiffs do not argue that individuals should not be *permitted* to undergo a fetal-demise procedure if they desire to do so; instead, they argue that individuals should not be *compelled* to undergo a fetal-demise procedure whether or not they desire to. Even if some have an interest in undergoing a fetal-demise procedure, this says nothing about whether they have an interest in being compelled by Kentucky to undergo a fetal-demise procedure. The dissent next suggests, out of thin air, that Plaintiffs do not desire to acquire the training necessary to perform digoxin injections. But the dissent points to no evidence supporting this proposition, and it cannot create a conflict through bare assertion. Thus, its arguments are altogether without merit.

respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877. According to the Secretary, H.B. 454 serves the Commonwealth's interests in respecting the dignity of human life, preventing fetal pain, and protecting the ethics, integrity, and reputation of the medical community. Neither the district court nor Plaintiffs questioned that the Commonwealth indeed held these interests or that it might justifiably regulate abortion to further them. Neither do we. The Commonwealth "may use its voice and its regulatory authority to show its profound respect" for the dignity of human life. *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). Preventing fetal pain is part and parcel of this interest. Likewise, states "ha[ve] an interest in protecting the integrity and ethics of the medical profession." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)).

However, no Commonwealth interest may justify "placing a substantial obstacle in the path of a woman seeking an abortion" prior to viability. *Casey*, 505 U.S. at 877. Such an obstacle would unduly burden the right to choose prior to viability, in violation of the Fourteenth Amendment. *Gonzales*, 550 U.S. at 146. H.B. 454 applies to abortions beginning at thirteen weeks LMP, well before the point of viability. The question before this Court, then, is whether H.B. 454 imposes an undue burden. As explained by the Supreme Court in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016), we answer this question by weighing "the burdens a law imposes on abortion access together with the benefits those laws confer."

This is where the Commonwealth's problems begin. The Secretary takes issue with the district court's application of this test. He asserts that there are multiple ways to apply the undue burden analysis, and "*Hellerstedt* does not apply here because its balancing test arose in the context of a law that a state claimed protected women's health." (Def. Br. at 28 (citing *Hellerstedt*, 136 S. Ct. at 2310).) Because the Commonwealth interests behind H.B. 454 are purportedly more "intangible," the Secretary says, it is the legislature's place—and not the courts'—to assess whether the Commonwealth's interest justifies regulating abortion. The Secretary suggests that *Gonzales* articulated a separate test that applies where a state acts to express respect for human life—that is, "the State may use its regulatory power to bar certain procedures and substitute others," so long as the alternative procedures do not impose an undue

No. 19-5516   *EMW Women's Surgical Center, et al. v. Friedlander, et al.*   Page 10

burden in the form of "significant health risks." (*Id.* at 26–27 (emphasis omitted) (quoting *Gonzales*, 550 U.S. at 158, 161).)

Like other courts presented with this argument, we find it unpersuasive. *See, e.g.*, *Planned Parenthood of Ind. & Ky. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 817 (7th Cir. 2018) ("The State is incorrect that the standard for evaluating abortion regulations differs depending on the State's asserted interest or that there are even two different tests . . . ."); *Hopkins*, 267 F. Supp. 3d at 1055 (rejecting argument that "the Supreme Court has created two distinct undue burden tests, depending on what interests the state seeks to regulate"). In *Hellerstedt*, the Supreme Court inferred that the state had legislated in the interest of protecting women's health. 136 S. Ct. at 2310. Yet the Court did not distinguish that case from *Gonzales* based on the state's interest; in fact, it cited *Gonzales*'s analysis. *See id.* at 2309–10 (citing *Gonzales*, 550 U.S. at 165–66). The *Hellerstedt* Court explained that it simply applied "[t]he rule announced in *Casey*, . . . [which] requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. In *Gonzales*, the Court also explained that "*Casey*, in short, struck a balance," and it simply "applied [*Casey*'s] standards to the cases at bar." *Gonzales*, 550 U.S. at 146. *Casey* itself did not suggest that any separate test applied to regulations based on an interest in the dignity of human life; instead, it presented the "woman's right to terminate her pregnancy before viability" and "the interest of the State in the protection of potential life" as two sides of an equation. *Casey*, 505 U.S. at 871. Nor have other lower courts understood there to be two different analyses. Courts regularly apply the undue burden analysis, as articulated in *Hellerstedt*, to regulations passed in the interest of protecting the dignity of human life. *See, e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 983–84 (7th Cir. 2019); *J.D. v. Azar*, 925 F.3d 1291, 1328, 1333, 1335 (D.C. Cir. 2019); *Williamson*, 900 F.3d at 1326–27; *Planned Parenthood of Ind. & Ky. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d at 824–25, 831.

The Secretary also relies upon *Gonzales* to assert that there is "medical uncertainty over whether [H.B. 454's] prohibition creates significant health risks," and that legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." (Def. Br. at 27 (quoting *Gonzales*, 550 U.S. at 163–64).) But *Hellerstedt* addressed this very

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 14 of 47 PageID #: 5848
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 11   (14 of 47)

No. 19-5516       *EMW Women's Surgical Center, et al. v. Friedlander, et al.*       Page 11

argument.  *See* 136 S. Ct. at 2310.  It explained that "[t]he statement that legislatures, and not courts, must resolve questions of medical uncertainty is . . . inconsistent with this Court's case law."  *Id.*  It clarified that while *Gonzales* suggested that courts must apply deferential review to legislative fact findings, that deference should not be "[u]ncritical" and courts "must not 'place dispositive weight' on those 'findings.'"  *Id.* (alteration in original) (quoting *Gonzales*, 550 U.S. at 165–66); *see also Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 926 (6th Cir. 2020).  In the case of H.B. 454, the legislature made no findings of fact addressing the medical safety of the Secretary's suggested procedures; in fact, H.B. 454 does not acknowledge these procedures at all.  Thus, there are no legislative findings of fact to which this Court could even defer.  As discussed below, the district court appropriately considered the medical evidence surrounding H.B. 454's safety and found that it presented impermissible, unduly burdensome risks to those seeking a D&E prior to viability.

Setting aside the Secretary's argument, then, we must apply the undue burden analysis, as explained in *Hellerstedt*.[3]  We therefore turn to consider the district court's assessment of the burdens H.B. 454 imposes.

### A.  Burdens

An undue burden exists if a statute's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."  *Casey*, 505 U.S. at 878.  The Supreme Court has repeatedly affirmed that laws that amount to a prohibition of the most common second-trimester abortion method impose such a burden.  *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 930, 938–39 (2000) (finding that a Nebraska statute effectively prohibiting D&E abortions constituted an undue burden); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 78–79 (1976) (striking down a ban on saline amniocentesis, then the method "most commonly used nationally . . . after the first trimester"); *see also Gonzales*,

---

[3]Although we decline to apply the purportedly separate test the Secretary suggests, we note that H.B. 454 would fail that test, too.  The Secretary suggests that a law "imposes an undue burden only when the regulation creates a substantial obstacle to previability abortion by 'creat[ing] significant health risks' for women."  (Def. Reply Br. at 10–11 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 162 (2007)).)  For the reasons explained later in this opinion, the district court did not err in finding that H.B. 454 creates significant health risks by compelling individuals to undergo fetal-demise procedures.

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 12

550 U.S. at 150–54, 164–65 (contrasting a permissible law prohibiting only dilation and extraction ("D&X") abortions,[4] and not standard D&E, with the unconstitutional law at issue in *Stenberg*). This Court has duly applied those holdings, explaining simply that "if a statute prohibits pre-viability D & E procedures, it is unconstitutional." *Northland Family Planning, Inc. v. Cox*, 487 F.3d 323, 330 (6th Cir. 2007); *accord Eubanks v. Stengel*, 224 F.3d 576, 577 (6th Cir. 2000); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) ("Because the definition of the banned procedure includes the D & E procedure, the most common method of abortion in the second trimester, the Act's prohibition on the D & X procedure has the effect 'of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" (quoting *Casey*, 505 U.S. at 877)). If H.B. 454 effectively prohibits the D&E procedure, then, it poses a substantial obstacle to abortion access prior to viability and is an undue burden.

H.B. 454 criminalizes a physician's performance of a standard D&E abortion unless fetal demise occurs before the fetus is removed from the uterus. The Secretary argues that H.B. 454 does not ban D&Es because physicians may lawfully administer D&Es if they first induce fetal demise through one of three methods: digoxin injection, potassium chloride injection, or umbilical cord transection. The Secretary asserts that the Commonwealth may constitutionally require individuals to undergo these procedures because they are "reasonable alternative[s]" to a standard D&E. (Def. Br. at 27, 33 (citing *Gonzales*, 550 U.S. at 163).)

Before considering the feasibility of each of these procedures, we pause to note a fundamental flaw in the Secretary's argument. Fetal-demise procedures are not, by definition, *alternative* procedures. A patient who undergoes a fetal-demise procedure must still undergo the entirety of a standard D&E. Instead, fetal-demise procedures are *additional* procedures. Additional procedures, by nature, expose patients to additional risks and burdens. No party argues that these procedures are necessary or provide any medical benefit to the patient. The district court's findings suggest that these procedures impose only additional medical risks.

---

[4] In a D&X procedure, a physician dilates a patient's cervix to allow the fetus to partially pass through. *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 440 (6th Cir. 2003). When the fetus emerges past the cervix, the physician uses tools to access and remove the contents of the fetal skull, before removing the rest of the fetal body from the patient. *Id.*

Thus, we consider them inherently suspect. *See, e.g.*, *Adams & Boyle*, 956 F.3d at 926 (concluding that applications of a temporary ban on abortions during the COVID-19 pandemic that "would require [a woman] to undergo a more invasive and costlier procedure tha[n] she otherwise would have . . . constitutes 'beyond question, a plain, palpable invasion of rights secured by [the] fundamental law'" (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905))); *Paxton*, 280 F. Supp. 3d at 948 ("Although the court will consider the argument [that physicians may induce fetal demise through one of the proposed methods], the State's reliance on adding an additional step to an otherwise safe and commonly used procedure in and of itself leads the court to the conclusion that the State has erected an undue burden on a woman's right to terminate her pregnancy prior to fetal viability."); *id.* at 953 (similar); *see also, e.g.*, *Danforth*, 428 U.S. at 78–79 (striking down Missouri's ban on saline amniocentesis because it "forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed"); *Williamson*, 900 F.3d at 1326 (similar); *Farmer*, 220 F.3d at 145 (similar); *Planned Parenthood of Cent. N.J. v. Verniero*, 41 F. Supp. 2d 478, 500 (D.N.J. 1998) (similar), *aff'd sub nom. Farmer*, 220 F.3d 127; *Evans*, 977 F. Supp. at 1318 (similar). In essence, H.B. 454 conditions an individual's right to choose on her willingness to submit herself to an additional painful, risky, and invasive procedure. At some point, that requirement itself becomes so onerous that it would substantially deter individuals from seeking an abortion. This is surely an undue burden.

Our consideration of the Secretary's proposed means of inducing fetal demise only solidifies this conclusion. The district court correctly found that none of these methods is a feasible workaround to H.B. 454. We address each method in turn.

### 1. Digoxin Injections

The first fetal-demise method the Secretary identifies is digoxin injections. As the district court explained, "[t]o inject digoxin, physicians begin by using an ultrasound machine to visualize the woman's uterus and the fetus. The physician then inserts a long surgical needle through the patient's skin, abdomen, and uterine muscle, to inject digoxin into the fetus" or the amniotic fluid. *Meier*, 373 F. Supp. 3d at 818. Because digoxin can take up to twenty-four

hours to work, physicians generally must administer this injection the day before performing a D&E. *Id.* at 818–19.

The district court found that digoxin injections were not a feasible method for inducing fetal demise for five reasons. First, with between a 5% and 20% failure rate, digoxin injections do not reliably induce fetal demise and so patients may require a second injection, the effects of which have not been studied. *Id.* at 818. Second, digoxin injections are also insufficiently studied when administered before eighteen weeks LMP, and would therefore essentially be experimental for the approximately 50% of patients who would receive injections before this point. *Id.* Third, various factors make it difficult or impossible for many patients to receive a digoxin injection prior to a D&E. *Id.* Fourth, digoxin injections expose patients to substantial added health risks. *Id.* Finally, digoxin injections subject patients to additional logistical and emotional burdens by requiring them to undergo a risky and invasive procedure and by requiring them to invest resources in making a visit to their physician to have the injection twenty-four hours before receiving a D&E. *Id.* at 818–19.[5]

Much of the Secretary's argument pertaining to digoxin injections amounts to an attempt to relitigate factual issues. He contends that digoxin injections do not fail as frequently as the district court found, that receiving multiple injections is safe, that receiving injections before eighteen weeks is safe, and that some of the risks identified by the district court are minimal or theoretical. In essence, the Secretary takes issue with the district court's decision to credit Plaintiffs' experts and cited studies over his own.

---

[5]The district court found that digoxin injections are generally "not terribly difficult to perform," but that they "still [are] not a feasible option for fetal-demise" for the five reasons indicated. *Meier*, 373 F. Supp. 3d at 818. Yet the dissent repeatedly asserts that the problem is simply that Plaintiffs do not desire to receive the training necessary to give the injections. This assertion has no grounding in the facts as the district court found them, and, as previously discussed, the dissent provides no support for it. In any event, the possibility that Plaintiffs could be trained to perform digoxin injections is irrelevant if digoxin injections are not otherwise a feasible workaround to H.B. 454. The evidence pointed to by the dissent provides no reason to question the district court's conclusion that they are not. As detailed above, each of the factual findings relating to digoxin injection's feasibility was a permissible view of the evidence. *See Anderson*, 470 U.S. at 574. Apparently recognizing this, the dissent does not suggest that any of the court's findings were clearly erroneous. Instead, it simply asserts the facts as it sees them. But it is not our role to find facts, particularly in the absence of evidence, when we have no basis to reverse the district court's permissible findings. *See id.*

No. 19-5516     *EMW Women's Surgical Center, et al. v. Friedlander, et al.*     Page 15

The Secretary's strategy is misguided.  Even if we were inclined to disagree with the district court's factual findings, we may not reverse those findings merely because we are "convinced that had [we] been sitting as the trier[s] of fact, [we] would have weighed the evidence differently."  *Anderson*, 470 U.S. at 573–74.  As a federal appellate court, "we must let district courts do what district courts do best—make factual findings—and steel ourselves to respect what they find."  *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018).  In reviewing a grant of permanent injunction following a bench trial, we ask simply whether the district court's view of the evidence was permissible.  *Anderson*, 470 U.S. at 574.

The record supports each of the district court's factual findings.  Expert testimony presented at trial, supported by medical studies, suggested that digoxin injections fail between 5% and 20% of the time.[6]  (Tr. Vol. I, R. 106 at PageID #4391; Tr. Vol. II, R. 107 at PageID ##4675–76; Tr. Vol. IV, R. 103 at PageID #3911.)  We cannot override the district court's decision not to credit competing evidence that suggested the lower bound of this failure rate is 2%, (*e.g.*, Tr. Vol. I, R. 106 at Page ID #4391; Tr. Vol. III-B, R. 102 at PageID ##3737, 3743), and we would not be compelled to conclude that digoxin injections are feasible even if we could.  As a legal matter, the Secretary also contends that Plaintiffs should be bound by the statement in their complaint that digoxin fails between 5% and 10% of the time.  But "[i]n order to qualify as [a] judicial admission[], an attorney's statement must be deliberate, clear and unambiguous."  *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997).  The complaint's statement that "digoxin simply fails to cause demise in *approximately* 5–10% of cases," (Compl., R. 1 at PageID #8 (emphasis added)), leaves ample room for Plaintiffs to show that the failure rate is higher.

Likewise, evidence supports the district court's conclusion that performing successive digoxin injections would amount to an experimental medical procedure, because no medical literature identifies the correct dose for or the risks of a second digoxin injection.  (*See, e.g.*, Tr.

---

[6]The Secretary also argues that even a 20% failure rate does not make H.B. 454 facially invalid because this does not constitute an undue burden on the requisite large fraction of individuals for whom the restrictions are relevant.  As this argument goes to the appropriateness of facial relief, we address it in considering what relief Plaintiffs are due.  But at this juncture, it is worth noting that digoxin injections' failure rate is not the only thing that makes them an infeasible workaround to H.B. 454.  Thus, we need not consider whether this failure rate, standing alone, would be sufficient to suggest that H.B. 454 unduly burdens a large fraction of the population it restricts.

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 16

Vol. I, R. 106 at PageID ##4395–96; Tr. Vol. II, R. 107 at PageID #4678; Tr. Vol. III-B, R. 102 at PageID #3792.)   The court's conclusion regarding the use of digoxin injections before eighteen weeks LMP is also well grounded: according to witness testimony, no studies have been performed on the efficacy, dosage, or safety of digoxin injections before seventeen weeks, and just one study includes a few individuals at seventeen weeks' pregnancy.  (Tr. Vol. I, R. 106 at PageID ##4396–97; Tr. Vol. IV, R. 103 at PageID ##3984–85.)

The court's conclusion that digoxin injections are not available to many patients also is not clearly erroneous.  Multiple experts testified that factors including placental positioning, fetal positioning, obesity, the presence of uterine fibroids, and the presence of cesarean-section scars can interfere with or prevent the successful administration of a digoxin injection.  (Tr. Vol. I, R. 106 at PageID ##4387–88; Tr. Vol. III-B, R. 102 at PageID ##3793–94; Tr. Vol. IV, R. 103 at PageID ##4000–01.)  Moreover, expert testimony and studies suggested that patient contraindications—including multiple gestations, fetal abnormalities, digoxin or cardiac glycoside sensitivities and allergies, cardiac abnormalities, renal failure, bleeding disorders, and use of certain medications—may prevent the safe administration of a digoxin injection.  (Tr. Vol. I, R. 106 at PageID ##4388–90.)  Despite the Secretary and the dissent's assertions otherwise, the district court's finding that digoxin injections are not generally technically difficult to perform does not remotely conflict with its conclusion that they cannot successfully be performed on all patients or that they are technically difficult to perform in some situations. In the event that an individual cannot receive a digoxin injection for any of these reasons, H.B. 454 could prevent her from receiving a D&E.  There is no exception to H.B. 454's restrictions for those who cannot undergo one of the proposed fetal-demise procedures.[7]

While the district court's opinion did not include specific record citations to support its conclusion that that digoxin injections subject patients to additional health risks, *Meier*, 373 F. Supp. 3d at 818, this too is supported by the evidence.  Expert testimony suggested that digoxin

---

[7]The only exception to H.B. 454's prohibition is for instances of "medical emergency."  (H.B. 454, R. 43-1 at PageID #244.)  The unavailability of a digoxin injection generally does not "so complicate[] the medical condition of a pregnant female as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function."  (*Id.*); Ky. Rev. Stat. § 311.720(9).  On appeal, the Secretary does not argue that this medical exception covers any of the situations in which a fetal-demise procedure would be unavailable.

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 17

injections may increase patients' risk of vomiting, infection, bowel or intestinal rupture, sepsis, and general hospitalization.  (Tr. Vol. I, R. 106 at PageID ##4400–06; Brady Dep., R. 112-1 at PageID #5242.)  Digoxin injections can also lead to extramural delivery, meaning delivery outside a clinic environment, which further increases medical risks (including the risk of hemorrhaging) and may also be painful and emotionally traumatic.  (Tr. Vol. I, R. 106 at PageID ##4405–09; Brady Dep., R. 112-1 at PageID #5242.)

The Secretary says that these negative effects rarely occur and dismisses them as "marginal or insignificant risks generalized to the entire population of women seeking . . . abortions [at the relevant time]."  (Def. Br. at 35 (alterations in original) (quoting *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 447 (6th Cir. 2003)).)[8]  The Secretary draws this language from *Women's Medical Professional Corp. v. Taft*, in which this Court considered whether a state could forbid D&X abortions if the statute doing so provided for a health exception.  353 F.3d at 446–47.  Noting that Supreme Court precedent required exceptions for "when the procedure is necessary to prevent a significant health risk," this Court concluded that the Supreme Court did not intend to require medical exceptions to include "marginal or

---

[8]In his reply brief, the Secretary contends for the first time that whether the three fetal-demise procedures pose significant risks is a constitutional fact subject to *de novo* review.  A constitutional fact is one "upon which the enforcement of the constitutional rights of the citizen depend."  *Crowell v. Benson*, 285 U.S. 22, 56 (1932); *see also* Henry Paul Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 230, 254–55 (1985) (describing constitutional fact review as "judicial review of the adjudicative facts decisive of constitutional claims" and summarizing *Crowell*).

To be sure, this Court has explained, in the context of abortion cases, that "an appellate court is to conduct an independent review of the record when constitutional facts are at issue."  *Voinovich*, 130 F.3d at 192; *see also Women's Med. Prof'l Corp. v. Taft*, 353 F.3d at 442.  But we have not clarified what that "independent review" means, nor have we identified any constitutional facts to which we apply that independent review.  *See, e.g., Voinovich*, 130 F.3d at 192; *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d at 442.  In both of the cases the Secretary cites to support his argument, the Court reviewed legal questions pertaining to statutory construction, including how a health exception in a statute regulating abortion should be interpreted.  *Voinovich*, 130 F.3d at 208–10; *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d at 443–51.  This Court did not hold in either case that the existence of a significant health risk is a constitutional fact.  The Secretary's argument turns on his assertion that a law "imposes an undue burden only when the regulation creates a substantial obstacle to previability abortion by 'creat[ing] significant health risks' for women," implying that the undue burden analysis turns exclusively on whether a law presents significant health risks.  (Def. Reply Br. at 10–11 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 162 (2007)).)  Of course, in balancing the benefits and burdens H.B. 454 imposes, we consider more than just health risks alone.

We consider the question of whether a procedure poses a significant health risk a mixed question of fact and law.  What risks a procedure poses is a question of fact, and whether those risks are significant is a question of law.  Accordingly, we apply clear error review to the former question and *de novo* review to the latter question.

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 21 of 47 PageID #: 5855
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 18   (21 of 47)

No. 19-5516       *EMW Women's Surgical Center, et al. v. Friedlander, et al.*       Page 18

insignificant risks generalized to the entire population of women seeking late second-trimester abortions." *Id.* We found it significant that the law in question "specifically exclude[d]" D&Es from its restrictions, as D&Es provided a safe alternative to the D&X procedure. *Id.* at 438, 451–53. As the Supreme Court later explained, in comparing D&X and D&E abortions, there was substantial medical uncertainty "over whether the barred procedure [*i.e.*, D&X] is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives [*i.e.*, D&E]." *Gonzales*, 550 U.S. at 166–67.

By contrast, under H.B. 454, an individual is left with no safe alternative to undergoing a fetal-demise procedure, and the record shows, with no medical uncertainty, that a D&E without a fetal-demise procedure may be necessary to preserve an individual's health. Indeed, in every circumstance, a fetal-demise procedure poses additional health risks beyond those present with a D&E alone, and so it always places an individual's health in jeopardy. Accordingly, every court to consider the question has found that digoxin injections pose impermissible, significant risks to those who would be compelled to undergo them. *See, e.g.*, *Williamson*, 900 F.3d at 1323–24, 1327; *Bernard*, 392 F. Supp. 3d at 949, 960; *Yost*, 375 F. Supp. 3d at 858; *Paxton*, 280 F. Supp. 3d at 949; *Hopkins*, 267 F. Supp. 3d at 1039, 1060–61; *Evans*, 977 F. Supp. at 1301, 1318; *Schmidt*, 368 P.3d at 678; *see also Farmer*, 220 F.3d at 145–46 (discussing digitalis, another cardiac glycoside); *Verniero*, 41 F. Supp. 2d at 500 (same), *aff'd sub nom. Farmer*, 220 F.3d 127; *accord Meier*, 373 F. Supp. 3d at 818. We agree.

Finally, the district court found that digoxin injections impose additional logistical and emotional burdens on patients because they may increase the length of the D&E procedure by a day and because they require patients to undergo an additional invasive, painful, and likely scary procedure. *Meier*, 373 F. Supp 3d at 818–19. The Secretary's argument that D&E procedures regularly take two days anyway is unavailing; even if he is correct, the record suggests that an additional day may be required for some patients to undergo a digoxin injection. (*See* Tr. Vol. I, R. 106 at PageID ##4396, 4432; Tr. Vol. II, R. 107 at PageID #4768.)

In sum, we see no error in the district court's analysis of the feasibility of using digoxin injections to induce fetal demise prior to a D&E. Digoxin injection is an unreliable procedure that may not effectively cause fetal demise, presents unknown risks when administered multiple

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 22 of 47 PageID #: 5856
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 19   (22 of 47)

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 19

times or before eighteen weeks, may not be administrable at all based on the patient's health history and characteristics, increases medical risks under any circumstance, and creates additional emotional and logistical challenges for patients.  Based on these findings of fact, digoxin injections are not a safe or effective workaround to H.B. 454.

### 2.  Potassium Chloride Injections

As a second possibility, the Secretary suggests that an abortion provider may induce fetal demise by injecting potassium chloride into the fetus or the fetal heart.  As described by the district court, physicians using this method "begin by using an ultrasound machine to visualize the patient's uterus and fetus.  The physician then inserts a long surgical needle through the woman's skin, abdomen, and uterine muscle, and then into either the fetus or, more specifically, the fetal heart." *Meier*, 373 F. Supp. 3d at 819.  At this stage, the fetal heart is approximately the size of a dime.  *Id.*  If injected into the fetal heart, potassium chloride causes fetal demise almost immediately.  *Id.*  The physician may then perform a standard D&E.

The district court found that potassium chloride injections were not a feasible method for inducing fetal demise for three reasons.  First, potassium chloride injections cannot be completed on every individual seeking a D&E.  *Id.* at 820.  Second, they subject patients to serious health risks.  *Id.*  Third, potassium chloride injections are extremely challenging and require substantial technical training to perform—training that the physician Plaintiffs do not have and cannot easily acquire.  *Id.* at 819–20.

In contesting the district court's first finding, the Secretary again quibbles with the district court's decision to credit Plaintiffs' expert testimony over his own.  But ample evidence grounded the district court's conclusion that potassium chloride injections would not be successful for many seeking a D&E—because of factors including obesity, fetal and uterine position, cesarean-section or other scar tissue, and uterine fibroids—in addition to the procedure's independent possibility of failure.  (Tr. Vol. I, R. 106 at PageID ##4423, 4551–52; Tr. Vol. IV, R. 103 at PageID ##3966, 4187–89.)

With regard to the district court's second finding, the Secretary does not dispute that potassium chloride injections pose health risks to patients.  And the record clearly suggested that

potassium chloride injections increased patients' risks of infection, bleeding, cramping, uterine or bowel perforation, uterine atony and hemorrhaging, and cardiac arrest. (*See, e.g.*, Tr. Vol. I, R. 106 at PageID ##4423–24, 4561–62; Tr. Vol. III-B, R. 102 at PageID ##3802–06; Tr. Vol. IV, R. 103 at PageID ##4198–99.) The Secretary does contest the significance of these risks, but this argument fails for the same reasons it failed previously. H.B. 454 cannot be said to impose only marginal or insignificant risks because no safe alternative exists and because it requires every individual seeking a D&E abortion to expose themselves to these risks. Again, every court to consider whether potassium chloride injections present substantial risk has agreed that they do. *Williamson*, 900 F.3d at 1322, 1324, 1327; *Farmer*, 220 F.3d at 145–46; *Bernard*, 392 F. Supp. 3d at 950–51, 960; *Yost*, 375 F. Supp. 3d at 860, 868; *Paxton*, 280 F. Supp. 3d at 950–51; *Hopkins*, 267 F. Supp. 3d at 1040, 1062–63; *Verniero*, 41 F. Supp. 2d at 500*, aff'd sub nom. Farmer*, 220 F.3d 127; *Evans*, 977 F. Supp. at 1301, 1318; *accord Meier*, 373 F. Supp. 3d at 820.

Regarding the district court's finding that potassium chloride injections require technical skill and training that is not available to Plaintiffs, the Secretary argues that this is no issue. Even if the physician Plaintiffs themselves do not have and cannot acquire the requisite training, the Secretary says, EMW can simply hire physicians who do. According to the Secretary, because EMW has not attempted to hire such physicians, Plaintiffs themselves have caused this obstacle to abortion access, not H.B. 454.

This argument misses the point. Whether Plaintiffs could find some way to provide potassium chloride injections is only relevant if those injections otherwise present a feasible workaround to H.B. 454. They do not. Potassium chloride injections cannot be performed on many patients and present substantial added health risks even when they can be. It would be irrational to require Plaintiffs to go to the effort and expense of attempting to hire other physicians in order to prove that they cannot make a dangerous and potentially ineffective procedure available to their patients. The burden here is undoubtedly caused by H.B. 454.

But even setting this analysis aside, the Secretary's argument also fails for other reasons. First, neither Supreme Court precedent nor this Court's precedent requires Plaintiffs to prove that EMW could not have hired physicians with the skills and training necessary to perform potassium chloride injections. For this proposition, the Secretary cites *Gonzales*, noting that

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 21

physicians need not have "unfettered choice" in what abortion procedures they may use and that regulations may require them to perform procedures that are "standard medical options." (Def. Br. at 20 (quoting *Gonzales*, 550 U.S. at 163, 166).) But the point of the district court's findings is that potassium chloride injection is not a standard medical option, and Plaintiffs could not provide that procedure even if they would so choose, because they have no available avenue to develop the necessary skills. We agree.

The Secretary cites to *June Medical Services L.L.C. v. Gee*, 905 F.3d 787 (5th Cir. 2015), *cert. granted*, 140 S. Ct. 35 (2019), to support his argument. In that case, the Fifth Circuit upheld a Louisiana law requiring abortion providers to gain admitting privileges at a nearby hospital. The court found that the plaintiff physicians had failed to show that the law presented an undue burden because they had not applied for admitting privileges or otherwise shown that had they "put forth a good-faith effort to comply with [the law], they would have been unable to obtain privileges." *Id.* at 807. Because the plaintiffs failed to make this showing, the Fifth Circuit concluded that "[t]heir inaction severs the chain of causation." *Id. But see id.* at 830 (Higginbotham, J., dissenting) (explaining that *Hellerstedt* "did not require proof that every abortion provider . . . put in a good-faith effort to get privileges and had been unable to do so"). The Fifth Circuit thus took issue not with the plaintiffs' failure to attempt to hire or replace themselves with other physicians who had admitting privileges, but with their failure to show that they could not have obtained admitting privileges had they tried. *See id.* at 807. In the case at bar, the district court found that Plaintiffs "have no practical way to learn how to perform this procedure safely," due to "the length of time it would take to learn the procedure and the lack of training available within the Commonwealth." *Meier*, 373 F. Supp. 3d at 820. The Secretary does not dispute this finding, and the record supports it. (*See, e.g.*, Tr. Vol. I, R. 106 at PageID ##4573–74; Tr. Vol. II, R. 107 at PageID ##4732–33; Tr. Vol. IV, R. 103 at PageID ##4185–86.) Thus, plaintiffs succeed even under the heightened showing required by the Fifth Circuit in *Gee*.

Still, Supreme Court precedent does not support such a requirement. Nor does Sixth Circuit precedent. Notably, the Supreme Court granted a stay of the Fifth Circuit's decision, *Gee*, 139 S. Ct. 663 (2019) (mem.), and the Court does not stay a decision absent a "significant

Case 3:18-cv-00224-JHM-RSE  Document 139  Filed 06/02/20  Page 25 of 47 PageID #: 5859
Case: 19-5516  Document: 53-2  Filed: 06/02/2020  Page: 22  (25 of 47)

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 22

possibility that the judgment below will be reversed," *Philip Morris U.S.A. Inc. v. Scott*, 561 U.S. 1301, 1302 (2010). Far from requiring plaintiffs to specifically and affirmatively show good-faith efforts to comply with a challenged law, Supreme Court precedent suggests that plaintiffs may demonstrate an undue burden "by presenting direct testimony as well as plausible inferences to be drawn" from the evidence, *Hellerstedt*, 136 S. Ct. at 2313, including the inference that any good-faith efforts would fail to alleviate the burden. Common sense suggests that when only a small subset of physicians have undergone the extensive training required to perform a procedure, it would be difficult to impossible for an abortion clinic to recruit one of those physicians. Still, the relevant question in abortion cases is not whether it would unduly burden a provider to comply with a law, but whether compliance would unduly burden their patients' right to elect abortion prior to viability. And it is even clearer that should Kentucky require a procedure that only a small subset of physicians can administer—in comparison to the large number who can administer a D&E—it would restrict the number of D&Es that could be provided in Kentucky, thereby burdening those seeking a D&E.

Altogether, the district court's well-supported findings suggest that if patients were required to undergo a potassium chloride injection prior to a D&E, they would be subjected to a medically risky and unreliable procedure, which they may not be able to receive successfully and to which they would have only limited access, given the dearth of Kentucky providers trained to administer the procedure. These findings demonstrate that potassium chloride injections are not a feasible workaround to H.B. 454.

### 3. Umbilical Cord Transection

Finally, the Secretary suggests that abortion providers may induce fetal demise through umbilical cord transection. To administer this procedure, the physician first dilates a patient's cervix and then—using an ultrasound for guidance—ruptures the amniotic membrane in order to allow access inside the amniotic sac, where the umbilical cord is located. This causes the amniotic fluid to drain from the uterus, shrinking its size and making it more difficult to visualize and grasp the umbilical cord. The physician then inserts an instrument through the cervix and locates the umbilical cord, which at this stage is approximately the width of a piece of yarn. Grasping the umbilical cord, the physician inserts another instrument through the cervix and cuts

the cord. Once the cord is cut, the physician waits for the fetal heartbeat to stop, which can take up to ten minutes. The physician may then administer a standard D&E.

The district court found that this, too, was not a workable method for inducing fetal demise. It provided three reasons for that finding. First, umbilical cord transection is technically challenging because of the difficulty of visualizing the uterus and locating and grasping the umbilical cord. *Meier*, 373 F. Supp. 3d at 821 (citing Tr. Vol. I, R. 106 at PageID ##4434–36; Tr. Vol. II, R. 107 at PageID ##4669–70, 4672). Second, it is essentially experimental because there has only been one study focused on the procedure. *Id.* (citing Tr. Vol. I, R. 106 at PageID ##4438–41; Tr. Vol. III-B, R. 102 at PageID ##3808–09). Finally, umbilical cord transection carries serious health risks, including blood loss, infection, and uterine injury. *Id.* at 821–22 (citing Tr. Vol. I, R. 106 at PageID ##4436–37; Tr. Vol. II, R. 107 at PageID ##4669, 4673).

The Secretary does not meaningfully challenge any of these findings, which again are more than adequately supported by the record. He argues only that the one study of umbilical cord transection suggests the procedure is feasible, safe, and effective, as does the fact that an EMW expert and an EMW doctor had performed umbilical cord transections in the past. But on clear error review, we will not override the district court's decision not to credit a single medical study after finding that it "does not provide the type or quality of evidence that warrants reaching generalized conclusions about the feasibility or reliability of umbilical cord transection." *Id.* at 821. And the simple fact that umbilical cord transections have been performed at some point does not suggest that they are safe in every instance or that they pose no additional, significant risks to those who would be compelled to undergo them.

The Secretary also takes issue with the district court's statement that umbilical cord transections "pose[] another hurdle for the provider because if they cut fetal tissue instead of, or in addition to the cord" while searching for it in the uterus, "they have arguably violated the Act." *Id.* (citing Tr. Vol. I., R. 106 at PageID ##4435–36; Tr. Vol. II, R. 107 at PageID ##4669–70). The Secretary responds that, because of H.B. 454's intent requirement, it does not apply when a physician accidentally dismembers a fetus prior to demise, and so it would not be enforced against a physician in this circumstance. But, as the Eleventh Circuit has explained in a similar case, "[m]id-litigation assurances are all too easy to make and all too hard to enforce,

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 24

which probably explains why the Supreme Court has refused to accept them." *Williamson*, 900 F.3d at 1328 (citing *Stenberg*, 530 U.S. at 940–41); *accord Stenberg*, 530 U.S. at 945–46; *Yost*, 375 F. Supp. 3d at 868. Nor does this argument disturb the court's conclusion that the technical difficulty of umbilical cord transection makes it an infeasible workaround to H.B. 454.

Taken together, these findings demonstrate that should patients be required to undergo an umbilical cord transection prior to receiving a D&E, they would be subjected to a medically risky and experimental procedure that, given its technical challenges, fewer providers may be equipped to administer. These findings inevitably lead to the conclusion that umbilical cord transection—like digoxin and potassium chloride injections—is not a feasible workaround to H.B. 454.

### B. Benefits

After taking stock of the burdens imposed by H.B. 454, we must next consider the Act's benefits. The Secretary asserts that H.B. 454 provides three primary benefits: It "shows Kentucky's profound respect for unborn life. It eliminates the possibility of unborn children feeling pain while being dismembered. And [it] protects the integrity of the medical profession." (Def. Br. at 57.)

The Secretary contends that a statement by the district court—namely, "the fact that the Act furthers legitimate state interests does not end this constitutional inquiry"—suggests the district court found that H.B. 454 did advance the Commonwealth's asserted interests. *See Meier*, 373 F. Supp. 3d at 817. This conclusion is debatable, at best.

The district court clearly concluded that H.B. 454 did not benefit the Commonwealth's interest in preventing fetal pain because "it is very unlikely that a fetus can feel pain before 24 weeks," at which point physicians no longer perform D&Es. *Id.* at 823; *accord Yost*, 375 F. Supp. 3d at 865. In so finding, the court dismissed the Secretary's expert's testimony suggesting that a fetus may feel pain as early as fifteen weeks, purportedly because the development of a fetus's ability to feel pain is like "a dimmer switch" that "turn[s] on over weeks of development." (Tr. Vol. IV, R. 103 at PageID ##4020–21); *Meier*, 373 F. Supp. 3d at 822. Instead, the court credited Plaintiffs' expert testimony, supported by multiple studies, that it is

not possible for a fetus to feel pain before twenty-four weeks because "fetal pain perception requires consciousness, which in turn requires two elements absent in a fetus before 24 weeks: intact [neural] connections from the periphery [of the brain] to the thalamus and then to the cortex, and a sufficiently developed cerebral cortex." *Meier*, 373 F. Supp. 3d at 822 (citing Tr. Vol. IV, R. 103 at PageID ##4140–55, 4180–82, 4210). Given the abundant evidence supporting Plaintiffs' account of pain perception, the district court's conclusion was not clearly erroneous. And, accepting that a fetus cannot feel pain during the period in which D&Es are administered, we conclude that H.B. 454 does not benefit this Commonwealth interest.

The district court made no clear findings regarding whether or how H.B. 454 advanced the Commonwealth's interest in demonstrating respect for the dignity of human life. Upon consideration, we note that the Commonwealth's interests in preventing fetal pain and demonstrating respect for human life are substantially intertwined, if not subsumed in one another. While H.B. 454 would prohibit separation of fetal tissue prior to fetal demise, it would not prohibit separation of fetal tissue following fetal demise. The most obvious potential benefit to separating fetal tissue post-demise rather than pre-demise is that it eliminates any possibility of fetal pain. But the district court permissibly found that it is impossible for a fetus to feel pain during the period in which D&Es are administered, and so H.B. 454 provides no benefit in that regard. Nevertheless, even recognizing the impossibility of fetal pain at this point, some may believe that separating fetal tissue prior to fetal demise is more "brutal and inhumane" than or "implicates additional ethical and moral concerns" beyond those implicated by separating fetal tissue following demise. *See Gonzales*, 550 U.S. at 157–158. In recognition of that fact, we assume that H.B. 454 provides some limited benefit in this regard. *See Women's Med. Prof'l Corp. v. Taft*, 353 F.3d at 444 ("[A state's] expression of . . . important and legitimate interests warrants a measure of deference . . . .").

Turning to the Commonwealth's final interest in protecting the ethics, integrity, and reputation of the medical profession, the district court also came to no clear findings or conclusions regarding if or how H.B. 454 benefited this interest. We note that H.B. 454 would require physicians to subject their patients to additional harmful, experimental, and invasive medical procedures, in contravention of their ethical duties. (*See, e.g.*, Tr. Vol. II, R. 107 at

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 29 of 47 PageID #: 5863
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 26   (29 of 47)

No. 19-5516       *EMW Women's Surgical Center, et al. v. Friedlander, et al.*       Page 26

PageID ##4819–20 ("H.B. 454 is inconsistent with the principle of nonmaleficence, the principle that physicians should not do unjustified harm to their patients" because fetal-demise procedures "offer[] only risks to [the patient], only the risk of harm, and do[] not offer [the patient] any potential for medical benefits.").) And to the extent that physicians have any obligation to not do harm to a fetus, performing a D&E on a fetus prior to fetal demise subjects it to little harm, if any, because it cannot feel pain. If H.B. 454 provides any benefit to the Commonwealth's interest in the medical profession, it also provides countervailing damage to that interest. We therefore conclude that H.B. 454 provides little to no benefit in this regard.

### C. Balancing

Altogether, H.B. 454 imposes substantial burdens on the right to choose. Because none of the fetal-demise procedures proposed by the Secretary provides a feasible workaround to H.B. 454's restrictions, it effectively prohibits the most common second-trimester abortion method, the D&E. In the balance against these burdens, we weigh the minimal benefits that H.B. 454 provides with respect to the Commonwealth's asserted interests. These benefits are vastly outweighed by the burdens imposed by H.B. 454.[9] Thus, H.B. 454 unduly burdens the right to choose, in violation of the Fourteenth Amendment.

Should H.B. 454 be allowed to go into effect, it would cause Plaintiffs' patients to suffer "'continuing irreparable injury' for which there is no adequate remedy at law." *Baird*, 438 F.3d at 602 (quoting *Kallstrom*, 136 F.3d at 1067). The Secretary does not dispute the district court's determinations as to any of the other elements of the permanent injunction analysis. In any event, those arguments would be without merit.

---

[9]The Secretary takes issue with the district court's interpretation of *Hellerstedt* as establishing that a regulation constitutes an undue burden when the burdens it imposes exceed its benefits. The Secretary argues that a regulation constitutes an undue burden only when the burdens it imposes *substantially* outweigh its benefits. But we need not decide this question today. H.B. 454 fails under any version of the undue burden analysis because it provides minimal benefit while imposing substantial burdens on the right to elect an abortion prior to viability.

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 30 of 47 PageID #: 5864
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 27   (30 of 47)

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 27

### Summary

Because the burdens imposed by H.B. 454 dramatically outweigh any benefit it provides, H.B. 454 unduly burdens an individual's right to elect to have an abortion prior to viability. Thus, H.B. 454 violates the Fourteenth Amendment. We affirm.

### II.

We turn, then, to the appropriate relief. Plaintiffs sought—and the district court granted—facial relief in the form of a declaration that H.B. 454 is unconstitutional and a permanent injunction against the enforcement of H.B. 454. *Meier*, 373 F. Supp. 3d at 826. Facial relief is available when a challenged law places a substantial obstacle in the path of an individual's access to abortion prior to viability in "a large fraction of cases in which [the provision at issue] is relevant." *Hellerstedt*, 136 S. Ct. at 2320 (alteration in original) (emphasis omitted) (quoting *Casey*, 505 U.S. at 895). The Secretary argues that the district court wrongly declared H.B. 454 facially unconstitutional.

In place of a facial challenge, the Secretary asserts, Plaintiffs' claims are better handled through as-applied challenges. *Gonzales* explained that as-applied challenges are "the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used." 550 U.S. at 167. Based on this, the Secretary contends that situations where fetal-demise procedures are not feasible due to "side effects, failed injections, contraindications, the inability to perform fetal death procedures on certain women, and the alleged inability to perform digoxin injections before 18 weeks" are such "discrete and well-defined instances" that the individuals who face them should instead bring as-applied challenges. (Def. Br. at 61–62.)

But this set of circumstances is not "discrete and well-defined," because individuals cannot anticipate whether they will suffer from side effects or failed injections. As Plaintiffs point out, those in the midst of failing procedures or suffering from side effects cannot rewind time and litigate an as-applied challenge because they will "already have suffered the very harm the Constitution prohibits Kentucky from inflicting on [them]." (Pls. Br. at 62.) Nor are H.B. 454's burdens limited to those who find themselves in the situations the Secretary describes—

No. 19-5516     *EMW Women's Surgical Center, et al. v. Friedlander, et al.*     Page 28

others will be exposed to added emotional and logistical burdens, to potentially dangerous and experimental procedures, and to the risk that their fetal-demise procedure may go awry.

In his broader challenge to the district court's award of facial relief, the Secretary contends that the district court used the wrong denominator to decide whether H.B. 454 unduly burdens a large fraction of individuals. As the Supreme Court has explained, "the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" *Hellerstedt*, 136 S. Ct. at 2320 (alterations in original) (quoting *Casey*, 505 U.S. at 895). The district court determined that the relevant denominator was all individuals seeking a D&E during the time frame in which that procedure is typically administered. *Meier*, 373 F. Supp. 3d at 824–25; *accord, e.g.*, *Williamson*, 900 F.3d at 1326; *Bernard*, 392 F. Supp. 3d at 963; *Paxton*, 280 F. Supp. 3d at 952; *Hopkins*, 267 F. Supp. 3d at 1067. The Secretary argues that the denominator should also include individuals contemplating an abortion even before the point in pregnancy when D&Es are performed, because they might choose to get an abortion prior to thirteen weeks, rather than have to undergo a fetal-demise procedure. We disagree. The question is not whether an individual seeking an abortion might consider H.B. 454 relevant, but whether H.B. 454 actually applies to restrict her. H.B. 454 is not responsible for preventing someone from having a D&E before the point that D&Es are performed; therefore, H.B. 454 does not actually restrict such individuals and they are not properly considered in the denominator.

The question then becomes what portion of this population would be unduly burdened by H.B. 454. The Secretary complains that the district court did not adequately define or estimate the number of individuals who would be unduly burdened by H.B. 454. To the contrary, the district court did estimate the number of relevant individuals who would be burdened: its estimate was 100%. *Meier*, 373 F. Supp. 3d at 824. The Secretary counters that H.B. 454 at most unduly burdens those who suffer from "side effects, failed injections, and conditions that make fetal-demise procedures more difficult (obesity, fibroids, etc.) or impossible (contraindications)." (Def. Br. at 59.) He asserts that this population is relatively small and does not make up 100% of the population seeking a D&E.

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 29

Again, we disagree.  H.B. 454 does not burden only those who suffer from side effects, failed indications, and the aforementioned conditions.  *All* individuals who seek a D&E abortion in the second trimester must undergo a fetal-demise procedure.  For some, these procedures may not be possible, and H.B. 454 may prevent them from receiving a D&E altogether.  They would surely be unduly burdened.  Some more may discover, mid-procedure, that an injection has failed, that the umbilical cord cannot be located, or that some other complication occurred.  They, too, would be unduly burdened by the medical harm the procedure causes or by being compelled to undergo additional, untested medical procedures to induce fetal demise.  But all those required to undergo a fetal-demise procedure will be compelled to expose themselves to the negative consequences to their health, to invest additional time in the procedure, and to subject themselves to an additional invasive and potentially experimental procedure.  Thus, the district court correctly found that 100% of the relevant population would be unduly burdened by this law.

The dissent, for its part, presents a new argument on the Secretary's behalf.  It says that "H.B. 454 will not operate as a substantial obstacle to those women who prefer digoxin injections."  This argument is meritless, even if we could set aside the lack of factual findings on this issue and assume that some individuals may indeed prefer to undergo a fetal-demise procedure before a D&E.  An obstacle is an obstacle, regardless of whether some might be willing to overcome it.  Even those who may be willing to subject themselves to a fetal-demise procedure are exposed to the medical risks, uncertain consequences, potential unavailability, and time and emotional burden that procedure entails.

The Secretary next asserts that in order for H.B. 454 to constitute an undue burden, "practically all" of the individuals affected must face a substantial obstacle to abortion access.  (*Id.* at 40–41, 58 (quoting *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 369 (6th Cir. 2006)); Def. Reply Br. at 29.)  As explained, H.B. 454 unduly burdens not just "practically" all, but actually all of the individuals affected, and so this argument is factually meritless.

This argument is also legally meritless.  In *Cincinnati Women's Services*, this Court explained that it "has previously found that a large fraction exists when a statute renders it nearly impossible for the women actually affected by an abortion restriction to obtain an abortion."  468

F.3d at 373 (citing *Voinovich*, 130 F.3d at 201). It did not suggest that this is the *only* circumstance in which we will find that a large fraction exists. And the "practically all" language that the Secretary cites comes from this Court's suggestion that "*[o]ther circuits . . .* [have] only found a large fraction when practically all of the affected women would face a substantial obstacle." *Id.* (emphasis added). In fact, *Cincinnati Women's Services* avoided identifying a threshold at which this Court might find that a "large fraction" of individuals are unduly burdened, but it implied that threshold could be even less than a majority of women affected. *See id.* at 374. The Court explained that "a challenged restriction need not operate as a *de facto* ban for all or even most of the women actually affected," but "the term 'large fraction' which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here." *Id.* There can be no question that H.B. 454 burdens considerably more than the fraction at issue in *Cincinnati Women's Services.*

The Secretary further argues that the district court did not properly address his contention that there is no burden because "affected women can simply travel to other nearby clinics" outside of Kentucky. (Def. Br. at 60–61.) On this point, the Secretary attempts to "incorporate[] his arguments" from *E.M.W. Women's Surgical Center, P.S.C. v. Meier*, No. 18-6161 (6th Cir. argued Aug. 8, 2019), which is currently pending before a panel of this Court. He claims that "five circuit judges agree with [him] on this point." (*Id.* at 61 n.9 (citing *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 933–34 (7th Cir. 2015) (Manion, J., dissenting); *Whole Woman's Health v. Cole*, 790 F.3d 563, 596–98 (5th Cir. 2015) (per curiam), *rev'd on other grounds by Hellerstedt*, 130 S. Ct. at 2292; *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 461–67 (5th Cir. 2014) (Garza, J., dissenting)).)

We reject the Secretary's argument out of hand. This Circuit has firmly established that, on appeal, parties may not even "incorporat[e] by reference . . . arguments made at various stages of the proceeding in the district court." *Northland Ins. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003). They certainly may not incorporate arguments made in altogether different proceedings. And the authorities the Secretary cites in support of his proposition are of no assistance. The only majority decision supporting his point has been overturned by the Supreme Court, and dissenting opinions from out-of-circuit cases are of no weight in our analysis.

Case 3:18-cv-00224-JHM-RSE  Document 139  Filed 06/02/20  Page 34 of 47 PageID #: 5868
Case: 19-5516  Document: 53-2  Filed: 06/02/2020  Page: 31  (34 of 47)

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 31

Moreover, many more circuit judges—indeed, many more circuit courts, including the majority in two of the cases the Secretary cites—have rejected this argument.  *See, e.g.*, *Azar*, 925 F.3d at 1332 ("The undue-burden framework has never been thought to tolerate any burden on abortion the government imposes simply because women can leave the jurisdiction."); *Schimel*, 806 F.3d at 918–19 (rejecting as "untenable" the proposition that "the harm to a constitutional right [can be] measured by the extent to which it can be exercised in another jurisdiction" (alteration in original) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011))); *Currier*, 760 F.3d at 449 (holding that a state "may not shift its obligation to respect the established constitutional rights of its citizens to another state").  As the Supreme Court explained in *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938), obligations are "imposed by the Constitution upon the States severally as governmental entities—each responsible for its own laws establishing the rights and duties of persons within its borders."  States may not shift the burden of their constitutional obligations to other states, "and no State can be excused from performance by what another State may do or fail to do."  *Id.*

As a last attempt to save H.B. 454, the Secretary contends that this Court should tailor its remedy by granting only limited injunctive relief.  The Secretary asks this Court to "take[] a scalpel-like approach" and carve out H.B. 454's unconstitutional applications from its purported constitutional applications, leaving intact some skeleton of the prior Act.  (Def. Br. at 62.)  This argument fails for several reasons.  First, the Secretary did not make this argument before the district court, and so it is not preserved for our review.  *See, e.g.*, *Big Dipper Entm't v. City of Warren*, 641 F.3d 715, 719–20 (6th Cir. 2011).  But even if he had made this argument, we cannot "rewrit[e] state law to conform it to constitutional requirements."  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)).  Specifically, we are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent."  *Stenberg*, 530 U.S. at 944 (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)).  H.B. 454 does not even mention the fetal-demise procedures that the Secretary claims provide ready workarounds to its otherwise-complete prohibition of D&E abortions.  It certainly cannot be construed to require those procedures in only the specific situations the Secretary identifies.  And even if it

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 32

could be, our undue burden analysis suggests that H.B. 454 unduly burdens one's right to elect an abortion prior to viability even in those situations.

### Summary

H.B. 454 imposes an undue burden on not just a large fraction, but all of the individuals it restricts, and so facial relief is appropriate. We cannot rewrite H.B. 454 in order to limit that relief to certain especially unconstitutional applications of the law. Accordingly, we affirm the district court's grant of facial relief in the form of a permanent injunction.

### CONCLUSION

For these reasons, we **AFFIRM** the district court's decision.

Case 3:18-cv-00224-JHM-RSE   Document 139   Filed 06/02/20   Page 36 of 47 PageID #: 5870
Case: 19-5516   Document: 53-2   Filed: 06/02/2020   Page: 33   (36 of 47)

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 33

-------------------

**DISSENT**

-------------------

JOHN K. BUSH, Circuit Judge, dissenting.  This case concerns a statute, H.B. 454, that affects women's rights to abortions under the Fourteenth Amendment.  What's odd about this case—but not unusual in the abortion context—is that not a single person whose constitutional rights are directly impacted by the law is a party to the case.  What's even odder—but again, not uncommon in abortion litigation—is that none of those individuals even testified at trial.  In many cases the absence of the very people that the case is about would be the end of the matter: the case would be dismissed for lack of standing.  But in abortion cases, courts have held that the absence of the constitutionally-affected parties does not matter.  In such cases the interests of the abortion providers who bring the suit are deemed to be aligned with those of the affected parties, their patients.

Here, however, there is a potential conflict of interest between Plaintiffs and their patients: for whatever reason—be it financial, litigation strategy, or otherwise—EMW's physicians have refused to obtain the necessary training to perform fetal demise,  even though uncontroverted studies presented at trial show that many, and perhaps a substantial majority, of women would choose fetal demise before undergoing a D&E procedure.  Such women may favor the effect of H.B. 454, which would, among other things, require EMW's doctors to be trained in fetal demise if they are to perform the D&E procedure.  Contrary to this patient preference, EMW's doctors simply do not want to provide fetal demise before a D&E procedure, and their opposition to fetal demise creates a potential conflict of interest that deprives them of standing to bring this facial challenge against H.B. 454.

Plaintiffs are two abortion providers and an abortion clinic.  Their only claims for relief rest on the premise that H.B. 454 "violates Plaintiffs' patients' right to liberty . . . privacy . . . [and] bodily integrity guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution."  Plaintiffs' claim is thus based solely on the rights of their patients, because abortion providers "do not have a Fourteenth Amendment right to perform abortions."  *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019) (en banc).  The

No. 19-5516     *EMW Women's Surgical Center, et al. v. Friedlander, et al.*     Page 34

Majority holds that Plaintiffs have third-party standing to sue on behalf of their patients, but it does not sufficiently fulfill our "independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).[1]

Oral argument in this case highlighted why Plaintiffs do not have standing because of the potential conflict of interest identified above. Plaintiffs' counsel was asked what EMW's physicians would do if a patient asked for fetal demise before a D&E. The answer of Plaintiffs' counsel made clear that the physicians would do nothing to honor this request and that her only option would be to travel out of state for the procedure. This admission and the evidence presented at trial demonstrate a potential conflict of interest that destroys Plaintiffs' standing to bring this facial constitutional challenge against H.B. 454.

## I.

Whether a plaintiff has standing to bring suit is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Examination of the standing issue "involves two levels of inquiry." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987). The first is "of a constitutional dimension" and involves determining whether the plaintiff has suffered an injury in fact that is likely to be redressed by a favorable decision. *Id.* (citing *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). The second is "prudential" and concerns whether "the plaintiff is the proper proponent of the rights on which the action is based." *Id.* (citing *Singleton v. Wulff*, 428 U.S. 106, 112 (1976)).

---

[1] Defendants challenged Plaintiffs' standing before the district court, (R. 108 at PageID 5034–35), but even if they had not, and contrary to the Majority's assertion, we would not be relieved of our duty to ensure that standing requirements have been met. *See Cmty. First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994) (holding that there is "no authority for the plaintiffs' argument that prudential standing requirements may be [forfeited] by the parties" and declining to "recogniz[e] a distinction between prudential and constitutional standing requirements in this context"); *see also Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("[I]n this circuit we treat prudential standing as akin to jurisdiction, an issue we may raise on our own"); *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 747 (7th Cir. 2007) ("[N]onconstitutional lack of standing belongs to an intermediate class of cases in which a court can notice an error and reverse on the basis of it even though no party has noticed it"); *Thompson v. Cty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994) (holding that "we have an independent obligation to examine . . . [prudential] standing under arguments not raised below"). In creating a distinction between Article III standing and prudential standing in the forfeiture context, the Majority opinion conflicts with the clear weight of the law, including precedent from this court. (*See* Majority Op. at n.2).

No. 19-5516      *EMW Women's Surgical Center, et al. v. Friedlander, et al.*      Page 35

Relevant to the second inquiry, the Supreme Court has held that generally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of [other] parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citing *Tileston v. Ullman*, 318 U.S. 44 (1943) (per curiam)).  There is a "limited . . . exception" to this general rule when the third party can show: (1) that the third party has "a 'close' relationship with the person who possesses the right," and (2) that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (citation omitted).[2]

In *Singleton v. Wulff*, a case involving a challenge to limits on Medicaid funding for abortions in Missouri, a plurality of the Supreme Court held that the plaintiff-physicians satisfied the closeness and hindrance requirements for third-party standing.  428 U.S. at 118.  The plurality explained that the close relationship between doctors and patients was "patent" since a woman cannot "safely secure an abortion without the aid of a physician." *Id.* at 117.  And a woman faced multiple hindrances to challenging the Missouri law, including "a desire to protect the very privacy of her decision [to abort] from the publicity of a court suit" and "the imminent mootness . . . of any individual woman's claim" when she is no longer pregnant. *Id.*  While the plurality acknowledged that these obstacles are "not insurmountable," it nevertheless concluded "that it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Id.* at 117–18.

---

[2] Although I am bound by this court's and the Supreme Court's precedent that third-party standing is a question of prudential jurisdiction, I note that constitutional considerations also underlie my conclusion that Plaintiffs lack standing in this case. *See Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 127 n.3 (2014) (reserving the question of whether third-party standing should be treated as a component of Article III jurisdiction).  I have my doubts that an injury can be "particularized" enough to constitute an injury in fact when the alleged injury belongs solely to a third party, as it does here. *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 n.1 (1992) ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.").  Due process concerns also drive my decision.  Plaintiffs are essentially seeking to act as a representative for a class of all their patients affected by H.B. 454.  The Due Process Clause requires "that the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43, 45, 85 L. Ed. 22, 61 S. Ct. 115 (1940)).  As in the class action context, it would be inequitable, and perhaps deleterious to due process rights, to allow a putative representative for a group of people to proceed with litigation in a representative capacity when those who are purportedly represented may not desire the relief that the putative representative seeks. *See Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 80 (1978) (citation omitted) (holding that third-party standing should be limited to "avoid[] . . . the adjudication of rights which those not before the Court may not wish to assert").

Since *Wulff* was decided, we and our sister circuits have routinely conferred third-party standing on abortion providers without engaging in a serious analysis of whether the plaintiffs have satisfied the closeness and hindrance requirements.[3]  But, we should not read *Wulff* so broadly to confer third-party standing virtually any time an abortion provider seeks to invalidate an abortion regulation.  First, only a plurality of the *Wulff* Court, not a majority, held that the providers had third-party standing.  But more critically, *Wulff* was a case in which the interests of the plaintiffs and the rights-holders were parallel, because both providers and patients had an interest in removing state funding limits on abortion.  *Wulff* is not applicable in a case like this, where providers have a potential conflict of interest with many, if not most, of their patients, and the closeness requirement of *Kowalski* is thus not satisfied.

To be sure, *Wulff* and cases following that decision emphasize the doctor-patient relationship as the basis for abortion providers to have third-party standing to assert their patients' constitutional rights.  "But a close personal relationship" such as between a doctor and a patient "is neither necessary nor sufficient for third party standing."  *Amato v. Wilentz*, 952 F.2d 742, 751 (3d Cir. 1991).  "Even a close relative will not be heard to raise positions contrary to the interests of the third party whose rights he or she claims to represent: the litigant would then hardly be a vigorous advocate of the third party's position."  *Id.* at 751–52.  For example, in *Gilmore v. Utah*, 429 U.S. 1012 (1976), the mother of a man convicted of murder lacked third-party standing to seek a stay of her son's execution where he "himself knowingly and intelligently . . . waive[d]" his right to appeal.  *Amato*, 952 F.2d at 752 (citing *Gilmore*, 420 U.S. at 1013).

---

[3]*See, e.g.*, *Planned Parenthood Ass'n of Cincinnati, Inc.*, 822 F.2d at 1396 n.4 (citing *Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir. 1986)) ("[T]he Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases."); *Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 223 (6th Cir. 1991); *see also Planned Parenthood of N. New Eng. v. Heed*, 390 F.3d 53, 56 n.2 (1st Cir. 2004), *vacated sub nom. Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1347–48 (2d Cir. 1989); *Am. Coll. Of Obstetricians & Gynecologists, Penn. Section v. Thornburgh*, 737 F.2d 283, 289 n.6 (3d Cir. 1984), *aff'd sub nom. Thornburgh v. Am. Coll. Of Obstetricians & Gynecologists*, 476 U.S. 747 (1986); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 194 n.16 (4th Cir. 2000); *Margaret S.*, 794 F.2d at 997; *Planned Parenthood of Wis. v. Schimel*, 806 F.3d 908, 910–11 (7th Cir. 2015); *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 757 n.7 (8th Cir. 2018); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916–18 (9th Cir. 2004); *Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller*, 934 F.2d 1462, 1465 n.2 (11th Cir. 1991).

Plaintiffs have the burden of establishing that they satisfied all of the requirements for Article III and prudential standing, including the closeness requirement for third-party standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citing Fed. R. Civ. Pro. 56(e)) (holding that "the party invoking federal jurisdiction bears the burden of . . . 'set[ting] forth' by affidavit or other evidence 'specific facts'" supporting their claim to standing); *Amato*, 952 F.2d at 750 ("[W]e will bear in mind that third party standing is exceptional: the burden is on the [plaintiff] to establish that it has third party standing, not on the defendant to rebut a presumption of third party standing."). Plaintiffs failed to satisfy their burden. None of Plaintiffs' patients, with whom they claim a close relationship, testified at trial. Indeed, Plaintiffs did not even invoke a specific patient's rights. Instead, Plaintiffs relied on their "relationship[s] with as yet unascertained" patients. *Kowalski*, 543 U.S. at 131. Such "hypothetical . . . relationship[s]" do not satisfy *Kowalski*'s closeness requirement. *See id.*

What is more, the evidence presented at trial shows that although Plaintiffs have an interest in challenging H.B. 454, a substantial majority of their patients may very well favor the effect of H.B. 454 because they prefer fetal demise prior to a D&E. Such a potential conflict of interest precludes a finding of closeness. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (holding that the plaintiff lacked standing because the interests of the plaintiff and the right-holder were "potentially in conflict"); *Mercer v. Michigan State Bd. of Educ.*, 419 U.S. 1081 (1974), *aff'g* 379 F. Supp. 580 (E.D. Mich. 1974) (affirming a district court decision that denied a public school teacher standing to assert the rights and parents, when the district court could not determine "whether or not any parents or students desire these laws to be changed.").[4]

---

[4]"The extent of potential conflicts of interest between the plaintiff and the third party whose rights are asserted matters a good deal. While it may be that standing need not be denied because of a slight, essentially theoretical conflict of interest, we have held that genuine conflicts strongly counsel against third party standing." *Amato*, 952 F.2d at 750 (citing *Polaroid Corp. v. Disney*, 862 F.2d 987, 1000 (3d Cir. 1988)); *accord Pony v. Cty. of Los Angeles*, 433 F.3d 1138, 1147 (9th Cir. 2006) (citations omitted) ("A litigant is granted third-party standing because the tribunal recognizes that her interests are aligned with those of the party whose rights are at issue and that the litigant has a sufficiently close connection to that party to assert claims on that party's behalf."); *Harris v. Evans*, 20 F.3d 1118, 1124 (11th Cir. 1994) (en banc) ("Courts have repeatedly emphasized that the key to third-party standing analysis is whether the interests of the litigant and the third party are properly aligned, such that the litigant will adequately and vigorously assert those interests."); *Canfield Aviation, Inc. v. National Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988) (citing *Wulff*, 428 U.S. at 114–15) ("When examining [whether a plaintiff has third-party standing], courts must be sure . . . that the litigant whose rights he asserts have interests which are aligned").

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 38

Dr. Thorp, a professor in the School of Medicine at the University of North Carolina, testified at trial that in one study examining women's preferences for fetal demise procedures, "73 percent . . . reported that if given the choice, they prefer to receive digoxin before the D&E procedure." (R.102 at PageID 3756)  In another study, the Jackson study, 92 percent of women "reported a strong preference for fetal death before abortion."  (R. 102 at PageID 3734)  Dr. Curlin, a professor in the School of Medicine at Duke University, testified:

> We know from studies of women who are undergoing abortion that they are conscious of what is happening to their fetus and that for many that's quite disturbing, and I think [the Jackson study] gives some not very surprising evidence that at least a substantial portion of women would prefer that something be done so that that fetus has died before it's dismembered.

(R. 104 at PageID 4309).

Even the study that Plaintiffs presented admitted that "several studies have reported a preference for feticide before evacuation." (R. 106 at PageID 4448).  Another study cited by Plaintiffs stated, "Majority of subjects, 73 percent, reported that, if given the choice, they preferred to receive digoxin before the D&E procedure." (R. 106 at PageID 4497).  Granted, these studies are only circumstantial evidence of the preferences of EMW's patients, but they were the *only* evidence of such preference presented at trial because, as noted, none of those patients testified.

The reasons why a woman would make the choice for fetal demise were demonstrated at trial.  Dr. Anthony Levantino testified that in a D&E procedure, the "[f]etus dies from dismemberment from literally having arms and legs pulled off"; "[it] bleed[s] to death." (R. 102 at PageID 3710).  Another physician, Dr. David Berry, described a D&E procedure in which the doctor "pulled out a spine and some mangled ribs and the heart was actually still beating." (R. 103 at PageID 3884).  It is not difficult to understand why a majority of women would want the heart to stop beating before the fetus undergoes such an ordeal.  As the Supreme Court has recognized, "No one would dispute that, for many, D&E is a procedure itself laden with the power to devalue human life." *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007).  This is because "[t]he fetus, in many cases, dies just as a human adult or child would: It bleeds to death as it is torn limb from limb." *Stenberg v.* Carhart, 530 U.S. 914, 958–59 (2000) (Kennedy, J.,

dissenting) (citation omitted).[5]  Plaintiffs themselves acknowledged as much, given that they did not question "the legitimacy" of "interests" that would favor stopping the heartbeat before D&E begins.  *EMW Women's Surgical Center, P.S.C. v. Meier*, 373 F. Supp. 3d 807, 817 (W.D. Ky. 2019).

These interests exist regardless of whether the unborn life feels any pain from the D&E procedure.  These interests also are significant enough that a woman, even after hearing of the health risks involved, might opt for fetal demise simply to be assured that the fetus was not alive when its limbs were torn apart.[6]

Plaintiffs, however, have interests that do not align with those women who want fetal demise before D&E.  For example, EMW's physicians do not want to receive the training needed to give the injections, even though the evidence at trial was that injections are not difficult to administer, training to perform the procedure is available, and such injections are within the reasonable medical scope of care.

The district court stated that digoxin injections can be "difficult, if not impossible, to administer," *Meier*, 373 F. Supp. 3d at 838, but this statement was contradicted by the district

---

[5]The gruesomeness of the D&E procedure is a reason that many abortion patients may prefer to avoid it altogether by having the abortion performed by aspiration earlier in the pregnancy, before limbs have begun to form.  *See Pre-Term Cleveland, et al. v. Attorney Gen. of Ohio, et al.*, No. 20-3365, 2020 WL 1673310, at *4 (6th Cir. Apr. 6, 2020) (Bush, J., concurring in part and dissenting in part) (noting that one factor to be considered in assessing the constitutionality of a COVID-19 emergency order delaying abortion procedures is "the preference of many women for having the abortion while the aspiration method can be performed, rather than the dilation & evacuation procedure that is required for later abortions.").  H.B. 454 imposes no requirement of fetal demise before an abortion by the aspiration method may be performed.

[6]Although the district court found that digoxin injections can carry significant health risks, the court did not find that the health risks are so significant that most or even some women, if made known of the health risks, would forgo a fetal demise procedure.  There is evidence in the record demonstrating that many or most women would decide that the value of a digoxin injection, at least in terms of peace of mind that the fetal heart is no longer beating when D&E occurs, outweighs the health risks of the injection.  The Steward study, for example, found that of 4,096 patients who received digoxin injections, only 0.04 percent—or 4 in 10,000—had infections, and only .3 percent—or 3 in 1,000—experienced extramural delivery.  (R. 102 at PageID 3741).  The Tocce study of 1,662 patients, which involved transvaginal, rather than transabdominal, digoxin injections (as in the Steward study), involved a higher rate of health risk, but not by much: 0.49 percent for infection and 0.12 for extramural delivery.  (R. 102 at PageID 3744).  In any event, it is not necessary in assessing an abortion provider's third-party standing to make a factual finding as to the number of patients who actually would choose fetal demise if informed of the health risks.  What matters is whether there is a *potential* that a patient would do so, for as noted, third-party standing is defeated if the interests of the plaintiff and the right-holder are merely "*potentially* in conflict."  *Newdow*, 542 U.S. at 15 (emphasis added).  The evidence demonstrates that there is a potential conflict here.

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 40

court's factual finding that digoxin injections "are not terribly difficult to perform, as it can also be administered into the amniotic fluid." *Id.*   One study introduced into evidence concluded that "[i]n our clinical experience where patients do not receive intravenous sedation, we have found it easy to administer intrafetal injection[s]," (R. 102 at PageID 3758), and in another study presented at trial, even medical residents performed them, (R. 102 at PageID 3733–34).

Evidence was also presented that it is possible for EMW's doctors to receive training to perform digoxin injections.   Dr. Franklin, one of EMW's doctors, acknowledged that digoxin injections are "very similar to amniocentesis, which I have done in the past," and she admitted that she "technically . . . would be able to" obtain the training to perform the injections.  (R. 107 at PageID 4716).  Dr. Bergin, EMW's other doctor, similarly testified that "probably with proper training I could learn to do" digoxin injections.  (Trial Ex. 420 at 117)

Finally, Dr. Davis—whom EMW called as an expert but did not hire as one of their physicians—acknowledged that an intrafetal or intraamniotic digoxin injection is within the standard of care for an OB/GYN to perform; indeed, she herself had performed such injections. (R. 106 at PageID 4460).  Likewise, the National Abortion Federation states in its 2018 Clinical Policy Guidelines for Abortion Care that an intraamniotic or intrafetal digoxin injection is a permissible option for accomplishing fetal death before a D&E procedure. (R. 106 at PageID 4514–15).   Another study funded by a Planned Parenthood affiliate reported that Planned Parenthood's clinics in Los Angeles, California had "protocols" that "dictate[d] the use of digoxin for all second trimester abortions."  (R. 102 at PageID 3755–56).

Notwithstanding this evidence, and proof that even Plaintiffs' own physician experts regularly inject digoxin and do so intrafetally, the Plaintiff-physicians have refused to obtain the necessary training to do the injections or to hire a physician like Dr. Davis who has that training. As noted, when questioned at oral argument as to what EMW's doctors would do if a woman asked for a digoxin injection before a D&E procedure, Plaintiffs' counsel responded that her only option would be to travel out of state to have her abortion.   And, indeed, there are practitioners in our circuit as close as southwestern Ohio, across the river from Kentucky, who perform digoxin injections. *See Planned Parenthood Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848, 857 (S.D. Ohio 2019) (listing doctors in southwestern Ohio who perform digoxin

No. 19-5516     *EMW Women's Surgical Center, et al. v. Friedlander, et al.*     Page 41

injections). But, given the evidence of the possibility of obtaining the necessary training to provide the injection, it is questionable why the EMW physicians insist that they cannot obtain this training or hire a doctor who does have that skill.

At the very least, the proof at trial reflects a potential conflict between the interests of the EMW physicians and some, perhaps the majority, of the patients that they seek to represent. All of the evidence presented at trial about patient preference circumstantially supports a finding that at least some—and potentially, most—of patients seen by Plaintiffs would favor the effect of H.B. 454 because those patients would want fetal demise before a D&E. The statute essentially requires that abortion providers at EMW receive the necessary training, which in turn would allow those women who prefer fetal demise to obtain it before the D&E procedure is performed.[7]

Because of this potential conflict of interest between Plaintiffs and many or most of their patients, I would hold that Plaintiffs have not shown that they have satisfied the closeness requirement necessary to invoke their patients' rights. *See Newdow*, 542 U.S. at 15.[8]

---

[7]That EMW's physicians say they will not obtain the training in fetal demise, and will stop performing D&E procedures altogether, if H.B. 454 is upheld, is no answer to their conflict-of-interest problem. The patients who want fetal demise are already being denied the D&E procedure they want in Kentucky because of Appellee's position that those patients must go out of state to have the procedure performed with fetal demise. Enactment of H.B. 454 may not immediately change this reality for these women who must go out of state. But, of course, parties to litigation may change their attitude towards a law once it is upheld in court, so if H.B. 454 is allowed to go into effect, EMW's physicians may decide to get the necessary training to comply with the law after all. In addition, in the period since the district court issued its injunction, another provider, Planned Parenthood, has obtained a license to perform abortions in Kentucky. *Planned Parenthood to Expand Abortion Access in Kentucky*, PLANNEDPARENTHOOD.ORG, http://plannedparenthood.org/planned-parenthood-indiana-kentucky/newsroom/planned-parenthood-to-expand-abortion-access-in-kentucky (last visited May 4, 2020). It is entirely possible that physicians at Planned Parenthood in Kentucky, like their counterparts in southwestern Ohio, *see Planned Parenthood Sw. Ohio Region*, 375 F. Supp. 3d at 857, will have the expertise to perform fetal demise. But regardless, so long as EMW's physicians refuse to obtain the necessary training and refuse to offer fetal demise to patients, they have a potential conflict of interest with their patients who want fetal demise.

[8]For similar reasons, I would also hold that a facial challenge is not the proper vehicle here. A facial challenge could be proper only if, "in a large fraction of the cases in which [H.B. 454] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 367 (6th Cir. 2006) (citation omitted). H.B. 454 will not operate as a substantial obstacle to those women who prefer digoxin injections. Given the potential for a D&E procedure to "devalue human life," *Gonzales*, 550 U.S. at 158, many women who are aware of the health risks involved might nonetheless opt for digoxin injections. For those women, requiring doctors to receive training to perform fetal demise would not be unconstitutional. To be sure, the district court did credit Plaintiffs' evidence that D&E abortions will no longer be performed in Kentucky if H.B. 454 goes into effect, and I do not dispute that that fact, if true, would cause H.B. 454 potentially to unduly burden women that do not prefer fetal demise. *Meier*, 474 F. Supp. 3d at 824. As-applied challenges may be brought by those women.

No. 19-5516        *EMW Women's Surgical Center, et al. v. Friedlander, et al.*        Page 42

None of the cases the Majority cites dictate the opposite result.  In *City of Akron*, the interests of the "minor patients" and abortion providers were largely parallel, as both wanted to abortions to proceed without involving parents in the decision.  *See City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 440 n.30 (1983), *overruled on other grounds by Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992).  *Danforth* and *Bolton* are also inapposite, because there, the Supreme Court did not analyze the closeness and hindrance requirements as *Kowalski* requires.  *See Planned Parenthood of Cent. Missouri v. Danforth*, 425 U.S. 52, 62 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973).  Instead, the Court held, without further analysis, that the plaintiff-physicians had standing because the statutes in question subjected them to potential criminal prosecution.  *Danforth*, 425 U.S. at 62; *Bolton*, 410 U.S. at 188.  While that may speak to the plaintiffs' standing to assert their own rights, it says nothing about the plaintiffs' third-party standing to assert the patients' rights.  Just because one may have an injury-in-fact—such that she has standing to assert her own rights—does not mean she has third-party standing to assert the rights of others.

*Kowalski* instructs that plaintiffs must satisfy the closeness and hindrance requirements in order to assert the rights of others in court.  *Kowalski*, 543 U.S. at 129–30.  Because Plaintiffs have not shown that they satisfy the closeness requirement in this case, I would hold that they lack third-party standing to sue on behalf of their patients.

## II.

Even if the Majority disagrees on the third-party standing analysis, they should nonetheless delay issuing an opinion in this case pending the Supreme Court's disposition of *June Medical Services*.  The Supreme Court granted certiorari in that case on October 4, 2019, and argument was held on March 4, 2020.  *See June Medical Servs. L.L.C. v. Gee*, 140 S. Ct. 35 (Mem.) (2019).  One of the questions raised in *June Medical Services* is whether abortion providers have third-party standing to invoke the constitutional rights of potential patients in challenging abortion laws.  We have broad discretion to stay proceedings to conserve judicial resources and avoid duplicative litigation, and we should exercise that discretion here.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

No. 19-5516     *EMW Women's Surgical Center, et al. v. Friedlander, et al.*     Page 43

We recently held in abeyance an appeal that raised an issue the U.S. Supreme Court granted certiorari to decide, pending the Supreme Court's disposition of that issue. *See United States v. Lara*, 679 F. App'x 392, 395 (6th Cir. 2017) ("Because our decision turns on precedent for which the Supreme Court has recently granted certiorari, we hold Lara's challenge in abeyance pending resolution of that issue."). Other circuits have done the same. *Mandel v. Max-France, Inc.*, 704 F.2d 1205, 1206 (11th Cir. 1983) (appeal held in abeyance pending Supreme Court decision); *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 47 (2d Cir. 2014) (same); *Golinski v. U.S. Office of Pers. Mgmt.*, 724 F.3d 1048, 1050 (9th Cir. 2013) (same); *Does v. Williams*, No. 01-7162, 2002 WL 1298752, at *1 (D.C. Cir. June 12, 2002) (per curiam) (same). Indeed, the Fifth Circuit held in abeyance a case with substantially similar facts to this case, pending the Supreme Court's disposition of *June Medical Services*. *See Whole Woman's Health, et al. v. Ken Paxton, et al.*, No. 17-51060, Doc. No. 00514871170. The majority's decision to issue an opinion just before the Supreme Court potentially decides an outcome-determinative issue in our case seems to me an unwise use of judicial resources.

For these reasons, I must respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-5516

EMW WOMEN'S SURGICAL CENTER, P.S.C., on behalf
of itself, its staff, and its patients; ASHLEE BERGIN, M.D.,
M.P.H. and TANYA FRANKLIN, M.D., M.S.P.H., on behalf
of themselves and their patients,

      Plaintiffs - Appellees,

      v.

ERIC FRIEDLANDER, in his official capacity as Acting
Secretary of Kentucky's Cabinet for Health and Family
Services,

      Defendant - Appellant.

```
┌─────────────────────────────┐
│           FILED             │
│        Jun 02, 2020         │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before:  MERRITT, CLAY, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk